DEWEY PEGNO & KRAMARSKY LLP
220 East 42nd Street
New York, New York 10017
Thomas E.L. Dewey (TD-6243)
Keara A. Bergin (KB-0831)
(212) 943-9000
*Attorneys for Defendants and Counterclaimants*

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES BURKE and BRADLEY L. GROW, as the designated Sellers' Representatives, etc., <br><br> Plaintiffs, <br><br> -against- <br><br> HESTIA HOLDINGS, LLC, EATERIES, INC. and FIESTA HOLDINGS, INC., <br> Defendants. | Civ. No. 07-9909 (HB) <br><br> **ANSWER AND COUNTERCLAIMS** <br><br> **(Jury Trial Demanded)** |
| HESTIA HOLDINGS, LLC, EATERIES, INC. and FIESTA HOLDINGS, INC., <br><br> Counterclaimants, <br><br> -against- <br><br> JAMES BURKE and BRADLEY L. GROW, as the designated Sellers' Representatives, EATERIES HOLDINGS, LLC, THE BURKE FAMILY, LLC, BRADLEY L. GROW, THE GROW FAMILY LLC, THE BRADLEY L. GROW REVOCABLE TRUST, VINCENT F. ORZA, PATRICIA L. ORZA, PATRICIA LANDI ORZA TRUST, ALEXANDRA MARIA ORZA TRUST, PATRICIA L. ORZA TRUST, VINCENT F. ORZA JR. TRUST, J.B. EDWARDS, DOUG DAVIS, PHILLIPS, MCFALL, MCCAFFREY, MCVAY & MURRAH 401K PROFIT SHARING PLAN, D. KEITH MCFALL, and BILL TOTTY, <br><br> Counterclaim Defendants. | |

Defendants Hestia Holdings, LLC ("Hestia"), Eateries, Inc. ("Eateries") and Fiesta Holdings, Inc. ("Fiesta Holdings") (collectively "Defendants"), by and through their undersigned counsel, hereby answer the Complaint in this matter as follows:

## JURISDICTION AND VENUE

1.      Defendants lack information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 1.

2.      Defendants lack information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 2.

3.      Defendants admit the allegations set forth in Paragraph 3 of the Complain.

4.      Defendants admit the allegations in Paragraph 4 of the Complaint.

5.      Defendants admit the allegations in Paragraph 5 of the Complaint.

6.      Defendants state that the allegations in Paragraph 6 are legal conclusions to which no response is required, and respectfully refer the Court to the document referenced in Paragraph 6 for its contents.

7.      Defendants state that the allegations in Paragraph 7 are legal conclusions to which no response is required.

8.      Defendants state that the allegations in Paragraph 8 are legal conclusions to which no response is required, but admit that Section 13.3 of the Agreement and Plan of Reorganization and Merger, dated as of December 29, 2006 (the "Merger Agreement"),[1] provides for the jurisdiction and venue of courts located in the Borough of Manhattan for any dispute arising out of the Merger Agreement, and respectfully refer the Court to the Merger Agreement for its contents.

---

[1] Capitalized terms have the definitions set forth in the Merger Agreement unless specifically set forth herein.

9.      Defendants state that the allegations in Paragraph 9 are legal conclusions to which no response is required, but admit that Section 13.3 of the Merger Agreement provides for venue in the courts of the Borough of Manhattan, and respectfully refer the Court to the Merger Agreement for its contents.

## COUNT ONE
### (Breach of Contract)

10.     Defendants repeat their answers to Paragraphs 1-7 of the Complaint as if fully set forth herein.

11.     Defendants deny the allegations set forth in Paragraph 11 of the Complaint, and respectfully refer the Court to the Merger Agreement for its contents.

12.     Defendants deny the allegations set forth in Paragraph 12 of the Complaint.

13.     Defendants deny the allegations set forth in Paragraph 13 of the Complaint, except admit that Defendants have not issued any Earnout Notes for the reasons set forth in the Counterclaims below.

14.     Defendants state that the allegations in Paragraph 14 are legal conclusions to which no response is required, except respectfully refer the Court to the Merger Agreement for its contents; Defendants deny that Plaintiffs are entitled to specific performance or to any relief.

15.     Defendants state that the allegations in Paragraph 15 are legal conclusions to which no response is required, except respectfully refer the Court to the Merger Agreement for its contents.

16.     Defendants deny each and every allegation not specifically admitted herein.

## FIRST AFFIRMATIVE DEFENSE

17.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

18.    Plaintiffs' claims are barred, in whole or in part, by Sellers' own material breach or breaches of the Merger Agreement, or otherwise by Sellers' own conduct.

## THIRD AFFIRMATIVE DEFENSE

19.    Plaintiffs' claims are barred by the doctrines of waiver and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

20.    Plaintiffs' claims are barred by their own and Sellers' culpable conduct, as described in detail in the Counterclaims set forth below.

## FIFTH AFFIRMATIVE DEFENSE

21.    Plaintiffs' claims are barred by the failure of a condition precedent.

## SIXTH AFFIRMATIVE DEFENSE

22.    Plaintiffs' claims are barred by the doctrine of unclean hands, as described in the Counterclaims set forth below.

## SEVENTH AFFIRMATIVE DEFENSE

23.    Plaintiffs' claims are barred for failure to join indispensable parties.

## EIGHTH AFFIRMATIVE DEFENSE

24.    Plaintiffs' claims are barred, in whole or in part, by Sellers' breaches of their duty of good faith and fair dealing.

## COUNTERCLAIMS

Hestia Holdings LLC ("Hestia"), Eateries, Inc. ("Eateries"), Fiesta  Holdings, Inc.

("Fiesta Holdings") (collectively "Counterclaimants") by their undersigned attorneys, as and for

their counterclaims against Counterclaim Defendants James Burke and Bradley Grow (in their

capacity as the designated Sellers' Representatives under that Agreement and Plan of

Reorganization and Merger dated December 29, 2006 (the "Merger Agreement")), Eateries

Holdings, LLC, The Burke Family LLC, Bradley L. Grow (in his individual capacity), The Grow

Family LLC, The Bradley L. Grow Revocable Trust, Vincent F. Orza, Patricia L. Orza, The

Patricia Landi Orza Trust, The Alexandra Marie Orza Trust, The Patricia L. Orza Trust, The

Vincent F. Orza Jr. Trust, J.B. Edwards, Doug Davis, The Phillips, McFall, McCaffrey, McVay

& Murrah 401K Plan, D. Keith McFall, and Bill Totty (collectively "Sellers" or "Counterclaim

Defendants"), allege, upon knowledge as to their own acts and upon information and belief as to

the acts of others, as follows:

## INTRODUCTION

1.      These counterclaims are brought to redress the pervasive scheme and conspiracy

by Sellers to manipulate the financial condition and financial statements of Sellers' restaurant

business (the "Restaurant Business"), which Sellers sold to Hestia pursuant to the Merger

Agreement (the "Sale"), in order to artificially inflate the proceeds Hestia paid Sellers in, and

Sellers retained from, the Sale, including the amounts of potential post-closing payouts.  To this

end, Sellers consistently engaged in numerous instances and types of financial wrongdoing,

provided false and misleading information to Hestia and its advisors, looted the assets of the

Restaurant Business and systematically concealed such activities from Hestia by, *inter alia*,

making affirmative misrepresentations and destroying documents and electronic records.

