# EXHIBIT A

*Execution Copy*

# AGREEMENT AND PLAN OF REORGANIZATION AND MERGER

by and among

EATERIES HOLDINGS, LLC,

EATERIES, INC.,

FIESTA, L.L.C.,

THE MEMBERS OF EATERIES HOLDINGS, LLC
LISTED ON SCHEDULE A HERETO,

HESTIA HOLDINGS, LLC,

EATERIES MERGER SUB, INC.,

AND

FIESTA MERGER SUB, LLC

Dated as of December 26, 2006

3316755-5

## TABLE OF CONTENTS

**Page**

ARTICLE I.    DEFINITIONS.................................................................................2

ARTICLE II.    CONTEMPLATED TRANSACTIONS ........................................15

    2.1.    Pre-Closing Reorganization Transactions................................15

    2.2.    The Fiesta Merger.....................................................................18

    2.3.    The Eateries Mergers. ..............................................................20

    2.4.    Seller Notes Issued to Holdings ..............................................27

    2.5.    Calculation of the Aggregate Purchase Price; Pre-Closing Statements of Debt and Holdings' Expenses. .................................27

    2.6.    Net Working Capital Adjustment. ...........................................28

    2.7.    EBITDA Amount......................................................................30

    2.8.    Closing .....................................................................................31

    2.9.    Transactions at the Closing......................................................32

ARTICLE III.    REPRESENTATIONS AND WARRANTIES OF THE SELLERS REGARDING THE SHARES AND THE INTERESTS OF THE SELLERS............................................................................34

    3.1.    Title ..........................................................................................34

    3.2.    Organization; Due Authorization; Enforceability....................34

    3.3.    No Violation. ............................................................................34

    3.4.    Brokers .....................................................................................35

    3.5.    Acquisition for Investment; Private Placement .......................35

ARTICLE IV.    REPRESENTATIONS AND WARRANTIES REGARDING HOLDINGS, THE SUBSIDIARIES AND THE BUSINESS .................36

    4.1.    Organization; Authority; Due Authorization. ..........................36

    4.2.    Capitalization of Eateries ........................................................36

    4.3.    Capitalization of Holdings .......................................................37

    4.4.    Subsidiaries. ............................................................................37

    4.5.    No Violation. ............................................................................38

    4.6.    Regulatory Approvals and Other Consents..............................39

    4.7.    Sufficiency of and Title to Assets ...........................................39

    4.8.    Financial Condition; Financial Statements ..............................40

    4.9.    Books and Records; Internal Controls. ....................................41

| | | |
|---|---|---|
| 4.10. | Tax Matters. | 42 |
| 4.11. | Legal Proceedings. | 46 |
| 4.12. | Tangible Personal Property. | 46 |
| 4.13. | Intellectual Property | 46 |
| 4.14. | Contracts | 48 |
| 4.15. | Compliance With Laws. | 50 |
| 4.16. | Insurance Coverage. | 52 |
| 4.17. | Real Property. | 53 |
| 4.18. | Environmental Matters. | 54 |
| 4.19. | Employee Matters. | 54 |
| 4.20. | ERISA/Employee Benefits. | 57 |
| 4.21. | Absence of Certain Changes and Events | 59 |
| 4.22. | Certain Transactions | 61 |
| 4.23. | Banking Facilities | 62 |
| 4.24. | Suppliers | 62 |
| 4.25. | No Broker | 62 |
| 4.26. | Prior Claims Relating to Health Matters | 62 |
| 4.27. | Disclosure; Information Supplied | 62 |
| 4.28. | Chiuchiarelli Share Transfer Agreement | 63 |
| ARTICLE V. | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ENTITIES | 63 |
| 5.1. | Due Organization | 63 |
| 5.2. | Authority to Execute and Perform Agreements | 63 |
| 5.3. | Due Authorization; Enforceability | 63 |
| 5.4. | No Violation | 63 |
| 5.5. | No Broker | 64 |
| ARTICLE VI. | PRE-CLOSING COVENANTS OF THE PARTIES | 64 |
| 6.1. | Commercially Reasonable Efforts | 64 |
| 6.2. | Conduct of the Business | 64 |
| 6.3. | Conduct of Sellers. | 66 |
| 6.4. | Notices of Certain Events; Continuing Disclosure | 67 |
| 6.5. | [Intentionally Omitted.] | 67 |
| 6.6. | Filings | 67 |

6.7.    Exclusivity ................................................................67
6.8.    Access ....................................................................68
6.9.    Transfers .................................................................68
6.10.   Audit of the 2006 Financial Statements ...............................68
6.11.   Continuation of Certain Benefits ....................................68
6.12.   Name Change ............................................................69
6.13.   Share Transfer .........................................................69
ARTICLE VII.    COVENANTS OF THE PARTIES .................................69
7.1.    [Intentionally Omitted] ...............................................69
7.2.    Publicity ................................................................69
7.3.    Access to Records .....................................................69
7.4.    Confidentiality, Non-Competition and Non-Solicitation.................70
        Certain Provisions Relating to the Seller Notes......................71
7.6.    Certain Liquor Licenses ..............................................72
ARTICLE VIII.    TAX MATTERS ...........................................72
8.1.    Tax Indemnity...........................................................72
8.2.    Tax Returns and Pre-Closing Periods. ................................73
8.3.    Refunds. ...............................................................73
8.4.    Contests................................................................73
8.5.    Time of Payment........................................................74
8.6.    Cooperation and Exchange of Information..............................74
8.7.    Conveyance Taxes. .....................................................75
8.8.    Miscellaneous. .........................................................75
8.9.    Tax Dispute Resolution.................................................75
ARTICLE IX.    CONDITIONS TO CLOSING ...................................76
9.1.    Conditions to the Obligations of each Party .........................76
9.2.    Conditions to the Obligations of the Purchaser Entities .............76
9.3.    Conditions to the Obligations of Holdings, Eateries, Fiesta and the Sellers ......78
ARTICLE X.    SURVIVAL; INDEMNIFICATION ................................78
10.1.   Survival................................................................78
10.2.   Obligation to Indemnify...............................................79
10.3.   Limitations on Indemnification........................................81
10.4.   Set-Off................................................................83

10.5.    Procedure for Indemnification - Third Party Claims. ...............................83

10.6.    Procedure for Indemnification - Other Claims ................................................85

ARTICLE XI.    TERMINATION ......................................................................................85

11.1.    Grounds for Termination .................................................................................85

11.2.    Effect of Termination ......................................................................................86

ARTICLE XII.    SELLERS' REPRESENTATIVES ...........................................................86

12.1.    Appointment of the Sellers' Representatives ...................................................86

12.2.    Limitation on Actions .....................................................................................88

12.3.    Indemnification ..............................................................................................88

ARTICLE XIII.    MISCELLANEOUS ...............................................................................88

13.1.    Notices ...........................................................................................................88

13.2.    Entire Agreement ...........................................................................................90

13.3.    Governing Law and Venue ..............................................................................90

13.4.    Waiver of Jury Trial ........................................................................................90

13.5.    Binding Effect .................................................................................................91

13.6.    Counterparts ...................................................................................................91

13.7.    Section Headings ............................................................................................91

13.8.    Interpretation ..................................................................................................91

13.9.    Severability ....................................................................................................92

13.10.    No Third Party Rights .....................................................................................92

13.11.    Expenses ........................................................................................................92

13.12.    Amendments; No Waivers ...............................................................................92

13.13.    Further Assurances ..........................................................................................93

13.14.    No Prejudice ...................................................................................................93

13.15.    Specific Performance ......................................................................................93

13.16.    Non-Management Sellers .................................................................................93

## AGREEMENT AND PLAN OF REORGANIZATION AND MERGER

THIS AGREEMENT AND PLAN OF REORGANIZATION AND MERGER, dated as of December 26, 2006, is made and entered into by and among EATERIES HOLDINGS, LLC, an Oklahoma limited liability company ("**Holdings**"), EATERIES, INC., an Oklahoma corporation ("**Eateries**"), FIESTA, L.L.C., an Oklahoma limited liability company ("**Fiesta**"), the members of Holdings (each of whom is listed on Schedule A hereto) (each of such members being referred to hereinafter from time to time individually as a "**Seller**" and collectively as the "**Sellers**"), HESTIA HOLDINGS, LLC, a Delaware limited liability company (the "**Purchaser**"), EATERIES MERGER SUB, INC., an Oklahoma corporation and direct wholly-owned subsidiary of the Purchaser ("**Eateries Merger Sub**"), and FIESTA MERGER SUB, LLC, a Delaware limited liability company and indirect wholly owned subsidiary of the Purchaser ("**Fiesta Merger Sub**" and, together with the Purchaser and Eateries Merger Sub, the "**Purchaser Entities**").