2.      In reliance on the financial information Sellers provided and on their representations in the Merger Agreement, Hestia paid over $30 million dollars for the Restaurant Business.  Hestia also agreed to provide additional payouts to Sellers after the closing of the Sale if certain financial conditions were met, which were to be determined based on accurate and GAAP-compliant financial statements of the Restaurant Business.  A true and correct copy of the Merger Agreement is attached hereto as Exhibit A.

3.      In fact, and unbeknownst to Hestia, the financial statements Sellers provided and represented as accurate and consistent with GAAP materially misstated the Restaurant Business's financial condition and results of operations due to Sellers' varied and extensive efforts to artificially inflate proceeds they received from the Sale.  Moreover, in conspiracy with JB Edwards, an individual Seller who acted as an accomplice to other Sellers and who remained as an employee of the Restaurant Business after the Sale, Sellers continued to implement their fraudulent schemes to extract funds from Counterclaimants even after the Sale.

4.      Through their false and misleading representations and their improper and unlawful practices, Sellers artificially inflated the condition and value of the Restaurant Business received post-closing payments to which they were not entitled, leaving Counterclaimants with a business worth far less than represented and causing substantial damages to Counterclaimants in uncovering and seeking to rectify Sellers' financial wrongdoing.

## PARTIES

5.      Counterclaimant Hestia Holdings, LLC ("Hestia") is a Delaware limited liability company.

6.      Counterclaimant Eateries, Inc. ("Eateries") is a Delaware corporation with its principal place of business in Texas.  Eateries is a wholly-owned subsidiary of Hestia.

7.     Counterclaimant Fiesta Holdings, Inc. ("Fiesta Holdings") is a Delaware corporation with its principal place of business in Texas. Fiesta Holdings is a wholly-owned subsidiary of Hestia, and is the sole member of Fiesta Holdings LLC.

8.     Upon information and belief, Counterclaim Defendant Bradley L. Grow is a citizen of Oklahoma. Prior to the Sale, Grow was Chief Financial Officer ("CFO") of the companies that were sold pursuant to the Merger Agreement, and was designated as one of the Sellers' Representatives pursuant to Section 12.1 of that Agreement. Grow was also, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

9.     Upon information and belief, Counterclaim Defendant James M. Burke is a citizen of Oklahoma. Prior to the Sale, Burke was the President of the companies that were sold pursuant to the Merger Agreement, and is designated as one of the Sellers' Representatives pursuant to Section 12.1 of that agreement.

10.    Upon information and belief, Counterclaim Defendant The Burke Family, LLC is an Oklahoma limited liability company. The Burke Family LLC was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

11.    Upon information and belief, Counterclaim Defendant The Grow Family LLC is an Oklahoma limited liability company. The Grow Family LLC was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

12.    Upon information and belief, The Bradley L. Grow Revocable Trust is a trust organized under the laws of the state of Oklahoma with its trustee, Bradley L. Grow, domiciled in Oklahoma. At all relevant times, The Bradley L. Grow Revocable trust was a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

13.     Upon information and belief, Counterclaim Defendant Vincent F. Orza ("Orza") is a citizen of the state of Oklahoma. Prior to the Sale, Orza was the Chairman of the companies that were sold pursuant to the Merger Agreement. Orza was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

14.     Upon information and belief, Counterclaim Defendant Patricia L. Orza ("Mrs. Orza"), Vincent F. Orza's wife, is a citizen of the state of Oklahoma. Mrs. Orza was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

15.     Upon information and belief, Counterclaim Defendant The Patricia Landi Orza Trust is a trust organized under the laws of the state of Oklahoma, with its trustee, Vincent F. Orza, domiciled in Oklahoma. The Patricia Landi Orza Trust was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

16.     Upon information and belief, Counterclaim Defendant Alexandra Marie Orza Trust is a trust organized under the laws of the state of Oklahoma, with its trustee, Vincent F. Orza, domiciled in Oklahoma. The Alexandra Marie Orza Trust was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

17.     Upon information and belief, Counterclaim Defendant Patricia L. Orza Trust is a trust organized under the laws of the state of Oklahoma, with its trustee, Vincent F. Orza, domiciled in Oklahoma. The Patricia L. Orza Trust was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

18.     Upon information and belief, Counterclaim Defendant The Vincent F. Orza, Jr. Trust is a trust organized under the laws of the state of Oklahoma, with its trustee, Vincent F.

Orza, domiciled in Oklahoma. The Vincent F. Orza Jr. Trust was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

19.    Upon information and belief, Counterclaim Defendant J.B. Edwards is a citizen of the state of Oklahoma. Edwards was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement. Edwards was also the Vice President of Finance of the companies that were sold pursuant to the Merger Agreement and, pursuant to an Employment Agreement, retained this position after the Sale.

20.    Upon information and belief, Counterclaim Defendant Doug Davis is a citizen of the state of Oklahoma. Davis was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

21.    Upon information and belief, Counterclaim Defendant D. Keith McFall is an individual who resides in the state of Oklahoma. McFall was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement. During all relevant times, McFall, a lawyer, represented himself and the other Sellers in the Sale and in connection with subsequent communications between Sellers and Counterclaimants. In addition, and in spite of his patent interest in the outcome of this litigation and the necessity of his testimony as a witness, McFall is a signatory to the Complaint and counsel of record in this lawsuit.

22.    Upon information and belief, Counterclaim Defendant Bill Totty is an individual who resides in the state of Oklahoma. Totty was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

23.    Upon information and belief, Counterclaim Defendant Phillips, McFall, McCaffrey, McVay & Murrah P.C. 401K Profit Sharing Plan is a trust organized, under the laws

of the state of Oklahoma, with its trustee, J. Mark Lovelace, domiciled in the state of Oklahoma. The Phillips, McFall, McCaffrey, McVay & Murrah P.C. 401K Profit Sharing Plan was, at all relevant times, a member of Eateries Holdings LLC and thus a "Seller" pursuant to the Merger Agreement.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367(a).