### RECITALS

WHEREAS, Eateries and the four direct wholly-owned subsidiaries of Holdings named on Schedule B-1 hereto (the "**GRP Entities**" and, together with Eateries, collectively, the "**Eateries Entities**") are engaged in the business of owning and operating or managing a network of mall-based or freestanding restaurants and eateries under the "Garfield's Restaurant and Pub" brand at the locations set forth in Schedule B-2 attached hereto (the "**Garfield's Business**");

WHEREAS, Roma Foods, Inc., an Oklahoma corporation and direct wholly owned subsidiary of Eateries ("**Roma Foods**") is engaged in the business of owning and operating a single mall-based restaurant under the "Pepperoni Grill" brand at the location set forth in Schedule C attached hereto (the "**Pepperoni Grill Business**");

WHEREAS, Fiesta is, directly and indirectly through its subsidiaries listed on Schedule D-1 hereto (the "**Fiesta Subsidiaries**" and, together with Fiesta, collectively the "**Fiesta Entities**"), engaged in the business of owning and operating or managing a network of mall-based or freestanding restaurants and eateries under the "Garcia's Mexican Restaurant" brand at the locations set forth in Schedule D-2 attached hereto (the "**Garcia's Business**" and together with the Garfield's Business and the Pepperoni Grill Business, collectively, the "**Business**");

WHEREAS, Holdings is the direct or indirect record and beneficial owner of 100% of the outstanding Equity Interests (as defined below) of the Fiesta Entities and the GRP Entities;

WHEREAS, as of the date of this Agreement, Holdings is the record and beneficial owner of 82.6% of the issued and outstanding shares of Common Stock, par value $0.002 per share, of Eateries ("**Eateries Common Stock**");

WHEREAS, the Boards of Directors, Managers or other equivalent governing bodies of each of parties hereto have each unanimously deemed it advisable and in the best interests of the respective shareholders or members, as applicable, of each such entity: (i) for the Purchaser to acquire the Business by means of an acquisition of 100% of the Equity Interests of each of the Subsidiaries (as defined below) of Holdings and (ii) to affect such acquisition by means of the

reorganization transactions and mergers described in Article II of this Agreement, in each case, upon the terms and subject to the conditions set forth herein;

WHEREAS, in furtherance thereof, the Boards of Directors, Managers or other equivalent governing bodies of each of the parties hereto have each unanimously adopted resolutions approving and declaring advisable this Agreement and each of the transactions contemplated by this Agreement and, concurrent with the execution and delivery of this Agreement, submitted this Agreement to the shareholders or members, as applicable, of each of such parties for approval;

WHEREAS, immediately following, and substantially concurrent with, the execution and delivery of this Agreement, 100% of the shareholders or members, as applicable, of each of the parties hereto (other than the shareholders of Eateries and the members of Holdings) are approving and adopting this Agreement and each of the transactions contemplated by this Agreement;

WHEREAS, immediately following, and substantially concurrent with, the execution and delivery of this Agreement, the Sellers (who are all of the members of Holdings and own of record and beneficially all of the outstanding Equity Interests in Holdings) and Holdings, Claudio Chiuchiarelli, Joanette Chiuchiarelli and Jacquiline Chiuchiarelli (who collectively own of record and beneficially approximately 98% of the capital stock of Eateries) are each executing and delivering a consent and support agreement in the form of Exhibit A-1 (the "Consent and Support Agreement") and a consent in the form of Exhibit A-2 (each a "Consent"); and

WHEREAS, concurrent with the execution and delivery of this Agreement, (a) Eateries and the Management Sellers are entering into the Management Seller Termination Agreements attached hereto as Exhibit B and (b) Eateries and the Other Managers are entering into the Other Manager Amended and Restated Employment Agreements attached hereto as Exhibit C.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

For purposes of the Agreement, the following terms shall have the meanings set forth below:

"Acquired Companies" means each of the Subsidiaries of Holdings as of the date of this Agreement (other than Fiesta Restaurants, Inc., if the Fiesta Restaurants Dissolution is effected prior to Closing), which shall be all of the Subsidiaries of Eateries and Fiesta after giving effect to the Pre-Closing Reorganization Transactions (each of which entities is listed on Schedule E hereto).

"Action" means any action, complaint, petition, suit, litigation, investigation, arbitration, hearing or other proceeding, whether civil or criminal, judicial or administrative, at law or in equity, by or before any Authority, arbitrator, or mediator.

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by or is under common control with such Person. The term "**control**," for the purposes of this definition, means the power to direct or cause the direction of the management or policies of the controlled Person.

"**Aggregate Purchase Price**" has the meaning ascribed to it in Section 2.5(a).

"**Agreement**" means this Agreement, as amended, modified and/or supplemented from time to time.

"**Allocation Statement**" has the meaning ascribed to it in Section 8.9.

"**Annual Financial Statements**" has the meaning ascribed to it in Section 4.8(a).

"**Assets**" means the assets, properties and rights of every nature, kind and description, whether tangible or intangible, personal or mixed, which are (i) owned by either Holdings or any Subsidiary or in which either Holdings or any Subsidiary has any interest (including the right to use) or (ii) used by either Holdings or a Subsidiary in the operation of the Business, and which shall include, without limitation, all Tangible Personal Property, Cash, Books and Records, Licenses, Permits, Intellectual Property Assets, Contracts, Leases, inventory, accounts receivable and prepaid expenses.

"**Assumed Liabilities**" means (a) accounts payable incurred in the Ordinary Course of Business (excluding any accounts payable that are aged for more than 45 days), (b) current accrued expenses incurred in the Ordinary Course of Business (excluding any accrued expenses that are aged for more than 45 days), and (c) Liabilities (other than payment obligations arising prior to the True-up Effective Time and Liabilities arising from any pre-Closing breach or violation thereof) arising in the Ordinary Course of Business under contracts, agreements, deeds, mortgages, leases, subleases and licenses to which the Acquired Companies are party or under the Specified Plans, but shall not include any Liabilities for borrowed money, any Holdings Expenses or any other Debt, except capital leases reflected on the Debt Schedule.

"**Authority**" means any governmental, regulatory or administrative body, agency or authority, any court or other judicial authority, any arbitrator or any public, private or industry regulatory authority, in each case whether Federal, state, local or foreign.

"**Benefit Arrangement**" means an employment, severance or similar Contract, arrangement or policy (written or oral) and each plan or arrangement providing for severance, salary continuation, change of control benefits, insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, fringe benefits, pension or retirement benefits or for deferred compensation, profit-sharing, bonuses, phantom stock, stock options, stock appreciation rights or other forms of equity-based or incentive compensation or post-retirement insurance, compensation or benefits or any co-employment agreement that (i) is not an Employee Plan, (ii) is entered into, maintained or contributed to, as the case may be, by Holdings, any Subsidiary or any of their respective ERISA Affiliates, or with respect to which any off them has any Liability, including any contingent liability, and (iii) covers any Employee or former Employee, or any director,

consultant, or other service provider (whether or not an Employee) of Holdings or any of the Subsidiaries.

"**Books and Records**" means all books, records and original documents that pertain to or are utilized by Holdings or a Subsidiary to administer, reflect, monitor, evidence or record information relating to the Business or conduct of the Business by Holdings or a Subsidiary and all such, books, records and original documents, including all such records maintained on electronic or magnetic media, or in any electronic database system of Holdings or a Subsidiary or necessary to comply with any applicable Law with respect to the Business.

"**Business**" has the meaning ascribed to it in the recitals to this Agreement.

"**Business Day**" means a day on which banks are open for business in Boston, Massachusetts, New York, New York and Oklahoma City, Oklahoma.

"**Cap**" has the meaning ascribed to it in Section 10.3(b).

"**Cash**" means, at any time of determination, all cash and cash equivalents held by Holdings and the Subsidiaries, determined in accordance with GAAP on a basis that is consistent with past practice.

"**Cash Deficiency**" means the amount, if any, by which the amount of Cash (other than restricted Cash) held by the Acquired Companies as of the True-up Effective Time is less than $1,000,000. Such amount will be adjusted, as necessary, in order that any impact on the consolidated Cash balance of the Acquired Companies caused by the Contemplated Transactions is eliminated.

"**Cash Purchase Price**" has the meaning ascribed to it in Section 2.5(a)(i).

"**CERCLA**" has the meaning ascribed to it in Section 4.18(a).

"**Certificates**" has the meaning ascribed to it in Section 2.3(f)(ii).

"**Chiuchiarelli Share Transfer**" has the meaning ascribed to it in Section 6.13.

"**Chiuchiarelli Share Transfer Agreement**" has the meaning ascribed to it in Section 6.13.

"**Closing**" has the meaning ascribed to it in Section 2.8.

"**Closing Date**" has the meaning ascribed to it in Section 2.8.

"**Consent**" has the meaning ascribed to it in the recitals to this Agreement.