25.     Counterclaim Defendants consented to the jurisdiction of this Court in Section 13.3 of the Merger Agreement.

26.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391.

27.     Counterclaim Defendants consented to venue in this district in Section 13.3 of the Merger Agreement.

## FACTS

**The Merger Agreement and Sale**

28.     Prior to the Sale, Sellers, through various companies, owned and operated the Restaurant Business, which is composed of three different restaurant chains. Eateries, Inc. and its subsidiaries operated a network of restaurants called "Garfield's Restaurant and Pub"; Roma Foods, Inc., a wholly owned subsidiary of Eateries, Inc., operated a restaurant called "Pepperoni Grill"; and Fiesta LLC operated a network of restaurants called "Garcia's Mexican Restaurant" (collectively, "the Companies"). Eateries Holdings, LLC ("Eateries Holdings") owned all of the stock of the Companies.

29.     Upon information and belief, in 2006 Sellers began attempts to sell the Restaurant Business. In mid-2006, an individual investor, David P. Malm, who had a previous relationship

with Sellers, approached non-party Cordova, Smart and Williams, LLC ("CSW"), a private

equity investment firm, to see if it would be interested in investing in the Restaurant Business

together with Malm and other parties. Throughout the late summer and fall of 2006, CSW and

its representatives engaged in discussions with Sellers and attempted to perform due diligence on

the Companies to determine the suitability of such an investment.

30.    Throughout this process, Sellers consistently represented that the Companies

enjoyed solid results and were poised to grow significantly due to, among other things, extremely

favorable real estate and supply contracts they had recently negotiated.

31.    During this time, Sellers repeatedly pushed for the Sale to be closed by year-end

2006. Though they were exerting this pressure, Sellers failed to provide requested, necessary

and accurate due diligence information in a timely manner (or at all). When Hestia raised

questions during due diligence, Sellers provided verbal assurances to Hestia and certain Sellers

threatened that if the Sale did not close by year-end Orza, the Companies' Chairman, would

refuse to close the deal at all, thereby continuing to expedite the process and precluding

Counterclaimants from conducting a fulsome review of the financial condition of the Restaurant

Business.

32.    Despite these obstacles, CSW ultimately determined to complete the transaction

in 2006. In order to accomplish the acquisition of the Restaurant Business, CSW, Malm and

other investors formed a Delaware limited liability company, Hestia Holdings LLC ("Hestia"),

the entity that would purchase the Restaurant Business.

33.    After the Sale, Eateries, Inc. ("Eateries") became a Delaware corporation and a

wholly-owned subsidiary of Hestia ("Eateries"), and Fiesta LLC became the sole member of

Fiesta Holdings, Inc. ("Fiesta Holdings"), a Delaware corporation and a wholly-owned

subsidiary of Hestia. (Hestia, Eateries and Fiesta Holdings are referred to collectively as "the Company".)

34.    On December 29, 2006, Sellers (together with entities not parties to this lawsuit), entered into the Merger Agreement with Hestia and two subsidiaries created specifically to effectuate the Sale. The Sale closed that same day.

35.    In connection with the closing, as described in more detail below, Sellers provided certain information and schedules to Counterclaimants, which they represented and warranted were true, complete and accurate. In particular, with respect to the financial statements through November 31, 2006, as well as an estimated closing balance sheet through December 31, 2006, Sellers warranted that these were true and accurate, and in accordance with GAAP consistently applied.

36.    In conjunction with the closing, under the terms of the Merger Agreement, Hestia paid Sellers over $30 million in cash. In addition, Hestia also provided Sellers with promissory notes in the collective amount of $2 million payable in five years.

37.    The Merger Agreement also provided for possible additional payments to Sellers after closing. Section 2.6 provided that if the Net Working Capital exceeded a certain target amount, Hestia would pay Sellers every dollar over that amount.

38.    The Net Working Capital payout would be determined by an estimation of Net Working Capital based on the estimated closing balance sheet through December 31, 2006 that Sellers provided at closing and represented was accurate and in compliance with GAAP.

39.    Hestia had until 90 days after closing to make objections to the Sellers' Net Working Capital estimate. The 90 day period was premised on Hestia's understanding, based on Sellers' various representations, that it would have sufficient and accurate bases, including

GAAP-compliant financials, for assessing and determining the propriety of the Net Working Capital estimate by that deadline.

40.     In addition, Section 2.7 of the Merger Agreement provided for Earnout Notes to be paid to Sellers in an amount equal to the amount of EBITDA of the Companies for fiscal 2006 over $6,000,000 and less than $7,000,000, multiplied by five.   Thus, no Earnout Notes were payable if the EBITDA of the Companies, as calculated based on accurate and GAAP-compliant financial statements, was less than $6 million in 2006, but could total up to $5 million if the 2006 EBITDA was $7 million.  For every dollar of EBITDA over $6 million, the Earnout Notes would increase by five dollars.

41.     Pursuant to the terms of the Merger Agreement, EBITDA would be calculated based on accurate and GAAP-compliant financial statements for 2006 provided by Hestia to Sellers no later than April 30, 2007.

42.     This period was premised on Hestia's understanding, based on Sellers' various representations, that it would have sufficient and accurate bases, including GAAP-compliant financials, for addressing and determining EBITDA, including final financial statements, by that deadline.

43.     Pursuant to the terms of the Merger Agreement, and as a condition of Hestia's entering into the transaction, at the time the Sale closed senior management resigned from their positions with the Companies.  Thus, Grow resigned from his position as CFO of the Companies, Burke resigned from his position as President of the Companies; and Orza resigned from his position as Chairman of the Companies.  However, Sellers attempted to, and ultimately did, convince Hestia to retain certain personnel, such as Edwards.

44.     As discussed more fully in Paragraphs 100-104 below, Counterclaim Defendants provided numerous covenants and warranties in the Merger Agreement, including representations that the financial statements—including the estimated closing balance sheet for fiscal year 2006—were accurate and GAAP-compliant; that Sellers had disclosed all liabilities and debts; and that Sellers were not aware of anything that might create a material adverse change in the business. These representations were critical to Hestia's decision to consummate the Sale.

45.     Sellers and, separately, Sellers' Representatives, bolstered these contractual warranties with certificates provided to Hestia at closing stating that the representations and warranties contained in the Merger Agreement were "true" as of that date, and that Sellers had complied with all covenants and obligations required by the Merger Agreement on or before December 29, 2006 (the "Certificates").