"**Consent and Support Agreement**" has the meaning ascribed to it in the recitals to this Agreement.

"**Contemplated Transactions**" means all of the transactions contemplated by this Agreement, the Other Holdings Documents, the Other Seller Documents and the Other Purchaser

Documents, including (a) each of the Pre-Closing Reorganization Transactions, (b) the Fiesta Merger, (c) the Eateries Mergers, (d) the repayment of all Debt, (e) the Chiuchiarelli Share Transfer and (f) the performance by the parties hereto of their respective obligations and covenants under this Agreement, the Other Holdings Documents, Other Seller Documents and Other Purchaser Documents.

"**Contest**" has the meaning ascribed to it in Section 8.4(a).

"**Contract**" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, commitment, promise, undertaking, arrangement or understanding, whether written or oral and whether express or implied, or other document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"**Conveyance Taxes**" has the meaning ascribed to it in Section 8.7(a).

"**Core Representations**" has the meaning ascribed to it in Section 10.1(b).

"**Cut-Off Date**" has the meaning ascribed to it in Section 11.1(b).

"**Debt**" means, without duplication, any and all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of Holdings and the Subsidiaries (a) for borrowed money from third parties, (b) evidenced by notes, bonds, debentures or similar Contracts, (c) under capital leases (in accordance with GAAP), (d) under Contracts relating to interest rate protection, swap agreements and collar agreements, (e) consisting of or relating to the Rewards Network Termination Liabilities and (f) in the nature of Guarantees of the obligations described in clauses (a) through (e) above of any other Person.

"**Debt Amount**" has the meaning ascribed to it in Section 2.5(b).

"**Debt Schedule**" has the meaning ascribed to it in Section 2.5(b).

"**Delaware LLC Act**" has the meaning ascribed to it in Section 2.1(a).

"**DGCL**" has the meaning ascribed to it in Section 2.1(b).

"**Disclosed Contract**" has the meaning ascribed to it in Section 4.14.

"**Dissenting Share Notice**" has the meaning ascribed to it in Section 2.3(h)(ii).

"**Dissenting Shares**" has the meaning ascribed to it in Section 2.3(h)(i).

"**Earnout Notes**" has the meaning ascribed to it in Section 2.3(g)(i)(C).

"**Eateries**" has the meaning ascribed to it in the preamble to this Agreement.

"**Eateries Common Stock**" has the meaning ascribed to it in the recitals to this Agreement.

"Eateries Earnout Notes" has the meaning ascribed to it in Section 2.3(g)(i)(C).

"Eateries Entities" has the meaning ascribed to it in the recitals to this Agreement.

"Eateries Merger" has the meaning ascribed to it in Section 2.3(a).

"Eateries Merger Consideration" has the meaning ascribed to it in Section 2.3(g)(i).

"Eateries Merger Effective Time" has the meaning ascribed to it in Section 2.3(b).

"Eateries Mergers" means, collectively, the Eateries Merger and the Eateries Reincorporation Merger.

"Eateries Merger Sub" has the meaning ascribed to it in the preamble to this Agreement.

"Eateries Merger Surviving Corporation" has the meaning ascribed to it in Section 2.3(c).

"Eateries Percentage" has the meaning ascribed to it in Section 2.3(g)(i)(A).

"Eateries Reincorporation Merger" has the meaning ascribed to it in Section 2.3(l).

"Eateries Reincorporation Merger Sub" has the meaning ascribed to it in Section 2.3(l).

"EBITDA" has the meaning ascribed to it in Section 2.7(b).

"EBITDA Amount" has the meaning ascribed to it in Section 2.7(a).

"EBITDA Objection Notice" has the meaning ascribed to it in Section 2.7(c)(ii).

"EBITDA Objection Period" has the meaning ascribed to it in Section 2.7(c)(ii).

"Employee" means any employee of Holdings or of a Subsidiary, including any employee co-employed by Holdings, and/or any Subsidiary.

"Employee Plan" means each "employee benefit plan," as such term is defined in Section 3(3) of ERISA, that (i) is subject to any provision of ERISA and (ii) is maintained, contributed (or required to be contributed) to or sponsored by Holdings, any Subsidiary or any of their respective ERISA Affiliates, or with respect to which any of them has any Liability, including any contingent liability, as the case may be.

"Employment Agreements" has the meaning ascribed to it in Section 4.19(d).

"Encumbrance" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environmental Law(s)" has the meaning ascribed to it in Section 4.18(a).

"Equity Interests" means (a) any capital stock, share, partnership or membership interest, unit of participation or other similar interest (however designated) in any Person and (b) any option, warrant, purchase right, conversion right, exchange rights or other Contract which would entitle any Person to acquire any such interest in such Person or otherwise entitle any Person to share in the equity, profit, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" of any entity means any other entity that, together with such entity, would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Estimated Closing Balance Sheet" has the meaning ascribed to it in Section 2.6(a).

"Estimated Net Working Capital Statement" has the meaning ascribed to it in Section 2.6(a).

"Fiesta" has the meaning ascribed to it in the preamble to this Agreement.

"Fiesta Delaware" has the meaning ascribed to it in Section 2.2(a).

"Fiesta Earnout Notes" has the meaning ascribed to it in Section 2.2(g)(iii).

"Fiesta Entities" has the meaning ascribed to it in the recitals to this Agreement.

"Fiesta Merger" has the meaning ascribed to it in Section 2.2(a).

"Fiesta Merger Consideration" has the meaning ascribed to it in Section 2.2(g).

"Fiesta Merger Effective Time" has the meaning ascribed to it in Section 2.2(b).

"Fiesta Merger Sub" has the meaning ascribed to it in the preamble to this Agreement.

"Fiesta Merger Surviving Company" has the meaning ascribed to it in Section 2.2(c).

"Fiesta Notes" has the meaning ascribed to it in Section 2.2(g)(iii).

"Fiesta Percentage" has the meaning ascribed to it in Section 2.2(g)(i).

"Fiesta Restaurants Dissolution" has the meaning ascribed to it in Section 2.1(d).

"Fiesta Subsidiaries" has the meaning ascribed to it in the recitals to this Agreement.

"Final Eateries Surviving Corporation" has the meaning ascribed to it in Section 2.3(l).

"Financial Statements" has the meaning ascribed to it in Section 4.8(a).

"**Fiscal 2006**" has the meaning ascribed to it in Section 2.7(a).

"**GAAP**" means generally accepted United States accounting principles consistently applied with past practices.

"**Garcia's Business**" has the meaning ascribed to it in the recitals to this Agreement.

"**Garfield's Business**" has the meaning ascribed to it in the recitals to this Agreement.

"**General Basket**" has the meaning ascribed to it in Section 10.3(a).

"**GRP Contribution**" has the meaning ascribed to it in Section 2.1(c).

"**GRP Entities**" has the meaning ascribed to it in the recitals to this Agreement.

"**Guarantee**" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person, (b) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor or (c) any Liability as a general partner of a partnership or as a venturer in a joint venture in respect of Debt or other obligations of such partnership or venture

"**Hazardous Substances**" has the meaning ascribed to it in Section 4.18(a).

"**Holdings**" has the meaning ascribed to it in the preamble to this Agreement.

"**Holdings Asset Contribution**" has the meaning ascribed to it in Section 2.1(e).

"**Holdings Expenses**" has the meaning ascribed to it in Section 2.5(b).

"**Holdings Member Percentage Interests**" has the meaning ascribed to it in Section 2.4.

"**Independent Auditor**" shall mean an individual partner of Grant Thornton, LLP or, if no such partner is available, an individual partner of an accounting firm reasonably acceptable to the Purchaser and the Sellers' Representatives who (i) is experienced as to arbitration and the issue under dispute and (ii) has no conflict of interest that would adversely affect his or her ability to be impartial towards the parties. If the parties are unable to appoint one arbiter within 30 Business Days after the receipt of a request to do so, then the Independent Auditor shall be chosen by appropriate procedures of the American Arbitration Association, and such Independent Auditor shall be a person meeting the qualifications set forth above.

"**Initial Eateries Notes**" has the meaning ascribed to it in Section 2.3(g)(i)(B).

"**Initial Fiesta Notes**" has the meaning ascribed to it in Section 2.2(g)(ii).

3316755-5
- 8 -

"**Initial Seller Notes**" has the meaning ascribed to it in Section 2.3(g)(i)(B).

"**Insurance Policies**" has the meaning ascribed to it in Section 4.16.

"**Intellectual Property Assets**" has the meaning ascribed to it in Section 4.13.

"**Intellectual Property Licenses**" has the meaning ascribed to it in Section 4.13.

"**Interests**" means all of the issued and outstanding membership interests of Holdings.

"**Interim Financial Statements**" has the meaning ascribed to it in Section 4.8(a).