**Hestia Hires Edwards as an Employee**

46.     Prior to closing, Sellers lobbied for Hestia's hiring of Edwards as CFO of the Company. Edwards is a CPA, and Sellers claimed that he had extensive knowledge of the Restaurant Business's finances, and possessed the skills and experience to assume that position and to direct the finances of the Company.

47.     Though Hestia did not hire Edwards as CFO of the Company, it was convinced by Sellers' representations that, due to Edwards's purported experience with the Restaurant Business and Sellers' recommendations as to his competency, the transition to new management would be facilitated by retaining Edwards. As a result, Hestia offered Edwards the position of Vice President of Finance of the Company, a similar position to that he had held with the Companies prior the Sale, and he accepted.

48.     In connection with its hiring of Edwards, Hestia requested Eateries, Inc. to modify its employment agreement with Edwards prior to the Sale, and the Company then assumed that contract post-closing (the "Employment Contract"). A true and correct copy of the Employment Contract is attached hereto as Exhibit B.

49.     The Employment Contract provided that "[d]uring the term hereof Edwards shall be employed in the business of the Company and its affiliates and shall perform such services diligently, faithfully and consistent with his assigned responsibilities."

50.     The Employment Contract also provided that Edwards's employment could be terminated immediately should he "take any action in bad faith and to the substantial detriment of the Company…."

51.     Despite his explicit commitment to perform his duties diligently and in good faith, and his fiduciary obligation to his new employer, Edwards, as the Company later discovered, engaged in numerous types and instances of financial malfeasance and fraud during his tenure with the Company, as set forth in detail below.

52.     While, upon information and belief, Edwards was the primary former Companies employee now at the Company who was involved with these improper and unlawful plans (although discovery will reveal the identity of other accomplices), he did not act alone. He was in constant post-closing contact with other Sellers, specifically Grow, Burke and Orza, concerning his conduct and activities, including, upon information and belief, the 2006 audit. Such contact is unsurprising given that although Edwards's improper actions, as set forth below, were designed to increase the proceeds Sellers (including himself) received from the Sale, such actions would most benefit those who were to receive significant percentages of the Sale proceeds, such as Grow, Burke and Orza.

**The 2006 Audit**

53.    One of Edwards's primary responsibilities in his role as Vice President of Finance for the Company was to coordinate and oversee the audit of the 2006 financials, which was to be completed well within 120 days post-closing.  The timely completion and sufficiency of the 2006 audit was critical to both Hestia and Sellers because both the Net Working Capital payout and the EBITDA Amount, by which the Earnout Notes were calculated, were to be based on the financial results of 2006.

54.    Edwards was the primary contact person for the Company's auditor, Deloitte & Touche LLP ("Deloitte") during the audit process, and was responsible for preparing and delivering accurate and complete financial statements and financial information to them and answering their questions in a timely and responsive manner.

55.    Upon information and belief, Grow had worked at Deloitte earlier in his career and had and maintained relationships with Deloitte, pursuant to which Deloitte became the Companies' auditor.  Also, upon information and belief, Grow continues to obtain information concerning the Restaurant Business from Deloitte.

56.    Based on past experience and the Sellers' representations, Hestia expected that the audit of the 2006 financials would be complete by the end of March, when any objections to the Net Working Capital estimate provided by Sellers at closing were due, and certainly before April 30, 2007, when 2006 EBITDA was to be determined for the purpose of calculating any amounts payable in Earnout Notes.

57.     On or about March 27, 2007, a few days before the objections to Sellers' Net Working Capital estimate were due, Edwards advised the Company that the 2006 audit was not yet complete and sent Company management a purported preliminary 2006 financial statement. He represented that the financial statement was accurate and that Deloitte had approved it. Hestia relied on the financial statement prepared and approved by Edwards to make its calculation that it owed a Net Working Capital payout to Sellers of $219,876, which it paid.

58.     In fact, as the Company later learned, Deloitte had not approved the 2006 preliminary financial statement, and it was false and misleading in numerous respects.

59.     Moreover, the Company later learned that Deloitte's delay in completing the audit was due in great part to Edwards's conduct, which continually frustrated the progress of the audit.  The financial information Edwards provided to Deloitte was incomplete and often erroneous, and the auditors were forced to ask repeatedly for more information.

60.     Edwards's conduct during the audit process was deficient in other ways as well.

61.     During the auditing process, Deloitte recommended to Edwards that the Company make two adjustments (to the amount of vendor rebates and to adjustments for prepaid assets as set forth in Paragraphs 76 and 80 below) to the 2006 financial statements that would have had the effect of reducing EBITDA and, therefore reducing the potential payouts to Sellers under the Earnout Notes.  Edwards rejected these adjustments without consulting the CFO or anyone else on the Company's management team.

62.     And, despite his role as the primary point person for the audit and his personal knowledge and role in preparation of the 2006 financials, Edwards initially refused to sign the management representation letter that would accompany the completed 2006 audit, which states

that management is aware of and has approved the adjustments and procedures performed by the auditors.

63.    Indeed, as a result of Edwards's obfuscating conduct, the audit was not completed until May 2007, by which time Edwards had already resigned.

**Edwards Leaves the Company and Sellers' Scheme of Wrongdoing Comes to Light**

64.    Almost immediately after Edwards's delivery of the purported preliminary 2006 financial statement on which the Company based the Net Working Capital payout, having done as much as he could to manipulate the 2006 financials and delay the audit thereof, Edwards indicated that he wanted to leave the Company.  Rather than resign, he asked to be terminated so his rights to severance in his Employment Agreement would be triggered.  The Company refused this request, and he shortly thereafter gave notice of his resignation.  His last day at the Company was May 1, 2007.

65.    Upon information and belief, shortly after leaving the Company, and not coincidentally, Edwards became employed by Burke & Grow, LLC, a company formed by Plaintiffs to invest in other restaurants.

66.    In taking over and reviewing Edwards's work and responsibilities upon his departure, Company management began discovering numerous irregularities in the financial department and results.  The Company immediately launched an extensive internal eventually investigation, and discovered that Edwards and other Sellers had engaged in numerous instances and types of financial malfeasance and fraud, and that the financial statements that Sellers had prepared and delivered were false and misleading in many respects, as detailed below.

67.    In addition to these improper and unlawful activities, the Company discovered concerted efforts by Sellers to cover up their fraud and improper conduct.  Just before he left,

Edwards painstakingly deleted all his work-related emails from the Company's central server—an effort far beyond deleting emails from his computer—while he left personal email largely untouched. In destroying Company property in this manner Edwards ensured it could not be recovered even with technical assistance.