"**Knowledge**" with respect to a Seller, means such Seller will be deemed to have "Knowledge" of a particular fact or other matter if (i) such Seller is actually aware of such fact or other matter, or (ii) a prudent individual similarly situated would have or should have known. With respect to Holdings, Holdings will be deemed to have "Knowledge" of a particular fact or other matter if (i) any individual identified on Schedule 1.1 is actually aware of such fact or other matter, or (ii) a prudent person in such individual's capacity as a manager, director, officer or employee of Holdings or any Subsidiary, as applicable, could reasonably be expected to discover or otherwise become aware of such fact or other matter in the course of performing such individual's duties as a Manager, director, officer or employee of Holdings or such Subsidiary.

"**Landlord Consents**" has the meaning ascribed to it in Section 9.2(e).

"**Law**" means any foreign, federal, state or local law, statute, ordinance, rule, regulation, Order, writ, injunction, judgment, decree, announcement or other binding action or requirement of any Authority.

"**Lease**" or "**Leases**" has the meaning ascribed to it in Section 4.17(b).

"**Letter of Transmittal**" has the meaning ascribed to it in Section 2.3(i)(i).

"**Liabilities**" has the meaning ascribed to it in Section 4.8(c).

"**Licenses**" has the meaning ascribed to it in Section 4.18(b).

"**Liquor Licenses**" has the meaning ascribed to it in Section 4.15(e).

"**LLC Reincorporation Merger**" has the meaning ascribed to it in Section 2.1(a).

"**LLC Reincorporation Merger Sub**" has the meaning ascribed to it in Section 2.1(a).

"**Local LLC Act**" means, in the case of any LLC Reincorporation Merger involving an Oklahoma limited liability company, the Oklahoma Limited Liability Company Act, and, in the case of any LLC Reincorporation Merger involving an Arizona limited liability company, the Arizona Limited Liability Company Act.

"**Losses**" means (subject to the proviso contained in Section 10.2(a)(viii), which is applicable solely to Section 10.2(a)(viii)) all losses, Liabilities, claims, Actions, causes of action,

awards, judgments, payments, costs, expenses, interest, penalties, fines and other damages (including consequential, punitive, special and incidental damages and diminution in value), all costs and expenses of investigating and defending any claim lawsuit or arbitration and any appeal therefrom (including reasonable attorneys', accountants', and advisors' fees) and all amounts paid incident to any compromise or settlement of any such claim, lawsuit, arbitration or other Action, in each case, whether or not involving a third-party claim.

"**Management Level Employee**" has the meaning ascribed to it in Section 4.19(e).

"**Management Sellers**" means James M. Burke, Bradley L. Grow and Vincent Orza, and each of their related investors named as Management Sellers on the signature pages to this Agreement.

"**Management Seller Termination Agreements**" means the agreements between Eateries and the Management Sellers attached hereto as <u>Exhibit B</u>, pursuant to which (a) the Employment Agreements between Eateries and the Management Sellers are being terminated effective as of the Closing and (b) all obligations thereunder of Eateries are being extinguished effective as of the Closing.

"**Manager**" or "**Managers**" means the managers of each of the limited liability companies consisting of Holdings and the Subsidiaries that are limited liability companies.

"**Material Adverse Effect**" means any effect which has had or could reasonably be expected to result in (i) a material adverse effect on or change in the Business, assets, condition (financial or otherwise), performance or results of operations of the Acquired Companies, taken as a whole, or (ii) a material adverse effect on the ability of Sellers, Holdings or any of the Subsidiaries to consummate the Contemplated Transactions, but excluding any effect or change arising from changes in general conditions in the restaurant industry after the date of this Agreement that do not disproportionately affect the Acquired Companies as compared to other casual-theme, full service restaurant chains operating primarily in malls in the United States.

"**Material Supplier**" has the meaning ascribed to it in Section 4.24.

"**Minimum Consent Requirement**" has the meaning ascribed to it in Section 9.2(e).

"**Most Recent Balance Sheet**" has the meaning ascribed to it in Section 4.8(a).

"**Multiemployer Plan**" means each Employee Plan that is a multiemployer plan, as defined in Section 3(37) 4001(a)(3) of ERISA.

"**Net Working Capital**" has the meaning ascribed to it in Section 2.6(b).

"**Net Working Capital Target**" has the meaning ascribed to it in Section 2.6(f).

"**Non-compete Period**" has the meaning ascribed to it in Section 7.4(d).

"**Non-Executing Shareholder**" means any record or beneficial owner of shares of Eateries Common Stock other than Holdings.

"**Objection Notice**" has the meaning ascribed to it in Section 2.6(d).

"**OGCA**" has the meaning ascribed to it in Section 2.1(b).

"**Order**" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any Authority.

"**Ordinary Course of Business**" means an action taken by a Person that is (i) consistent with the past practices of such Person and is taken in the ordinary course of the normal operations of such Person, (ii) customarily not required to be authorized by the board of directors or Managers of such Person (or by any Person or group of Persons exercising similar authority) and customarily is not required to be specifically authorized by the parent company (if any) of such Person, (iii) similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors or Managers (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal operations of other Persons that are in the same business as such Person and (iv) taken in compliance in all material respects with all applicable Laws and Contractual Obligations.

"**Organizational Documents**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

"**Other Holdings Documents**" has the meaning ascribed to it in Section 2.9(b)(x).

"**Other Managers**" means Preston Stockton, Jon B. Edwards and Douglas M. Davis.

"**Other Manager Amended and Restated Employment Agreements**" means the Amended and Restated Employment Contracts dated and entered into as of the date hereof between Eateries and the Other Managers attached as <u>Exhibit C</u> hereto, pursuant to which (a) the Other Manager Employment Agreements are being amended and restated effective as of the Closing Date and (b) the Other Manager Stock Agreements are being terminated effective as of the Closing Date (and prior to the consummation of the Contemplated Transactions on the Closing Date) and all rights and obligations of the parties thereto are being extinguished.

"**Other Manager Employment Agreements**" means the "Existing Employment Agreements" between Eateries and the Other Managers which are referred to in the Other Manager Amended and Restated Employment Agreements attached as <u>Exhibit C</u> hereto.

"**Other Manager Stock Agreements**" means the "Existing Stock Agreements" between Eateries and each of Doug Davis and J. B. Edwards which are referred to in the Other Manager Amended and Restated Employment Agreements for Doug David and J.B. Edwards which are attached as <u>Exhibit C</u> hereto.

"**Other Purchaser Documents**" has the meaning ascribed to it in Section 2.9(a)(iii)(D).

"**Other Seller Documents**" has the meaning ascribed to it in Section 2.9(c)(i)(C).

"**Other Subsidiary Shares**" has the meaning ascribed to it in Section 4.4(c).

"**Pepperoni Grill Business**" has the meaning ascribed to it in the recitals to this Agreement.

"**Permit**" means any governmental license, permit, authorization, concession or franchise.

"**Permitted Liens**" means (i) liens with respect to Taxes that are not yet due and payable, (ii) liens of repairmen or bailees or similar liens and (iii) landlords', materialmen's or mechanic's liens, provided, however, that such liens were incurred in the Ordinary Course of Business in respect of obligations which are not overdue and for which adequate provision has been made in accordance with GAAP.

"**Person**" means any entity, corporation, company, association, joint venture, joint stock company, limited liability company, partnership, trust, organization, individual (including personal representatives, executors and heirs of a deceased individual), Authority, trustee, receiver or liquidator.

"**Plan**" has the meaning ascribed to it in Section 4.20(c).

"**Post-Closing Liquor License Actions**" has the meaning ascribed to it in Section 4.15(e).

"**Post-Closing Taxes**" means Taxes attributable to Post-Closing Tax Periods other than any Conveyance Taxes. In the case of any Taxes that are imposed on a periodic basis and are payable for a Straddle Period the portion of such Tax that constitutes Post-Closing Taxes shall (x) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Post-Closing Tax Period and the denominator of which is the number of days in the entire Tax Period, and (y) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable if the relevant Tax period started on the day after the Closing Date. Any credits relating to a Straddle Period shall be taken into account as though the relevant Tax period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with reasonable prior practice of Holdings and its Subsidiaries.

"**Post-Closing Tax Period**" means any taxable period ending after the Closing Date or, with respect to any Straddle Period, that portion of the taxable period that begins after the Closing Date.

"**Potential Transaction**" has the meaning ascribed to it in Section 6.7.

"**Pre-Closing Liquor License Actions**" has the meaning ascribed to it in Section 4.15(e).

"**Pre-Closing Reorganization Transactions**" means each of the transactions contemplated by Section 2.1, including (a) each of the LLC Reincorporation Mergers, (b) the Roma Foods Reincorporation Merger, (c) the GRP Contribution, (d) if completed, the Fiesta Restaurants Dissolution and (e) if completed, the Holdings Asset Contribution.