68.     This conduct echoed that of other Sellers. In negotiating the Sale, Grow insisted on keeping his computer. CSW would not agree to allow Grow to take his computer, informing him that the business-related information on it would be used by the Company after closing. Indeed, CSW offered to purchase a new computer for Grow. Despite agreeing in the Merger Agreement that he would not take his computer with him, he did remove his computer upon his departure in order to prevent the Company's access to evidence of his activities.

69.     Moreover, Burke, Grow and Edwards had conspired to delete electronically stored information that would have revealed their actions shortly before the Sale and were advised that they needed to be "more careful" about the way they were destroying such information going forward.

**Numerous Types and Instances of Sellers' Wrongdoing Are Detected**

70.     The Company's internal investigation revealed numerous improprieties and fraudulent activities of Sellers, as set forth in detail below. Each of the manipulations described below had the purpose of artificially increasing Sellers' proceeds from the Sale at Hestia's expense—through an increase in the amount of the Net Working Capital payout, increased Earnout Notes, or simply the inflation of the value of the Restaurant Business—and contradicted representations Sellers had made in connection with the Sale.

A. **Improper Treatment of Smallwares Expenses**

71.    The Companies capitalized 100 percent of their 2006 smallwares and expendables expenses of approximately $644,000. This amount was exceedingly high, as evidenced by the fact that industry practice is to capitalize far less and, in 2005, the Companies capitalized only 61 percent of this expense. Contrary to industry practice, the smallwares that were capitalized in 2006 included napkins, straws, toothpicks and gift certificates—items that unquestionably have no future economic value.

72.    Moreover, the Companies' practice throughout the year—and through the period of CSW's due diligence—was to expense, rather than capitalize, smallwares. It was, tellingly, not until year end that the Companies revised their practice and their financials and capitalized 100 percent of the smallwares expenses.

B. **Improper Treatment of Consultant Fees**

73.    The Companies capitalized $250,000 of consulting fees related to site identification and lease negotiation services in 2006. These costs were improperly capitalized against sites that were operating before 2006 or were not the subject of lease negotiations in 2006, and, further, should not have been capitalized because no future benefit was derived from these costs. Such capitalization was in violation of GAAP.

C. **Improper Treatment of Gift Card Liability**

74.    Customers could purchase gift cards at the Companies' restaurants in various dollar amounts, which could later be redeemed at a restaurant to pay for a meal.

75.    Not only did the Companies' gift card program violate state law in numerous respects (including running afoul of state escheat laws, not having an expiration date, and charging a dormancy fee), in their representations to Hestia and in the Companies' financial

statements, Sellers grossly and willfully understated the Companies' gift card liability by several hundred thousand dollars.

**D.    *Improper Treatment of Vendor Rebates***

76.    In their representations to Hestia and in their financial statements, the Companies, contrary to GAAP, considerably overstated rebates to be received from vendors.  In 2006, the Companies recorded an unsubstantiated and overly large vendor rebate of close to $100,000 when, as a matter of fact, vendors actually reduced rebate percentages during 2006.

**E.    *Improper Recognition of Rent Expense Reversal***

77.    In 2003, 2004 and 2005 the Companies had overaccrued rent owed by $130,000. In connection with the 2006 year-end close, the Companies added this amount as a current year P & L item in violation of GAAP, as it should have been recorded as an adjustment to retained earnings/equity.

**F.    *Understatement of Property Tax Liability***

78.    The Companies improperly excluded smallwares and expendables from their property tax calculation over years prior to and including 2006.  As a result, property tax liability for those years was significantly understated and, in violation of law, underpaid, creating increased liabilities to the Company in 2007.

**G.    *Significant Reductions in Expenditures for Media Advertising***

79.    The Companies considerably reduced the amount of advertising they purchased in the fourth quarter of 2006.  This had the effect of retaining cash, thus increasing the Net Working Capital payout Sellers were to receive.  Moreover, the lack of advertising created a drop-off in the Restaurant Business from which it is still suffering, a trade-off Sellers were apparently more than willing to make since the business would lag after the Sale close and they had been paid.

**H.**    *Improper Adjustment of Prepaid Assets*

80.    The Companies' control account for prepaid assets exceeded supporting sub-ledger account balance by $32,000.  This additional amount should have been written off at year-end 2006, but instead was retained without any support, creating a false and unsupported impression of additional cash in the business.

**I.**    *Improper Recognition of Contingent Gains*

81.    In connection with its 2006 year-end close, the Companies, contrary to GAAP, recorded $62,000 for a contingent gain, representing proceeds from the outcome of a lawsuit that had not been received, thus creating an illusory impression that the Companies were in possession of additional cash.

**J.**    *Failure to Disclose, Recognize and Record Contract Termination Fees*

82.    At least one supply contract that the Companies entered into, and which was assumed by the Company, included onerous penalties for termination, which, along with other features of the contract, were never disclosed as required.

83.    In addition, another contract, entered into by the Companies in the last quarter of 2006 and never disclosed in any form, contained a significant termination penalty.  The contract was made with Burke's next door neighbor.

**K.**    *Improper and Illegal Transfer of Cash for the Restaurant Business*

84.    In the days prior to the December 29, 2006 close, when Sellers were pressuring Hestia to complete the Sale, Edwards directed payment of $150,000 from the Restaurant Business to fund Sellers' new business, Restaurant Holdings LLC.  (As a condition of the merger, Sellers agreed to rename Eateries Holdings, LLC; Restaurant Holdings LLC was the

renamed entity.)  This payment was not disclosed and was not made in the ordinary course of the Restaurant Business.

**L.**     ***Failure to Disclose, Recognize and Record Liabilities***

85.     Sellers failed to disclose, record and recognize outstanding amounts purportedly owed for the Sellers' personal expenses, including football tickets, life insurance premiums and country club dues for Edwards and Grow.  Certain of these expenses, including Edwards's country club dues were paid by the Company in 2007—after closing and after Grow had left the Company—during the time that Edwards was still employed by the Company and with his approval.  Such payments were unauthorized by the Company.  Sellers had at no point disclosed these liabilities or recorded them in the Companies' financials.

**M.**     ***Failure to Disclose, Recognize and Record Overdue and Unpaid Payables***

86.     Under the terms of the Merger Agreement, payables in excess of 45 days were to be assumed by Sellers.  In fact, however, numerous payables in excess of 45 days remained outstanding and Sellers did not record these or make Hestia aware of these overdue invoices.

87.     In addition, and despite Sellers' obligations to operate the Restaurants Business in the ordinary course of business, Edwards issued or caused to be issued checks for payables as they came due, but then directed that those checks be held in a drawer until after the Sale closed due to the lack of cash in the Companies' accounts.  In January 2007, under Edwards's instructions, the checks were sent and paid.