"**Pre-Closing Taxes**" means Taxes attributable to Pre-Closing Tax Periods. In the case of any Taxes that are imposed on a periodic basis and are payable for a Straddle Period the portion of such Tax that constitutes Pre-Closing Taxes shall (x) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Pre-Closing Tax Period and the denominator of which is the number of days in the entire Tax Period, and (y) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable if the relevant Tax period ended on the Closing Date. Any credits relating to a Straddle Period shall be taken into account as though the relevant Tax period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with reasonable prior practice of Holdings and its Subsidiaries.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date or, with respect to any Straddle Period, that portion of the taxable period that ends on the Closing Date.

"**Predecessor**" means, with respect to any specified Person, (a) any other Person that has ever merged or consolidated with or into such specified Person or (b) any other Person all or substantially all of whose assets has ever been acquired by such specified Person (whether by purchase, upon liquidation or otherwise).

"**Pro Forma**" means, with respect to the Financial Statements identified as being "Pro Forma", that the actual historical financial statements of Holdings and the Subsidiaries as of the applicable dates and for the applicable periods as prepared in accordance with GAAP have been adjusted in accordance with GAAP in order to give effect, as of the applicable balance sheet date or as of the first day of the applicable period, as the case may be, to the formation of Holdings and the transactions pursuant to which Holdings and its Subsidiaries became a consolidated group.

"**Proportional Percentage**" means, with respect to each Seller, the Holdings Member Percentage Interest of such Seller. Schedule 10.2(a) includes a table of the Proportional Percentages of the Sellers.

"**Purchaser**" has the meaning ascribed to it in the preamble to this Agreement.

"**Purchaser Entities**" has the meaning ascribed to it in the preamble to this Agreement.

"**Purchaser Indemnities**" has the meaning ascribed to it in Section 10.2(a).

"**Retained Liabilities**" means any and all Liabilities of Holdings and each of the Subsidiaries other than the specifically identified Assumed Liabilities.

"**Rewards Network**" means Rewards Network Establishment Services Inc., a Delaware corporation.

"**Rewards Network Agreements**" means all Contracts between Holdings and/or any of its Subsidiaries, on the one hand, and Rewards Network, on the other hand, including, without limitation, the following: (i) the Dining Credits Purchase Agreement by and between Rewards Network and Fiesta, (ii) the Dining Credits Purchase Agreement by and among Rewards Network, Eateries, Roma Foods and Fiesta Restaurants, Inc., (iii) the Dining Credits Purchase Agreement dated as of November 4, 2004 between Rewards Network and GRP of Muskogee, LLC (as amended) and the Corporate Guaranty thereof, (iv) the Security Agreement dated as of November 4, 2004 between Rewards Network and GRP of Muskogee, LLC, (v) Dining Credits Purchase Agreement dated as of November 4, 2004 between Rewards Network and GRP of Ft. Smith, LLC (as amended) and the Corporate Guaranty thereof and (vi) the Security Agreement dated as of November 4, 2004 between Rewards Network and GRP of Ft. Smith.

"**Rewards Network Termination Liabilities**" means any and all Liabilities incurred or to be incurred in connection with the termination of the Rewards Network Agreements.

"**Roma Foods**" has the meaning ascribed to it in the recitals to this Agreement.

"**Roma Foods Reincorporation Merger**" has the meaning ascribed to it in Section 2.1(b).

"**Roma Foods Reincorporation Merger Sub**" has the meaning ascribed to it in Section 2.1(b).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller Indemnities**" has the meaning ascribed to it in Section 10.2(c).

"**Seller Note Issuers**" has the meaning ascribed to it in Section 2.4.

"**Seller Notes**" has the meaning ascribed to it in Section 2.3(g)(i)(C).

"**Sellers**" has the meaning ascribed to it in the preamble to this Agreement.

"**Sellers' Representatives**" has the meaning ascribed to it in Section 12.1(a).

"**Shares**" means the issued and outstanding shares of Eateries Common Stock.

"**Specified Leases**" has the meaning ascribed to it in Section 9.2(e).

"**Specified Plans**" has the meaning ascribed to it in Section 6.11.

"**Straddle Period**" means any taxable period that includes the Closing Date and ends after the Closing Date.

"**Subsidiary**" or "**Subsidiaries**" has the meaning ascribed to it in Section 4.4(a).

"**Superlien**" has the meaning ascribed to it in Section 4.18(a).

"**Tangible Personal Property**" means all computers, machinery, equipment, furniture, fixtures, supplies, spare parts, tools, stores and other tangible personal property owned by either Holdings or any of the Subsidiaries, except such tangible personal property set forth on Schedule F, which such tangible personal property set forth on Schedule F is to be distributed to the Management Sellers prior to the Closing on terms and conditions reasonably acceptable to the Purchaser.

"**Taxes**" (or, in the singular, "**Tax**") means (i) all federal, state, municipal, local and foreign taxes, assessments and other charges, duties, impositions and Liabilities imposed by Authorities, including without limitation taxes based upon or measured by gross receipts, income, profits, sales, capital use and occupation, goods and services, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, VAT, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts, and (ii) any Liability for the payment of any amounts of the type described in the foregoing clause (i) as a result of any express or implied obligation to indemnify any other Person or as a result of any obligations under any Contracts with any other Person with respect to such amounts.

"**Tax Return**" means all returns, amended returns, declarations, reports, estimates, claims for refund, information returns and statements including any schedule or attachment thereto and any amendment thereof filed or required or permitted to be filed under federal, state, territorial, local, or foreign law relating to Taxes by Holdings and/or any of the Subsidiaries.

"**Taxing Authority**" means the Internal Revenue Service and any other United States federal, state, municipal or local or foreign Authority responsible for the administration of any Tax.

"**Third Party Claim**" has the meaning ascribed to it in Section 10.5(a).

"**True-up Effective Time**" means 11:59 P.M. PST on December 31, 2006.

"**2006 Financial Statements**" has the meaning ascribed to it in Section 2.7(c)(i).

"**2006 Financials Delivery Date**" has the meaning ascribed to it in Section 2.7(c)(i).

## ARTICLE II.

## CONTEMPLATED TRANSACTIONS

2.1.    <u>Pre-Closing Reorganization Transactions</u>.

(a)    <u>LLC Reincorporation Mergers</u>.    On or prior to the Closing Date, in accordance with the applicable provisions of the Local LLC Act and the Delaware Limited Liability Company Act (the "**Delaware LLC Act**"), each of the GRP Entities and each of the Fiesta Entities shall be merged (each such merger, an "**LLC Reincorporation Merger**") with and into a newly formed, wholly owned limited liability company subsidiary of such GRP Entity

or Fiesta Entity, as the case may be, organized and existing under the Delaware LLC Act (each such subsidiary, an "LLC Reincorporation Merger Sub"). At the effective time of each LLC Reincorporation Merger:

(i)     the separate limited liability company existence of the applicable GRP Entity or Fiesta Entity that is a constituent limited liability company in such merger shall cease, and the applicable LLC Reincorporation Merger Sub shall continue as the surviving limited liability company under the name of the non-surviving constituent limited liability company and shall succeed to and assume all of the rights and obligations of each of the applicable constituent limited liability companies in accordance with the applicable provisions of the Local LLC Act and the Delaware LLC Act;

(ii)     all of the limited liability company membership interests of the applicable LLC Reorganization Merger Sub shall be cancelled; and

(iii)     all of the limited liability company membership interests of the applicable GRP Entity or Fiesta Entity that is a constituent company in such merger that are held by its sole member (i.e., Holdings, in the case of the GRP Entities and Fiesta, and Fiesta, in the case of the Fiesta Subsidiaries) shall be converted into equivalent membership interests of the surviving company of such LLC Reincorporation Merger.

All documents relating to the formation of each LLC Reincorporation Merger Sub and each LLC Reincorporation Merger (including individualized agreements of merger and all articles of merger, certificates of merger and other documents to be filed with Authorities in connection therewith, all resolutions and other limited liability company approvals and all surviving limited liability company Organizational Documents, in each case, if applicable) shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement and shall be reasonably satisfactory to Holdings and its counsel.

(b)     <u>Roma Foods Reincorporation Merger</u>.  On or prior to the Closing Date, in accordance with the applicable provisions of the Oklahoma General Corporation Act (the "**OGCA**") and the Delaware General Corporation Law (the "**DGCL**"), Roma Foods shall be merged (the "**Roma Foods Reincorporation Merger**") with and into a newly formed, wholly owned corporate subsidiary of Roma Foods organized and existing under the DGCL (the "**Roma Foods Reincorporation Merger Sub**").  At the effective time of the Roma Foods Reincorporation Merger:

(i)     the separate corporate existence of Roma Foods shall cease, and the Roma Foods Reincorporation Merger Sub shall continue as the surviving corporation under the name "Roma Foods" and shall succeed to and assume all of the rights and obligations of Roma Foods and the Roma Foods Reincorporation Merger Sub in accordance with the applicable provisions of the OGCA and the DGCL;

(ii)     all of the issued and outstanding shares of capital stock of the Roma Foods Reincorporation Merger Sub shall be cancelled; and

(iii)    all of the issued and outstanding capital stock of Roma Foods held by its sole stockholder (*i.e.*, Eateries) shall be converted into shares of capital stock of the surviving corporation of such merger.