88.     This deliberate and planned delay in paying payables was not in the ordinary course of business, violated the Merger Agreement and resulted in poor relationships with vendors, including the Companies' largest supply vendor, U.S. Foodservice.

89.     Moreover, this practice created an avalanche of payables that Hestia ended up assuming in January 2007, contrary to the terms of the Merger Agreement.

90.     In January 2007, Company management asked Edwards about significant increase in payables that were being paid that month.  In spite of (or perhaps more to the point, because of) the fact that Edwards was well aware of, and was in the process of implementing, the wrongful scheme to delay payables, Edwards told the Company that such an uptick in payables was normal for that time of year and consistent with historical results.  The Company later discovered this was false.

**N.     *Improper and Unauthorized Payments to Orza***

91.     In January 2007, Edwards issued or caused to be issued a payment of $42,120.15 to Orza for payment of his personal credit card.  This payment was not disclosed, was not authorized, not properly assumed by the Company and was wholly improper.  The Merger Agreement set forth the precise payments Sellers were entitled to from the Company.  Reimbursement of personal credit card charges was plainly not included.

92.     Clearly well aware of the impropriety of this payment, Edwards directed the accounting staff to manually issue a repayment check within one day, a request at odds with normal Company procedures.  Mrs. Orza then picked the check from Mr. Edwards personally.

**O.     *Improper Adjustment of Pre-Opening Expenses***

93.     The Companies' opening balance sheet for January 1, 2006 had included overstated credit balances.  In conjunction with their 2006 year-end close, the Companies adjusted these balances by reducing 2006 pre-opening costs and eliminating these overstated credit balances, rather than making a prior period adjustment to retained earnings as required.

94.    The 2006 financial statements will require significant adjustments to be properly presented in accordance with GAAP due to the Sellers' financial misstatements and improprieties described in Paragraphs 71 through 93 above.    As a result, the Company does not consider its 2006 financial statements to be final at this time.

**In Spite of Their Flagrant Wrongdoing, Sellers Commence This Lawsuit**

95.    On or about November 7, 2007, Hestia sent counsel for Sellers' Representatives and Seller McFall a Notice of Claim pursuant to Sections 10.1(e) and 10.6 of the Merger Agreement, setting forth Counterclaim Defendants' false and fraudulent practices and Hestia's claims against them, including that the Earnout Notes are not payable and/or fully set off and that, in fact, Sellers owe Hestia significant damages flowing from their unlawful conduct.

96.    That next day, Defendants were served with the Complaint in this action, asserting a breach of contract claim for Defendants' purported failure to issue Earnout Notes in the amount of $5 million.

**Count I**
**(Breach of Contract)**
**(All Counterclaim Defendants)**

97.    Counterclaimant repeats and realleges the allegations contained in Paragraphs 1 through 1 through 96 as if fully set forth herein.

98.    The Merger Agreement between Hestia and Sellers was and is a valid and enforceable agreement.

99.    Hestia substantially performed its duties under the Merger Agreement, or was excused from performing its duties under the Merger Agreement.

100.    In the Merger Agreement, Sellers made representations, warranties and covenants, which include but are not limited to:

- Page 3                    Assumed Liabilities

Sellers agreed that Purchaser would assume responsibility only for "any accounts payable incurred in the Ordinary Course of Business (excluding any accounts payable that are aged for more than 45 days), [and] (b) current accrued expenses incurred in the ordinary course of Business (excluding any accrued expenses that are aged for more than 45 days) . . . ."

- Article 2.6(a), (b) Net Working Capital Adjustment

Sellers warranted to Purchaser that "[t]he Estimated Closing Balance Sheet and Estimated Net Working Capital Statement will be prepared in accordance with GAAP consistently applied with past practices used in the preparation of the Financial Statements."

Sellers further warranted to Purchaser that "Net Working Capital means (a) the consolidated current assets of the Acquired Companies . . . as of the True-Up Effective Time as determined in accordance with GAAP minus (b) the consolidated current liabilities of the Acquired Companies . . . as of the True-Up Effective Time.  Net Working Capital shall be determined in accordance with GAAP consistently applied with the practices used in the preparation of the Financial Statements . . . ."

- Article 4.8 (a), "Financial Condition, Financial Statements", in which Sellers warrant that "the Financial Statements: (i) are consistent with the books and records of Holdings and its Subsidiaries; (ii) fairly present the consolidated financial position, on a Pro Forma or actual basis, as applicable, of Holdings and its Subsidiaries as of the dates thereof, and the consolidated results of their operations for the period indicated therein; and (iii) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved."

- Article 4.8 (b), "Financial Condition, Financial Statements", in which Sellers warranted to Purchaser that "[n]either Holdings nor any subsidiary has any liabilities, claims or obligations of any nature, whether known or unknown, accrued, absolute, contingent, anticipated or otherwise, whether due or to become due, whether asserted or unasserted, whether liquidated or unliquidated, and whether or not required under GAAP to be accrued on the financials statements of Holdings or any of its subsidiaries . . . that are not reflected or reserved against in the Most Recent Balance Sheet, other than those accrued after the date of the Most Recent Balance Sheet in the Ordinary Course of Business."

- Article 4.21, "Absence of Certain Changes and Events", in which Sellers warranted that "[s]ince December 25, 2005" there have been no "(A) no event, change or circumstance has occurred that has had, or is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect", defined as "any effect which has had or could reasonably be expected to result in (i) a material adverse effect on or change in the Business, assets, condition (financial or otherwise), performance or results of operations of the Acquired Companies."   They further warranted that there has been no "incurrence of any Encumbrance or the incurrance of any Liability other than current liabilities incurred in the Ordinary Course of Business…" and that there had been no "change in accounting methods of principles in any

manner . . . of Holdings or any subsidiary."

- Article 4.27, "Disclosure; Information Supplied", in which Sellers warranted to Purchaser that "[n]o representation or warranty contained in this Agreement, and no statement contained in any document, certificate or schedule furnished to or to be furnished to the Purchaser or any of its representatives pursuant to this Agreement, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to be stated therein or necessary in order to make the statements herein or therein, under the circumstances under which it was or will be made, not misleading. The financial information delivered to Purchaser on behalf of Sellers or Holdings has been prepared in good faith based on the books and records of Holdings and the Subsidiaries, and is true, accurate and complete as of the time and for the periods indicated thereon."

- Article 6.2, "Conduct of the Business", in which Sellers represented that they would operate the Business in the "Ordinary Course of Business and shall use their commercially reasonable efforts to keep the Business and Assets intact".

- Article 9.2(b), "Conditions to the Obligations of Purchaser Entities", in which Sellers represented that "the representations and warranties of Holdings, Eateries, Fiesta and the Sellers contained in this Agreement shall be true and correct as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date."