All documents relating to the formation of the Roma Foods Reincorporation Merger Sub and the Roma Foods Reincorporation Merger (including an individualized agreement of merger and all articles of merger, certificates of merger and other documents to be filed with Authorities in connection therewith, all resolutions and other corporate approvals and all surviving company Organizational Documents, in each case, if applicable) shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement and shall be reasonably satisfactory to Holdings and its counsel.

(c)    __Contribution of the GRP Entities Equity to Eateries__.  On or prior to the Closing Date, Holdings shall contribute to the capital of Eateries all of its Equity Interests in each of the GRP Entities (the "**GRP Contribution**").  No consideration shall be paid to Holdings by Eateries in exchange for such Equity Interests.  All documents relating to the GRP Contribution (including all resolutions and other corporate and limited liability company approvals and all amendments to the Organizational Documents of the GRP Entities in connection therewith) shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement and shall be reasonably acceptable to Holdings and its counsel.

(d)    __Liquidation of Fiesta Restaurants, Inc__.  If requested by the Purchaser, on or prior to the Closing Date, Eateries shall cause its inactive subsidiary Fiesta Restaurants, Inc. to be liquidated and dissolved (the "**Fiesta Restaurants Dissolution**").  All documents relating to the Fiesta Restaurants Dissolution (including all resolutions and other corporate approvals and all documents to be filed with Authorities in connection therewith) shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement and shall be reasonably acceptable to Holdings and its counsel.

(e)    __Holdings Asset Contribution__.  If requested by the Purchaser, on or prior to the Closing Date, Holdings shall execute such bills of sale and other instruments of assignment and transfer as the Purchaser may request in order to (i) transfer and assign to Eateries (or its designee(s)) effective as of the Closing Date any interest that Holdings may have in the Assets used exclusively in connection with the Garfield's Business, (ii) transfer and assign to Roma Foods effective as of the Closing Date any interest that Holdings may have in the Assets used exclusively in connection with the Pepperoni Grill Business and (iii) transfer and assign to Fiesta (or its designee(s)) effective as of the Closing Date any interest that Holdings may have in the Assets used exclusively in connection with the Garcia's Business (such transfers and assignments, the "**Holdings Asset Contribution**").  Any Assets used in connection with more than one of the Garfield's Business, the Pepperoni Grill Business and the Garcia's Business shall be identified as such by Holdings and transferred to an Acquired Company designed by the Purchaser.  Such assignments shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement and shall be reasonably acceptable to Holdings and its counsel.  The parties hereto agree that none of the Subsidiaries of Holdings shall assume any Liability of Holdings in connection with such transfers and assignments or otherwise, and that all Liabilities of Holdings shall be deemed to be Retained Liabilities for purposes of this Agreement.

(f) **Certain Fees and Expenses Relating to the Pre-Closing Reorganization Transactions**. The Acquired Companies shall be responsible for and shall pay all of the fees and expenses of the parties relating to the Pre-Closing Reorganization Transactions (other than related Taxes imposed on the other parties hereto and legal fees incurred by the other parties hereto, which shall be paid by such other parties); *provided*, that the first $50,000 of such fees and expenses shall be paid by Holdings or, alternatively, by the Acquired Companies with such first $50,000 being treated as Holdings Expenses.

2.2.    **The Fiesta Merger**.

(a)     **The Fiesta Merger**.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the applicable provisions of the Delaware LLC Act, Fiesta Merger Sub shall be merged (the "**Fiesta Merger**") with and into the Delaware limited liability company that survived the LLC Reincorporation Merger involving Fiesta ("**Fiesta Delaware**") at the Fiesta Merger Effective Time (as hereinafter defined).

(b)     **The Fiesta Merger Effective Time**.  The parties hereto shall cause the Fiesta Merger to be consummated on the Closing Date by the filing of a certificate of merger with the Secretary of State of Delaware as provided in the Delaware LLC Act.  The Fiesta Merger shall become effective upon such filing or at such time thereafter as the Purchaser and Holdings shall agree and specify in such certificate of merger (the "**Fiesta Merger Effective Time**").

(c)     **Effects of the Fiesta Merger**.  At the Fiesta Merger Effective Time, the separate limited liability company existence of Fiesta Merger Sub shall cease, and Fiesta Delaware shall continue as the surviving corporation under the name "Fiesta, LLC" (or such other name as is designated by Purchaser prior to the Fiesta Merger Effective Time and set forth in the certificate of merger relating to the Fiesta Merger) and shall succeed to and assume all of the rights and obligations of Fiesta Merger Sub and Fiesta Delaware in accordance with, and otherwise have the effects provided in, the applicable provisions of the Delaware LLC Act.  As the context requires, Fiesta Delaware is sometimes hereinafter referred to as the "**Fiesta Merger Surviving Company**."

(d)     **Organizational Documents; Directors and Officers**.  The parties hereto shall cause Fiesta Delaware and Fiesta Merger Sub to take all required limited liability company actions so that, as of the Fiesta Merger Effective Time, the limited liability company operating agreement of the Fiesta Merger Surviving Company will be amended and restated in the form of the limited liability company operating agreement of Fiesta Merger Sub (with such changes therein as are required to reflect the name of the Fiesta Merger Surviving Company and the identity of the initial members of the board of managers and officers of the Fiesta Merger Surviving Company).  The members of the board of managers and officers of the Fiesta Merger Sub immediately prior to the Fiesta Merger Effective Time shall, from and after the Fiesta Merger Effective Time, be the initial members of the board of managers and officers of the Fiesta Merger Surviving Company until their successors have been duly elected or appointed and qualified, or until their earlier death, resignation or removal in accordance with the Fiesta Merger Surviving Company's limited liability company operating agreement.

(e) **Preparation of Documents Relating to the Fiesta Merger**. All documents relating to the Fiesta Merger (including all certificates of merger and other documents to be filed with Authorities in connection therewith) shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement and shall be reasonably acceptable to Holdings and its counsel.

(f) **Effect on Equity Interests**. As of the Fiesta Merger Effective Time, by virtue of the Fiesta Merger and without any action on the part of the holder of membership interests (or other Equity Interests) of either Fiesta Merger Sub or Fiesta Delaware:

(i) **Equity Interests of Fiesta Merger Sub**. The outstanding membership interests in Fiesta Merger Sub (all of which are held by a direct wholly owned corporate subsidiary of the Purchaser) shall be converted into a membership interest in the Fiesta Merger Surviving Company, and such subsidiary of the Purchaser shall become the sole member of the Fiesta Merger Surviving Company.

(ii) **Equity Interests of Fiesta Delaware**. All of the outstanding membership interests (and other Equity Interests) in Fiesta Delaware shall be converted into the right to receive the Fiesta Merger Consideration (as defined below) from the Fiesta Merger Surviving Company.

(g) **Fiesta Merger Consideration**. As used herein, "**Fiesta Merger Consideration**" means, subject to adjustment as hereinafter provided in this Article II and Articles VIII and X below, the aggregate of:

(i) an amount in cash (payable at Closing by wire transfer in immediately available funds to an account designated in writing prior to the Closing Date by Holdings to the Purchaser) equal to the product of (x) 39.53% (the "**Fiesta Percentage**") and (y) the remainder of (A) the Cash Purchase Price (as hereinafter defined) less (B) the Debt Amount (as hereinafter defined) attributable to the Fiesta Entities;

(ii) subordinated notes (the "**Initial Fiesta Notes**"), each in the form of Exhibit 2.2(g), in an initial aggregate principal amount equal to the product of (x) the Fiesta Percentage and (y) $2,000,000 (such notes to be issued to Holdings at the Closing); and

(iii) additional subordinated notes ("**Fiesta Earnout Notes**" and together with the Initial Fiesta Notes, the "**Fiesta Notes**"), if any, each in the form of Exhibit 2.2(g), in an initial aggregate principal amount equal to the product of (x) the Fiesta Percentage and (y) the EBITDA Amount (as determined in accordance with Section 2.7) (such notes to be issued to Holdings at the times provided for in Section 2.7 if and to the extent the conditions set forth in Section 2.7 are satisfied).