101.    The representations, warranties and covenants were repeated and bolstered by

Sellers and Sellers' Representatives representations in the Certificates.

102.    Sellers breached the representations, warranties and covenants in the Merger

Agreement by their numerous improper and illegal practices, including as detailed above.

103.    In addition to these warranties, Sellers were also obligated under Section 10.2 of

the Merger Agreement to indemnify Hestia:

Sellers agree to "indemnify, reimburse, defend, and hold harmless the Purchaser and each Acquired Company and each of their successors and assigns in interest . . . from and against, and will pay to the Purchaser Indemnitees the amount of, any Losses, incurred by any of them based upon, arising out of or otherwise, directly or indirectly, related to, resulting from or in respect of:

(i)    Any inaccuracy in or breach of any representation or warranty of Holdings, Eateries, Fiesta or Sellers contained in Article III or Article IV, the Schedules hereto, or any other representation or warranty of Holdings, Eateries, Fiesta or the Sellers contained in any Other Sellers Documents, Other Holdings Document, or any certificate delivered by or on behalf of the Sellers or Holdings or any Subsidiary pursuant to this Agreement with respect to such representation or warranties, in each case as such representation or warranty would read if all

27

qualifications as to materiality . . . were deleted therefrom.

(ii)    any fraud or intentional misrepresentation by Holdings, any Subsidiary or any Seller or any breach by Holdings, Eateries, Fiesta or any Seller or any covenant or obligation of Holdings, Eateries, Fiesta or any Seller contained in this Agreement or any Other Holdings Document or Other Seller Document; . . .

(vii)    any Retained Liability as of the Closing Date or arising out of or relating to or in connection with any events or circumstances existing, occurring or arising prior to the Closing . . . . "

104.    Sellers have failed to indemnify Hestia pursuant to the terms of the Merger Agreement.

105.    Sellers' breaches were neither justified nor excused.

106.    Sellers' breaches have caused significant damage to Hestia in an amount to be determined at trial but in no event less than several millions dollars, plus related transaction costs, interest and fees.

## Count II
### (Violation of the Covenant of Good Faith and Fair Dealing)
### (All Counterclaim Defendants)

107.    Hestia repeats and realleges Paragraphs 1 through 105 as if set forth herein in their entirety.

108.    Sellers owed Hestia a duty of good faith and fair dealing implied in every contract.

109.    Despite this duty, Sellers knowingly and deliberately misstated and undermined the financial condition of the Restaurant Business, deliberately inflating its value and manipulating its assets to increase their own proceeds from the Sale. The Sellers accomplished this in various ways, including but not limited to:

a.    Directing the payment of and paying $150,000 into Sellers' new company without disclosure or authorization;

b. Reducing the advertising rate in fourth quarter 2006 to retain cash with the effect that business in that quarter and in 2007 was seriously affected;

c. Delaying payables due in the fourth quarter 2006, leaving Hestia to pay an avalanche of overdue payables that the Company had not assumed and deal with angry vendors;

d. Paying Sellers' personal expenses from the Company's funds without disclosure or authorization; and

e. Manipulation of financials as set forth in Paragraphs 71 through 93 above to create the appearance of significantly more value in the business than was actually present.

110.    Hestia has suffered and will continue to suffer from these breaches in an amount to be determined at trial, but no less than several million dollars, plus related transaction costs, interest and fees.

## Count III
## (Prima Facie Tort)
## (All Counterclaim Defendants)

111.    Counterclaimants repeat and reallege the allegations contained in Paragraphs 1 through 114 as if fully set forth herein.

112.    Sellers intentionally inflicted harm on Counterclaimants through various instances and types of financial malfeasance and fraud, as set forth above in Paragraphs 71 through 93.

113.    This harm was inflicted without excuse or justification and was done solely to increase Sellers' proceeds from the Sale at the expense of the Company.

114.    These acts resulted in damage to Counterclaimants, in an amount to be proven at trial but in no event less than several million dollars, plus related transaction costs, interest and fees.

### Count IV
### (Breach of Fiduciary Duty)
### <u>(Edwards)</u>

115.    Counterclaimants repeat and reallege Paragraphs 1 through 117 as if fully set forth herein.

116.    Because of Edwards's role in the Companies prior to the merger and his intimate understanding of the Restaurant Business, Hestia and its subsidiaries reposed significant trust in Edwards and relied on his experience and expertise.

117.    Edwards had a duty as the Vice President of Finance of the Company to at all times exercise the utmost good faith and loyalty to the Company.

118.    Despite these obligations, Edwards breached his duty to the Company by repeatedly acting disloyally and in bad faith, including but not limited to paying personal expenses without authorization, including country club dues, with Company funds; refusing to accept Deloitte's adjustments and refusing to seek Company approval for those adjustments; destroying Company property prior to his departure; misrepresenting that Deloitte had approved the preliminary 2006 financial statement provided by Edwards to the Company in March 2007; frustrating the timely completion of the 2006 audit; misrepresenting the reasons for the avalanche of payables being paid out in January 2007; and issuing an unauthorized and improper payment of $42,120.15 to Orza from Company funds.

119.    As a result of Edwards's breaches of his fiduciary duty, Counterclaimants have suffered significant damage in an amount to be proven at trial.

120.    In addition, Counterclaimants are entitled to an accounting and return of all salary payments and any other form of compensation that Edwards received pursuant to his employment by Hestia in an amount to be determined at trial.

### Count V
### (Aiding and Abetting Breach of Fiduciary Duty)
### (Orza and Mrs. Orza)

121.    Counterclaimants repeat and reallege Paragraphs 1 through 120 as if fully set froth herein.

122.    Edwards had a fiduciary duty to the Company, which he breached as set forth above in Paragraphs 115 through 120.

123.    Counterclaim Defendants Orza and Mrs. Orza knew that Edwards was an employee of the Company in which the Company reposed significant and unique trust and thus that he owed the Company a fiduciary duty.  Despite this knowledge Orza and Mrs. Orza knowingly offered substantial assistance to Edwards's breaches of his fiduciary duty by:

    a.  In the case of Orza, directing that he be paid $42,120.15 for personal credit card expenses;

    b.  In the case of Mrs. Orza, retrieving the check paying Orza's personal credit card expenses.

124.    Counterclaimants have been damaged by the concerted actions of Edwards, Orza and Mrs. Orza in an amount to be determined at trial.