(h) **Withholding Rights**. The Purchaser or the Fiesta Merger Surviving Company shall be entitled to deduct and withhold from the Fiesta Merger Consideration otherwise payable pursuant to this Agreement such amounts as the Purchaser or the Fiesta Merger Surviving Company is required to deduct and withhold with respect to the making of

such payment under the Code, or any provision of state, local or foreign Tax Law, and the Purchaser or the Fiesta Merger Surviving Company shall make any required filings with and payments to Taxing Authorities relating to any such deduction or withholding. To the extent that amounts are so deducted and withheld by the Purchaser or the Fiesta Merger Surviving Company, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Holdings in respect of which such deduction and withholding was made by the Purchaser or the Fiesta Merger Surviving Company.

**2.3.**   **The Eateries Mergers.**

(a)   **The Eateries Merger.**  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the applicable provisions of the OGCA, Eateries Merger Sub shall be merged (the "**Eateries Merger**") with and into Eateries at the Eateries Merger Effective Time (as hereinafter defined).

(b)   **The Eateries Merger Effective Time.**  The parties hereto shall cause the Eateries Merger to be consummated on the Closing Date by the filing of a certificate of merger with the Secretary of State of Oklahoma as provided in the OGCA. The Eateries Merger shall become effective upon such filing or at such time thereafter as the Purchaser and Holdings shall agree and specify in such articles of merger (the "**Eateries Merger Effective Time**").

(c)   **Effects of the Eateries Merger.**  At the Eateries Merger Effective Time, the separate corporate existence of Eateries Merger Sub shall cease, and Eateries shall continue as the surviving corporation under the name "Eateries, Inc." (or such other name as is designated by Purchaser prior to the Eateries Merger Effective Time and set forth in the articles of merger relating to the Eateries Merger) and shall succeed to and assume all of the rights and obligations of Eateries Merger Sub and Eateries in accordance with, and otherwise have the effects provided in, the applicable provisions of the OGCA. As the context requires, Eateries is sometimes hereinafter referred to as the "**Eateries Merger Surviving Corporation.**"

(d)   **Organizational Documents; Directors and Officers.**  The parties hereto shall cause Eateries and Eateries Merger Sub to take all required corporate actions so that, as of the Eateries Merger Effective Time, the certificate of incorporation and bylaws of the Eateries Merger Surviving Corporation will be amended and restated in the form of the certificate of incorporation and bylaws of Eateries Merger Sub as in effect immediately prior to the Eateries Merger Effective Time (with such changes therein as are required to reflect the name of the Eateries Merger Surviving Corporation). The directors and officers of the Eateries Merger Sub immediately prior to the Eateries Merger Effective Time shall, from and after the Eateries Merger Effective Time, be the initial directors and officers of the Eateries Merger Surviving Corporation until their successors have been duly elected or appointed and qualified, or until their earlier death, resignation or removal in accordance with the Eateries Merger Surviving Corporation's certificate of incorporation and bylaws.

(e)   **Preparation of Documents Relating to the Eateries Merger.**  All documents relating to the Eateries Merger (including all articles of merger and other documents to be filed with Authorities in connection therewith) shall be prepared by counsel to the

3316755-5                                            - 20 -

Purchaser on a basis consistent with this Agreement and shall be reasonably acceptable to Holdings and its counsel.

(f) **Effect on Equity Interests**. As of the Eateries Merger Effective Time, by virtue of the Eateries Merger and without any action on the part of the holders of capital stock of either Eateries Merger Sub or Eateries:

(i) **Capital Stock of Eateries Merger Sub**. Each of the issued and outstanding shares of Common Stock, par value $0.01 per share of Eateries Merger Sub shall be converted into a share of Common Stock, par value $0.01 per share of the Eateries Merger Surviving Corporation.

(ii) **Capital Stock of Eateries**. All issued and outstanding shares of Eateries Common Stock, other than Dissenting Shares (as defined below), if any, shall be converted into the right to receive Eateries Merger Consideration (as defined below). All such shares of Eateries Common Stock, when so converted, shall no longer be outstanding, shall automatically be canceled and retired and shall cease to exist, and each certificate previously representing any such shares ("Certificates") shall thereafter represent only the right to receive the Eateries Merger Consideration. No interest will be paid or will accrue on any cash payable as Eateries Merger Consideration. The Eateries Merger Consideration payable in respect of shares of Eateries Common Stock pursuant to this Section 2.3 is payable in full satisfaction of all rights pertaining to such shares, and from and after the Eateries Merger Effective Time, there shall be no further registration of transfers on the stock transfer books of the Eateries Merger Surviving Corporation or the Final Eateries Surviving Corporation (as defined below) of the shares of Eateries Common Stock which were issued and outstanding immediately prior to the Eateries Merger Effective Time.

(iii) **Excluded Shares**. Any shares of Eateries Common Stock held in the treasury of Eateries shall be canceled and retired and shall cease to exist, and no consideration shall be payable in respect thereof.

(g) **Eateries Merger Consideration**.

(i) **Definition**. As used herein, "Eateries Merger Consideration" means, the consideration payable in respect of outstanding Equity Interests of Eateries in connection with the Eateries Merger, which shall be, in the aggregate for all outstanding Equity Interests of Eateries, subject to adjustment as hereinafter provided in this Article II and Articles VIII and X below), equal to:

(A) an aggregate amount in cash (payable in connection with the Closing as provided in Section 2.3(i) below) equal to the product of (x) 60.47% (the "**Eateries Percentage**") and (y) the remainder of (1) the Cash Purchase Price less (2) the Debt Amount attributable to the Eateries Entities;

(B) subordinated notes (the "**Initial Eateries Notes**" and together with the Initial Fiesta Notes, the "**Initial Seller Notes**"), each in the form of Exhibit 2.3(g), in an initial aggregate principal amount equal to the product of

(x) the Eateries Percentage and (y) $2,000,000 (such notes to be issued in connection with the Closing as provided in Section 2.3(i) below); and

(C)    additional subordinated notes ("Eateries Earnout Notes" and, together with the Fiesta Earnout Notes, collectively, the "Earnout Notes" and, together with the Fiesta Earnout Notes and the Initial Seller Notes, collectively, the "Seller Notes"), if any, each in the form of Exhibit 2.3(g), in an initial aggregate principal amount equal to the product of (x) the Eateries Percentage and (y) the EBITDA Amount (as determined in accordance with Section 2.7) (such notes to be issued in accordance with the instructions provided in the Letter of Transmittal (as defined below) at the time provided for in Section 2.7 if and to the extent the conditions set forth in Section 2.7 are satisfied).

(ii)    **Pro Rata Allocation of Eateries Merger Consideration.**  The Eateries Merger Consideration shall be allocated among the holders of shares of Eateries Common Stock (other than Dissenting Shares) on an equal and ratable basis determined, with respect to each holder, by reference to the total number of issued and outstanding shares of Eateries Common Stock (other than Dissenting Shares) held by such holder immediately prior to the Eateries Merger Effective Time as compared to the total number of issued and outstanding shares of Eateries Common Stock (including Dissenting Shares) as of immediately prior to the Eateries Merger Effective Time.

(iii)    **Exception to Pro Rata Allocation of Eateries Merger Consideration:  Non-Executing Shareholders to Receive Cash In Lieu of Sellers Notes.**  Notwithstanding anything to the contrary contained in Section 2.3(g)(ii), the Non-Executing Shareholders shall receive cash consideration (in lieu of being issued Seller Notes) with respect to that portion of the Eateries Merger Consideration otherwise payable to them in the form of Seller Notes under Section 2.3(g)(i)(B) and 2.3(g)(i)(C). In order that the aggregate amount of cash payable under Section 2.3(g)(i)(A) and Initial Eateries Notes issuable under Section 2.3(g)(i)(B) remain, in the aggregate, unchanged as a result of the Non-Executing Shareholders receiving all cash consideration pursuant to the application of this Section 2.3(g)(iii), the amount of cash consideration otherwise payable to Holdings under Section 2.3(g)(i)(A) shall be decreased on a pro rata dollar for dollar basis and the principal amount of Initial Eateries Notes issuable to Holdings under Section 2.3(g)(i)(B) shall be correspondingly increased on a pro rata dollar for dollar basis. In addition, in order that the aggregate amount of Eateries Earnout Notes to be issued remains, in the aggregate, unchanged as a result of the Non-Executing Shareholders receiving all cash consideration pursuant to the application of this Section 2.3(g)(iii), the Final Eateries Surviving Corporation shall not be required to issue any Eateries Earnout Notes to Holdings under Section 2.3(g)(i)(C) or pay any cash under this Section 2.3(g)(iii) in lieu of issuing Eateries Earnout Notes under Section 2.3(g)(i)(C) to the Non-Executing Shareholders unless and until the Management Sellers (who shall be jointly and severally obligated to do so) purchase from the Final Eateries Surviving Corporation (such purchase to be made at the time such Eateries Earnout Notes are to be issued and such cash is to be paid), additional subordinated promissory notes in the form of Exhibit 2.3(g) in an aggregate initial principal amount equal to the amount of the

aggregate additional cash payment to the Non-Executing Shareholders required by this Section 2.3(g)(iii).