### Count VI
### (Breach of Employment Contract)
### (Edwards)

125.    Counterclaimants hereby repeats and realleges paragraphs 1 through 124 as if fully set forth herein.

126.    The Employment Contract was and is a valid, enforceable contract.

127.    The Company substantially performed its obligations and duties under the Employment Contract.

128.    The Employment Contract requires, among other things, that Edwards "shall be employed in the business of the Company and its affiliates and shall perform such services diligently, faithfully and consistent with his assigned responsibilities."

129.    Edwards breached the Employment Agreement in numerous respects, including but not limited to the unauthorized and improper payment of his personal expenses, including country club dues, with Company funds without authorization; refusing to accept Deloitte's adjustments and refusing to seek Company approval for those adjustments; destroying Company property by deleting it from the Company server prior to his departure; misrepresenting that Deloitte had approved the preliminary 2006 financial statement provided by Edwards to the Company in March 2007; misrepresenting the reasons for the avalanche of payables being paid out in January 2007; and making an improper and unauthorized payment of $42,120.15 to Orza with Company funds.

130.    As a result of Edwards's breaches of the Employment Agreement, Counterclaimants have suffered significant damage in an amount to be determined at trial.

131.    In addition, Counterclaimants are entitled to an accounting and return of all salary payments and any other form of compensation that Edwards received pursuant to his employment by Hestia in an amount to be determined at trial.

## Count VII
## (Tortious Interference with Contract)
## (Orza)

132.    Hestia hereby repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

133.    The Employment Contract was and is a valid, enforceable contract.

134.    Orza knew about the Employment Contract, as he knew that Edwards had been hired by the Company after the Sale pursuant to a renegotiated contract.

135.    Orza intentionally caused the breach of the Employment Contract by directing that he be paid $42,120.15 for personal credit card expenses which he knew would result in violations of Edwards' duties under the Employment Contract.

136.    Orza was not justified in these actions.

137.    Hestia was damage by Orza's interference with the Employment Contract in an amount to be determined at trial.

## Count VIII
## (Fraud)
## (Edwards)

138.    Counterclaimants hereby repeat and reallege paragraphs 1 through 137 as if fully set forth herein.

139.    Edwards made false representations of material fact to Counterclaimants on at least two occasions.

140.    First, Edwards stated that the significant increase in payables in January 2007 was normal for that time of year, when in fact he knew that the significant increase was due to Sellers' scheme to delay payables.

141.    Edwards knew that this representation was false, and made the statement for the purpose of inducing Counterclaimants to rely on it.

142.    Counterclaimants relied on this representation and drew down on a line of credit to pay these improperly accumulated payables and keep the Restaurant Business running.

143.    In addition, Edwards stated that Deloitte had approved the preliminary 2006 financial statement distributed by Edwards in March 2007.

144.    Edwards knew this statement was false, and made it for the purpose of inducing Counterclaimants to rely on it and refrain from further investigating the financial condition of the Company.

145.    Edwards also knew the 2006 preliminary financial statement contained significant false and misleading information, as set forth in Paragraphs 71 through 93 above.

146.    Hestia relied on Edwards's statement that Deloitte had approved the 2006 preliminary financial statement and on the financial statement itself when it made a Net Working Capital payout to Sellers of approximately $200,000.

147.    Moreover, as a fiduciary of Counterclaimants, Edwards had a duty to disclose the improper and unauthorized payment to Orza of $42,120.15.

148.    Edwards knowingly failed to disclose this to keep Counterclaimants from investigating and uncovering Sellers' fraudulent acts.

149.    Hestia has suffered damaged by reason of its reliance on Edwards's false statements, and his failure to disclose information, in an amount to be determined at trial.

### Count IX
### (Aiding and Abetting Fraud)
### (Orza)

150.    Hestia repeats and realleges Paragraphs 1 through 149 as if set forth herein.

151. Edwards defrauded the Company, as set forth above in Paragraphs 141 through 152.

152. Counterclaim Defendant Orza knew of Edwards's fraud on the Company, and knowingly offered substantial assistance to Edwards by directing that he be paid $42,120.15 for personal credit card expenses.

153. Counterclaimants have been damaged by the concerted actions of Edwards and Orza action in an amount to be determined at trial.

**Count X**
**(Conversion)**
**(Orza)**

154. Eateries repeats and realleges Paragraphs 1 through 153 as if set forth fully herein.

155. Orza wrongfully exercised dominion over the property of Eateries when he accepted a check payable by Eateries for $42,120.15.

156. Orza did not have right or title to this money as it was an unauthorized repayment for Orza's use of his personal credit card instead of the Companies' cash funds to satisfy a payable.

157. Indeed, Orza is not entitled to any payout from the Company not specified in the Merger Agreement, which the unauthorized payment of $42,130.15 is not.

158. Counterclaimants were damaged as a result of Orza's wrongdoing in the amount of $42,120.15 plus related interest, transaction costs and fees.

**Count XI**
**(Aiding and Abetting Conversion)**
**(Edwards and Mrs. Orza)**

159. Eateries repeats and realleges Paragraphs 1 through 158 as if fully set forth herein.

160.    Orza converted Eateries' assets, in the amount of $42,120.15, as set forth above in Paragraphs 153 through 158 above.

161.    Edwards knew about Orza's conversion.

162.    Edwards knowingly offered substantial assistance to Orza by issuing or causing to be issued a check in the amount of $42,120.15 payable by Eateries to Orza on or about January 9, 2007.

163.    Edwards was not authorized to make such a payment.

164.    Mrs. Orza knew about Orza's conversion, and knowingly offered substantial assistance to Orza's wrongful actions by arranging to meet, and meeting, Edwards or one of his associates to pick up the check for $ 42,120.15 payable to Orza.

165.    Eateries has been damaged by Edwards's and Mrs. Orza's actions in the amount of $42,120.15, plus related transaction costs, interest and fees.

166.    Counterclaimants demand a jury trial on all issues properly triable thereby.

**WHEREFORE**, Counterclaimants request and demand:

(i)    As to Plaintiff's complaint, that the Court enter judgment in Defendants' favor that Plaintiff take nothing, and that Defendant be awarded costs and attorneys' fees;

(ii)    As to Counterclaimants' Counterclaims, that Counterclaimants be awarded compensatory damages in an amount to be determined at trial, but in no event less than several million dollars, plus transaction costs, interest and fees; and

(iii)    That the Court order all such other and further relief as may be just and proper.

Dated:  New York, New York
        November 29, 2007

DEWEY PEGNO & KRAMARSKY LLP

By:    *Keara A Bergin*
      Thomas E. L. Dewey (TD-6243)
      Keara A. Bergin (KB-0831)

220 East 42nd Street
New York, New York 10017
(212) 943-9000

*Attorneys for Defendants and Counterclaimants*