(iv)    **Absolute Limitation on Eateries Merger Consideration.**  The parties acknowledge and agree that (A) the Purchaser and Eateries Merger Sub are entering into this Agreement in reliance on the representations and warrants set forth in Articles III and IV, including those representations set forth in Sections 3.1 and 4.2 and that Purchaser and Eateries Merger Sub understand based on such representations and warranties that, other than the 109.67 issued and outstanding shares of Eateries Common Stock, which, subject to Section 6.13, are held beneficially and of record as listed on Schedule 4.2, there are not as of the date of this Agreement (and there will not be at the Eateries Merger Effective Time) any outstanding shares of capital stock or other Equity Interests of Eateries and (B) under no circumstances shall the Eateries Merger Consideration payable in respect of all Equity Interests of Eateries exceed that which is described in Section 2.3(g)(i).  In the event that any of the representations and warranties referred to in clause (A) of the immediately preceding sentence prove to be inaccurate for any reason, in addition to the indemnification remedies set forth in Article X (but without any duplicative recovery), the per share Eateries Merger Consideration, after prior written notice to Sellers' Representatives, shall be equitably adjusted in the good faith judgment of the Purchaser in order to give effect to this Section 2.3(g)(iv).  Promptly following receipt of written notice of any such equitable adjustment, any excess amounts previously paid to holders of Eateries Common Stock shall forthwith be returned to the Final Eateries Surviving Corporation and the Seller Notes previously issued shall be amended to reflect the appropriate reduced amount of outstanding indebtedness thereunder.

(h)    **Dissenting Shares of Eateries Common Stock.**

(i)    **Rights of Dissenting Shareholders.**  Notwithstanding anything in this Agreement to the contrary, shares of Eateries Common Stock that are issued and outstanding immediately prior to the Eateries Merger Effective Time and that are held by a holder who was entitled to and has validly demanded appraisal rights in accordance with Section 1091 of the OGCA ("**Dissenting Shares**") shall not be converted into the right to receive the Eateries Merger Consideration unless and until such holder shall have failed to perfect or shall have effectively withdrawn or lost such holder's appraisal rights under the OGCA, but instead shall be converted into the right to receive such consideration determined to be due to such holder with respect to such Dissenting Shares in accordance with the OGCA.  If any such holder shall have failed to perfect or shall have effectively withdrawn or lost such appraisal rights pursuant to the OGCA, each Dissenting Share of such holder shall be treated as a share of Eateries Common Stock that had been converted as of the Effective Time into the right to receive the Eateries Merger Consideration in accordance with Section 2.3(f).

(ii)    **Dissenters' Rights Notice; Disclosure Document.**  Promptly following the execution and delivery of this Agreement, Eateries shall mail to each record holder of Eateries Common Stock who has not delivered a Consent a notice and disclosure statement (the "**Dissenting Share Notice**") stating that this Agreement has been approved by shareholders of Eateries holding the requisite number of shares of

Eateries Common Stock and that appraisal rights are available for holders of Eateries Common Stock to the extent provided in Section 1091 of the OGCA. The Dissenting Share notice shall also include a copy of Section 1091 of the OGCA and shall include sufficient disclosure relating to the Business, the Contemplated Transactions and the Sellers Notes as is necessary to satisfy all requirements of the OGCA and all other applicable Laws. Prior to the mailing of the Dissenting Share Notice, Eateries shall provide a draft copy of the Dissenting Share Notice to the Purchaser and shall incorporate all comments reasonably proposed by the Purchaser to such Dissenting Share Notice. The Purchaser shall reasonably cooperate with Eateries in the preparation of the Dissenting Share Notice. Holdings and Eateries covenant and agree that the Dissenting Share Notice shall be prepared and delivered by Eateries in accordance with all applicable Laws and the Organizational Documents of Eateries and none of the information included in the Dissenting Shares Notice will contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

          (iii)    **Proceedings Relating to Dissenting Shares.** Eateries shall give prompt notice to the Purchaser of any demands, attempted withdrawals of such demands and any other instruments served pursuant to the OGCA received by Eateries for appraisal of shares of Eateries Common Stock, and the Purchaser shall have the right to control all negotiations and proceedings with respect to such demands. Eateries shall not, except with the prior written consent of the Purchaser, make any payment with respect to, settle, offer to settle or approve any withdrawal of, any such demands.

          (i)    **Exchange of Certificates; Payment of the Eateries Merger Consideration.**

          (i)    **Holdings and Other Shareholders Who Deliver Letters of Transmittal Prior to Closing.** At the Closing, the Final Eateries Surviving Corporation shall (A) pay to Holdings and each other record holder of Eateries Common Stock as of immediately prior to the Eateries Merger Effective Time that shall have delivered to Eateries a letter of transmittal in a form reasonably requested by the Purchaser and all other related documents reasonably requested by the Purchaser in connection therewith (collectively, the "**Letter of Transmittal**") prior to the Closing Date, that portion of the cash Eateries Merger Consideration payable to such shareholder under Sections 2.3(f) and 2.3(g)(i)(A) above and (B) issue to Holdings the Initial Eateries Note issuable under Sections 2.3(f) and 2.3(g)(i)(B) above. Each such cash payment will be made by wire transfer of immediately available funds (in the case of any such shareholder who has delivered wire transfer instructions to the Purchaser prior to the Closing Date) or by check (in the case of any other such shareholder). Subject to Section 2.3(g)(iii), the Final Eateries Surviving Corporation shall issue and deliver the Eateries Earnout Notes, if any, to Holdings in accordance with the instructions relating to such issuance provided in the Letter of Transmittal delivered by Holdings. No Eateries Merger Consideration shall be payable hereunder to any holder of Eateries Common Stock until such time as such holder shall have delivered a fully and properly completed and executed Letter of Transmittal to the Final Eateries Merger Surviving Corporation. The Purchaser shall use

its commercially reasonable efforts to provide to Eateries (for further distribution to all record holders of Eateries Common Stock) a form of the Letter of Transmittal prior to the Closing Date.

(ii)    **Non-Executing Shareholders; Exchange Procedures**. Promptly after the Closing Date, the Final Eateries Surviving Corporation shall (or shall cause an agent thereof) to mail or deliver to each Person who was, at the Eateries Merger Effective Time, a holder of record of Eateries Common Stock and whose shares are being converted into the Eateries Merger Consideration pursuant to Section 2.3(f) (other than those shareholders that submitted Letters of Transmittal prior to the Closing Date in accordance with Section 2.3(i)(i) above) a Letter of Transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates of such holder shall pass, only upon delivery of the Certificates to the Final Eateries Surviving Corporation (or its designee) and shall otherwise be in a form and have such other provisions as the Final Eateries Surviving Corporation may reasonably specify) containing instructions for use by such holders of Certificates to effect the exchange of their shares of Eateries Common Stock for the Eateries Merger Consideration as provided herein. As soon as reasonably practicable after the Closing Date, each such holder of an outstanding Certificate or Certificates shall, upon surrender to the Final Eateries Surviving Corporation (or its designee) of such Certificate or Certificates and such Letter of Transmittal duly executed and completed in accordance with the instructions thereto (together with such other documents as the Final Eateries Surviving Corporation may reasonably request) and acceptance thereof by the Final Eateries Surviving Corporation (or its designee), be entitled to the Eateries Merger Consideration (with any cash amounts to be payable by check) in respect of the shares represented by such Certificate or Certificates. The Final Eateries Surviving Corporation (or its designee) shall accept such Certificates upon compliance with such reasonable terms and conditions as the Final Eateries Surviving Corporation may impose to effect an orderly exchange thereof in accordance with normal exchange practices. The Final Eateries Surviving Corporation shall not be required to remit Eateries Merger Consideration to any Person other than the Person in whose name the Certificate surrendered for exchange is registered.

(iii)    **No Liability**. Neither the Purchaser nor the Final Eateries Surviving Corporation (or any successor or agent of any of the foregoing) shall be liable to any Person in respect of any Eateries Merger Consideration that is transferred to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(j)    **Withholding Rights**. The Purchaser or the Eateries Merger Surviving Corporation (and its successors (including the Final Eateries Servicing Corporation) and agents) shall be entitled to deduct and withhold from the Eateries Merger Consideration otherwise payable pursuant to this Agreement to any holder of shares of Eateries Common Stock such amounts as the Purchaser or the Eateries Merger Surviving Corporation (and their respective successors and agents) are required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax Law, and the Eateries Merger Surviving Corporation (or its successors and agents) shall make any required filings with and payments to Taxing Authorities relating to any such deduction or withholding. To the extent that amounts are so deducted and withheld by the Purchaser or the Eateries Merger Surviving