Corporation (and its successors and agents), such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Eateries Common Stock in respect of which such deduction and withholding was made by the Purchaser or the Eateries Merger Surviving Corporation (and their respective successors and agents).

(k)    **Lost Certificates**.  If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if reasonably required by the Eateries Merger Surviving Corporation (or its successors and agents), the posting by such Person of a bond in such reasonable amount as the Eateries Merger Surviving Corporation (and its successors and agents) may require as indemnity against any claim that may be made against it with respect to such Certificate, there shall be issued in exchange for such lost, stolen or destroyed Certificate the Eateries Merger Consideration payable pursuant to this Agreement.

(l)    **Eateries Reincorporation Merger**.  On the Closing Date, immediately following the Eateries Merger Effective Time, in accordance with the applicable provisions of the OGCA and the DGCL, the Eateries Merger Surviving Corporation shall be merged (the "**Eateries Reincorporation Merger**") with and into a newly formed, wholly owned corporate subsidiary of the Eateries Merger Surviving Corporation organized and existing under the DGCL (the "**Eateries Reincorporation Merger Sub**"). At the effective time of the Eateries Reincorporation Merger:

(i)    the separate corporate existence of the Eateries Merger Surviving Corporation shall cease, and the Eateries Reincorporation Merger Sub shall continue as the surviving corporation under the name "Eateries, Inc." and shall succeed to and assume all of the rights and obligations of the Eateries Merger Surviving Corporation and the Eateries Reincorporation Merger Sub in accordance with the applicable provisions of the OGCA and the DGCL;

(ii)    all of the issued and outstanding shares of capital stock of the Eateries Reincorporation Merger Sub shall be cancelled; and

(iii)    all of the issued and outstanding capital stock of the Eateries Merger Surviving Corporation held by its sole stockholder (*i.e.*, the Purchaser) shall be converted into shares of capital stock of the surviving corporation of such merger.  As the context requires, the Eateries Reincorporation Merger Sub (as surviving corporation in the Eateries Reincorporation Merger) is sometimes hereinafter referred to as the "**Final Eateries Surviving Corporation**."

All documents relating to the formation of the Eateries Reincorporation Merger Sub and the Eateries Reincorporation Merger (including an individualized agreement of merger and all articles of merger, certificates of merger and other documents to be filed with Authorities in connection therewith, all resolutions and other corporate approvals and all surviving corporation Organizational Documents) shall be prepared by counsel to the Purchaser on a basis consistent with this Agreement.

2.4.    Seller Notes Issued to Holdings.  Schedule 2.4 sets forth a complete and accurate listing of the Sellers' membership interests in Holdings on both an outstanding units and percentage interest basis (the "Holdings Member Percentage Interests").  Holdings covenants and agrees with the Purchaser that any Fiesta Merger Consideration or Eateries Merger Consideration that is received by Holdings and distributed to the Sellers shall be distributed to the Sellers in accordance with the Holdings Member Percentage Interests and the Organizational Document of Holdings.  In connection with any such distribution by Holdings of its interest in the Seller Notes issued or to be issued to it, the Fiesta Merger Surviving Company and the Final Eateries Surviving Corporation (each a "Seller Note Issuer" and, collectively, the "Seller Note Issuers") shall reasonably cooperate with Holdings in exchanging the Sellers Notes previously issued to Holdings for an aggregate principal amount of replacement notes that are substantially identical but registered in the names of the individual Sellers.  Notwithstanding the foregoing, neither Seller Note Issuer shall be required to register the transfer of any Seller Note to any Person other than a transfer of a Seller Note by Holdings to the Sellers as provided above.

2.5.    Calculation of the Aggregate Purchase Price; Pre-Closing Statements of Debt and Holdings' Expenses.

(a)    The following shall constitute the aggregate consideration payable by the Purchaser Entities in connection with the Contemplated Transactions (the "Aggregate Purchase Price"):

(i)    subject to adjustment pursuant to Section 2.6, cash in an aggregate amount equal to (1) $30,500,000 minus (2) the amount of the Holdings Expenses minus (3) the amount of any Cash Deficiency (as so adjusted, the "Cash Purchase Price") (it being understood that the total cash purchase price payable hereunder is also being reduced by the aggregate Debt Amount pursuant to the application of clause (B) of Section 2.2(g)(i) and clause (2) of Section 2.3(g)(i)(A);

(ii)    Initial Seller Notes in an initial aggregate principal amount of $2,000,000; and

(iii)    Earnout Notes, if any, in an initial aggregate principal amount equal to the EBITDA Amount (as determined in accordance with Section 2.7).

(b)    Prior to the Closing Date, Holdings will deliver to the Purchaser (i) a schedule (the "Debt Schedule") of the Debt as of 12:01 a.m. on the Closing Date, as adjusted to reflect any increases (for example, as a result of the accrual of interest or prepayment of penalties) therein that will accrue on the Closing Date (the amount Debt as of such time, as so adjusted, being referred to as the "Debt Amount"), together with payoff letters relating thereto and (ii) a reasonably detailed description and estimate of the expenses of Holdings and the Subsidiaries incurred in connection with the negotiation and preparation of this Agreement and the consummation of the Contemplated Transactions, including without limitation, attorneys fees, accountants fees and other advisor fees and any "change of control" bonuses, severance or other payments to be triggered as a result of the Contemplated Transactions and, subject to the limitations set forth in Section 2.1(f), any amounts required to be paid in connection with any authorizations, approvals, consents or waivers to be obtained or filings or notices made or given

by Holdings or its Subsidiaries in connection with the Contemplated Transactions (the foregoing collectively being referred to as the "**Holdings Expenses**"), in each case, in form and substance reasonably satisfactory to the Purchaser. For the avoidance of doubt, the parties hereby acknowledge that the Holdings Expenses shall include all filings fees, assessments, transfer taxes and other charges by and payments to Authorities in connection with the Pre-Closing Liquor License Actions and the Post-Closing Liquor License Actions; provided, that for purposes of determining the amount of such charges, as between the parties to this Agreement, the value of the Liquor License relating to the Idaho Falls, Idaho Garcia's restaurant shall be deemed to be $50,000. To the extent that the Holdings Expenses are greater than the estimated Holdings Expenses used for purposes of calculating the Cash Purchase Price, the Sellers' Representatives shall be responsible for paying any such additional amounts to satisfy all of the actual Holdings Expenses, and such Holdings Expenses shall be paid promptly when due and the Sellers Representatives shall indemnify and hold harmless the Purchaser Indemnitees from any Losses relating to such unpaid Holdings Expenses.

**2.6.    Net Working Capital Adjustment.**

(a)    Prior to the Closing Date, Holdings shall deliver to the Purchaser an estimated consolidated balance sheet of the Acquired Companies as of the True-up Effective Time (the "**Estimated Closing Balance Sheet**"), adjusted as provided below, together with a written statement setting forth in reasonable detail its good faith estimate of Net Working Capital (as defined below) and the Cash Deficiency, if any, as derived from the Estimated Closing Balance Sheet (such statement, which will be in a form reasonably acceptable to the Purchaser and Holdings, the "**Estimated Net Working Capital Statement**"). The Estimated Closing Balance Sheet and Estimated Net Working Capital Statement will be prepared in accordance with GAAP consistently applied with the past practices used in the preparation of the Financial Statements; provided, that the Net Working Capital and Cash Deficiency calculations shall each be adjusted, as necessary, in order that any impact on the consolidated Net Working Capital and Cash of the Acquired Companies caused by the Contemplated Transactions shall be eliminated. The Estimated Net Working Capital Statement will be prepared in accordance with the sample Net Working Capital calculation attached as Exhibit 2.6(a) hereto.

(b)    For purposes of this Agreement, "**Net Working Capital**" means (a) the consolidated current assets of the Acquired Companies (excluding any restricted cash or deferred tax assets) as of the True-up Effective Time as determined in accordance with GAAP minus (b) the consolidated current liabilities of the Acquired Companies (excluding accruals relating to Debt and Holdings Expenses) (including, without duplication of any amounts, the aggregate amount of any checks or other drafts drawn on the accounts of the Acquired Companies (*e.g.*, payroll checks) that have not cleared) as of the True-up Effective Time. Net Working Capital shall be determined in accordance with GAAP consistently applied with the practices used in the preparation of the Financial Statements but will be adjusted, as necessary, in order that any impact on the Net Working Capital of the Acquired Companies caused by the Contemplated Transactions shall be eliminated.

(c)    For purposes of the Closing, the aggregate cash Fiesta Merger Consideration and cash Eateries Merger Consideration shall be calculated using the Cash Deficiency if any, as derived from the Estimated Closing Balance Sheet. The parties agree that

there shall be no adjustment to the cash consideration payable at Closing based on estimated Net Working Capital.

(d) Not later than 90 days after the Closing Date, the Purchaser shall deliver to Sellers' Representatives a statement setting forth in reasonable detail its objections to the Estimated Closing Balance Sheet and the Estimated Net Working Capital Statement (the "Objection Notice"). An Objection Notice shall include, without limitation, (i) any proposed revisions to the Estimated Closing Balance Sheet and (ii) Purchaser's alternative calculation of the Net Working Capital and/or the amount of the Cash Deficiency. If Purchaser does not deliver the Objection Notice to the Sellers' Representatives within such 90 day period, the Estimated Closing Balance Sheet and the calculation of Net Working Capital and the Cash Deficiency, if any, as reflected on the Estimated Net Working Capital Statement, shall become final, conclusive and binding on the parties.

(e) During the fifteen (15) Business Day period following the Purchaser's delivery to the Sellers' Representatives of an Objection Notice, the parties shall negotiate in good faith to resolve the matters raised in the Objection Notice. If the parties are unable to resolve all of the disputed items within such fifteen (15) Business Day period, they shall refer the remaining disputed items to the Independent Auditor. The parties shall instruct the Independent Auditor to deliver its written determination to the Purchaser and the Sellers' Representatives no later than the 30th day after the remaining disputed items are referred to the Independent Auditor. The Independent Auditor will promptly review only those items and amounts specifically set forth and objected to in the Objection Notice and resolve all disputed items in accordance with this Agreement by determining whether the positions of the Purchaser or the Sellers' Representatives are, on the whole, more accurate and, based on such determination, adopting either all of the positions set forth by the Purchaser or all of the positions set forth by the Sellers' Representatives. The Independent Auditor's determination shall be final, conclusive and binding and non-appealable by the parties hereto. Neither the Purchaser, on the one hand, nor the Sellers' Representatives, on the other hand, shall have any ex parte conversations or meetings with the Independent Auditor without the written prior consent of the other. The fees and expenses of the Independent Auditor incurred pursuant to this Section 2.6 shall be borne by the Sellers' Representatives (in the event that the Purchaser's positions are adopted by the Independent Auditor) or the Purchaser and/or the Acquired Companies (in the event that the Sellers' Representatives' positions are adopted by the Independent Auditor).

(f) If Net Working Capital (as finally determined pursuant to this Section 2.6) is greater in amount than negative six million five hundred thousand dollars $(6,500,000) (the "Net Working Capital Target"), then the Fiesta Merger Consideration and the Eateries Merger Consideration shall be increased by an aggregate amount equal to the difference between final Net Working Capital and the Net Working Capital Target and the Fiesta Merger Surviving Company and Final Eateries Surviving Corporation shall (on a *pro rata* basis in accordance with the Fiesta Percentage and the Eateries Percentage) be required to pay additional cash Fiesta Merger Consideration or Eateries Merger Consideration, respectively, in an the aggregate amount of such difference to Holdings (in the case of such additional Fiesta Merger Consideration) or Holdings and the other former stockholders of Eateries (in the case of such additional Eateries Merger Consideration). Any such payment to Holdings shall be made by wire transfer of immediately available funds to an account designated by Holdings. Any such

payment to the other former shareholders of Eateries shall be made by checks mailed to the addresses of such former stockholders as specified in the Letter of Transmittals received from such former stockholders. If the Net Working Capital Target exceeds Net Working Capital (as finally determined pursuant to this Section 2.6) then an amount equal to the difference between final Net Working Capital and Net Working Capital Target will be paid by the Sellers' Representatives to the Purchaser (or its designee). If the Cash Deficiency (as finally determined pursuant to this Section 2.6) differs from the Cash Deficiency set forth in the Estimated Net Working Capital Statement, the Aggregate Purchase Price shall be appropriately adjusted to reflect such difference (it being understood that any such adjustments relating to Net Working Capital and the Cash Deficiency shall be effected on a net basis).

### 2.7. **EBITDA Amount.**

(a)    The Aggregate Purchase Price shall include an amount (the "**EBITDA Amount**") equal to the product of (i) that amount of the EBITDA of the Acquired Companies for the 12 month period ended December 31, 2006 ("**Fiscal 2006**") that is (A) greater than $6,000,000 and (B) equal to or less than $7,000,000, <u>multiplied by</u> (ii) five, provided that in no event shall the EBITDA Amount exceed $5,000,000. By way of example for clarification purposes, if the EBITDA of the Acquired Companies for Fiscal 2006 is $6,500,000, then the EBITDA Amount shall be $2,500,000 ($6,500,000 - $6,000,000 = $500,000; $500,000 <u>multiplied by</u> 5 = $2,500,000. The EBITDA Amount shall be subject to adjustment in accordance with Articles VIII and X and payable in accordance with Section 2.7(d).

(b)    For purposes of this Agreement, "**EBITDA**" shall mean, for Fiscal 2006, (i) the consolidated net income of the Acquired Companies <u>plus</u> (ii) taxes, interest, depreciation and amortization, in each case in accordance with GAAP, <u>plus</u> (iii) the actual amount of salary and bonus compensation and related benefits (other than benefits provided under the Specified Plans (as defined in Section 6.11) paid to James M. Burke, Bradley L. Grow, and Vincent Orza during Fiscal 2006 that are in excess of $500,000 (it being understood that the amount of such add-back shall not exceed the excess of (x) the lesser of $1,300,000 and aggregate of the estimated amounts of such salary and bonus compensation and benefits as set forth on Part A of <u>Schedule 2.7(b)</u>) over (y) $500,000, <u>less</u> (iv) tenant allowance amortization, <u>plus</u> (v) the amount of all one time, non-operating charges of the type described on Part B of <u>Schedule 2.7(b)</u> that are actually incurred and expensed in Fiscal 2006 in amounts not to exceed the estimated amounts therefore which are set forth on Part B of <u>Schedule 2.7(b)</u> <u>plus</u> (vi) if (but only if) the net cumulative EBITDA for Fiscal 2006 of the two restaurants listed on Part C of <u>Schedule 2.7(b)</u> is a negative number, an amount equal to the absolute value of the net cumulative EBITDA for Fiscal 2006 of such restaurants.

(c)    EBITDA and the EBITDA Amount shall be calculated as follows:

(i)    Not later than the earlier of (x) the 10th Business Day following the delivery to the Purchaser of the final audit report with respect to the 2006 Financial Statements (as defined below) and (y) April 30, 2007 (the "**2006 Financials Delivery Date**"), the Purchaser shall deliver to the Sellers' Representatives an unaudited consolidated balance sheet of the Acquired Companies as of December 31, 2006 and unaudited related statements of income, retained earnings and cash flows for the 12

months then ended (the "**2006 Financial Statements**"), all of which financial statements shall be prepared in accordance with GAAP consistently applied with past practices used in preparing the Financial Statements. The 2006 Financial Statements shall include a calculation of the EBITDA Amount for Fiscal Year 2006 prepared in accordance with the sample calculation of EBITDA attached as Exhibit 2.7(c)(i) hereto.

(ii)    The Sellers' Representatives shall have twenty (20) Business Days after delivery of the 2006 Financial Statements (the "**EBITDA Objection Period**") to raise any objection thereto by delivery of written notice to the Purchaser setting forth such objections in reasonable detail (the "**EBITDA Objection Notice**"). In the event that the Sellers' Representatives shall fail to deliver the EBITDA Objection Notice within the EBITDA Objection Period, then, subject to Section 2.7(f), such 2006 Financial Statements and the Purchaser's calculation of the EBITDA Amount shall be deemed final, conclusive and binding on the parties.

(iii)    During the fifteen (15) Business Day period following the Sellers' Representatives delivery to the Purchaser of an EBITDA Objection Notice, the parties shall negotiate in good faith to resolve the matters raised in the EBITDA Objection Notice. If the parties are unable to resolve all of the disputed items within such 15-Business Day period, they shall refer the remaining disputed items to the Independent Auditor. The parties shall instruct the Independent Auditor to deliver its written determination to the Purchaser and the Sellers' Representatives no later than the 30th day after the remaining disputed items are referred to the Independent Auditor. The Independent Auditor will promptly review only those items and amounts specifically set forth and objected to in the EBITDA Objection Notice and resolve all disputed items in accordance with this Agreement by determining whether the positions of the Purchaser or the Sellers' Representatives are, on the whole, more accurate and, based on such determination, adopting either all of the positions set forth by the Purchaser or all of the positions set forth by the Sellers' Representatives. The Independent Auditor's determination shall be final and binding and non-appealable by the parties hereto. Neither the Purchaser, on the one hand, nor the Sellers' Representatives, on the other hand, shall have any ex parte conversations or meetings with the Independent Auditor without the prior consent of the other. The fees and expenses of the Independent Auditor incurred pursuant to this Section 2.7 shall be borne by the Sellers' Representatives (in the event that the Purchaser's positions are adopted by the Independent Auditor) or the Purchaser and/or the Acquired Companies (in the event that the Sellers' Representatives' positions are adopted by the Independent Auditor).

(d)    The EBITDA Amount shall be paid by means of issuance of Earnout Notes promptly following the final determination of the EBITDA amount in accordance with the Sections 2.2(g)(iii) and 2.3(g)(i)(C) (and the instructions contained in the applicable Letters of Transmittal).

2.8.    <u>Closing</u>. Subject to the terms and conditions set forth in this Agreement, the closing of the Fiesta Merger and the Eateries Mergers (the "**Closing**") shall take place at the offices of Ropes & Gray LLP, 45 Rockefeller Plaza, New York, New York 10111 at 10:00 a.m. local time on December 29, 2006, or at such other time, date and place as the Purchaser and the

Sellers' Representatives mutually agree (such date, the "**Closing Date**"). If and to the extent the Purchaser and the Sellers' Representatives mutually agree, the Closing may take place by the exchange of faxed or electronic signatures (with original documents to follow) without the necessity for a physical closing.

    **2.9.**   **Transactions at the Closing**. In addition to the deliveries contemplated by Sections 2.2 and 2.3 in connection with the Fiesta Merger and the Eateries Merger, at the Closing, the following shall occur:

    (a)    The Purchaser shall cause the Acquired Companies to pay or deliver:

    (i)    the Debt Amount directly to the third parties to whom Debt is owed, to such accounts as are designated on the Debt Schedule and in the related payoff letters;

    (ii)    the estimated Holdings Expenses directly to the third parties to whom such expenses are owed, to such accounts as are designated on the written invoices relating thereto;

    (iii)    to the Sellers' Representatives:

    (A)    a copy of the resolutions duly adopted by the board of Managers of the Purchaser, certified by the Secretary thereof, authorizing the execution, delivery and performance of this Agreement;

    (B)    a certificate of an officer of the Purchaser as to the incumbency of the officers authorized to execute this Agreement and each Other Purchaser Document to be executed by the Purchaser at the Closing;

    (C)    a copy of the Organization Documents of the Purchaser, certified by the Secretary of the Purchaser, each as amended through the Closing Date; and

    (D)    such other documents or certificates as are reasonably deemed necessary by the Sellers' Representatives and their counsel in furtherance of the Contemplated Transactions (the deliveries set forth in clause (iii), the "**Other Purchaser Documents**").

    (b)    Holdings, Fiesta, Eateries and the Sellers shall make the following deliveries to the Purchaser:

    (i)    a copy of the Organizational Documents of Holdings and each of the Subsidiaries and all documentation relating to the applicable Pre-Closing Reorganization Transactions, certified by the Secretary of each such entity, each as amended through the Closing Date;

    (ii)    a certificate of an officer of each of Holdings, Fiesta and Eateries as to the incumbency of each of their officers or managers authorized to execute this

Agreement and each Other Holdings Document to be executed at the Closing on behalf of Holdings, Fiesta or Eateries, as applicable;

(iii)    a certificate from the Secretary of State of the State of Oklahoma, and each state where Holdings is duly registered as a foreign limited liability company as to the good standing of Holdings;

(iv)    a certificate from the Secretary of State of the applicable jurisdiction in which each Subsidiary is established and of each state where such Subsidiary is duly registered as a foreign entity as to the good standing of such Subsidiary;

(v)    each of the consents required to be obtained from third parties to allow the completion of the Contemplated Transactions, including, without limitation, those identified in Schedule 4.5 of this Agreement;

(vi)    resignation letters from each of the officers, Managers and directors of each Acquired Company requested in writing by the Purchaser prior to the Closing;

(vii)    a certificate of the Sellers' Representatives and Holdings certifying that the conditions to the Purchaser's obligations hereunder set forth in Sections 9.2(a), (b), (c), (d), (e), (f), (g), (h), (m), (n), (p) and (r) have been satisfied;

(viii)    a certificate, in form and substance reasonably satisfactory to the Purchaser and the Purchaser's counsel, of an officer of Holdings, Fiesta and Eateries to the effect that neither the Shares nor the Interests constitute a "United States real property interest" as defined in Section 897(c) of the Code;

(ix)    a legal opinion of Phillips McFall McCaffrey McVay & Murrah, P.C., counsel to Holdings, the Subsidiaries and Sellers, in substantially the form of Exhibit 2.9(b)(ix) hereto; and

(x)    such other documents or certificates as are deemed reasonably necessary by the Purchaser and its counsel in furtherance of the Contemplated Transactions (the deliveries set forth in clauses (b) (i) through (x), the "**Other Holdings Documents**").

(c)    each of the Sellers shall make the following deliveries:

(i)    to the Purchaser:

(A)    a certificate of such Seller certifying that the conditions to the Purchaser's obligations hereunder set forth in Sections 9.2(a) and (b) have been satisfied as it relates to such Seller;

(B)    a release for each Seller, in the form of Exhibit 2.9(c)(i)(B), executed and delivered by such Seller; and

(C) such other documents or certificates as are deemed reasonably necessary by the Purchaser and its counsel in furtherance of the Contemplated Transactions (the deliveries set forth in clause (c), the "**Other Seller Documents**").

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS REGARDING THE SHARES AND THE INTERESTS OF THE SELLERS

Each Seller, severally but not jointly, represents and warrants to the Purchaser Entities as follows (it being understood and agreed that Holdings shall be deemed to be a Seller for purposes of Section 3.1):

**3.1.** **Title**. Such Seller has good and marketable title to the Shares or Interests set forth opposite such Seller's name on Schedule 4.2 or Schedule A, as the case may be, free and clear of all Encumbrances. Other than the Interests listed on Schedule A hereto and the Shares listed on Schedule 4.2 hereto, such Seller has no other Equity Interest in Holdings or any Subsidiary. Such Seller is not a party to, and the Shares or Interests set forth opposite such Seller's name on Schedule 4.2 or Schedule A, as the case may be, are not subject to, any shareholders agreement, voting agreement, voting trust, proxy or other Contract relating to the transfer or voting of such Interests or Shares.

**3.2.** **Organization; Due Authorization; Enforceability**. Such Seller (other than any Seller that is an individual) is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized. Such Seller has the full and absolute legal right, capacity, power and authority to execute and deliver this Agreement and the Other Seller Documents, to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions. The execution, delivery and performance of this Agreement and the Other Seller Documents and the consummation of the Contemplated Transactions have been duly and validly authorized by all necessary action on the part of such Seller and no other proceedings on the part of such Seller are necessary to authorize this Agreement and the Other Seller Documents or consummate the Contemplated Transactions. This Agreement has been, and the Other Seller Documents will be at the Closing, validly executed and delivered by such Seller, and constitutes (and, with respect to the Other Sellers Documents, will constitute upon such Seller's execution and delivery thereof) a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.

**3.3.** **No Violation**. The execution and delivery by such Seller of this Agreement and the Other Seller Documents, the consummation of the Contemplated Transactions, and the performance of such Seller's obligations hereunder and thereunder do not or will not: (a) where such Seller is not an individual, violate any provision of any of the Organizational Documents of such Seller, (b) violate, conflict with or constitute a default under any Contract to which such Seller is party or by which such Seller may be bound or to which such Seller's Interests or other property may be subject, (c) violate any applicable Law or Order of any Authority having jurisdiction over such Seller or any of such Seller's Interests or other property, (d) require any authorization, consent or approval of, filing with, exemption or other action by, or notice to, any

Authority or any party to any Contract to which such Seller is party or by which such Seller may be bound or to which such Seller's Interests or other property may be subject; or (e) result in the creation or imposition of any Encumbrance upon the Interests of such Seller.

3.4.    **Brokers.**  No broker or finder has acted for any Seller in connection with this Agreement or the Contemplated Transactions, and no broker or finder is entitled to any brokerage or finder's fee or other commissions with respect to such transactions based upon any Contract made by or on behalf of any Seller.

3.5.    **Acquisition for Investment; Private Placement.**  Each Seller severally but not jointly, represents and warrants to the Purchaser Entities as follows (it being understood that, for purposes of this Section 3.5, the Seller Notes to be distributed to the Sellers as contemplated by Section 2.4 and any Seller Notes to be acquired by the Management Sellers for cash pursuant to Section 2.3(g)(iii) shall be deemed to be Seller Notes that such Sellers are acquiring hereunder):

(a)    Such Seller is acquiring the Seller Notes being acquired by such Seller for investment for such Seller's own account and not with a view to, or sale in connection with, any distribution thereof.

(b)    Such Seller's financial situation is such that such Seller can afford to bear the economic risk of holding the Seller Notes being acquired by such Seller hereunder for an indefinite period of time, and such Seller can afford to suffer the complete loss of such Seller's investment in the Seller Notes.

(c)    Such Seller's knowledge and experience in financial and business matters are such that such Seller is capable of evaluating the merits and risks of such Seller's investment in such Seller Notes or such Seller has been advised by a representative possessing such knowledge and experience.

(d)    Such Seller understands that the Seller Notes being acquired by such Seller hereunder are a speculative investment which involves a high degree of risk of loss of the entire investment therein, that there will be substantial restrictions on the transferability of the Seller Notes and that following the date hereof there will be no public market for the Seller Notes and that, accordingly, it may not be possible for such Seller to sell or pledge the Seller Notes, or any interest in the Seller Notes, in case of emergency or otherwise.

(e)    Such Seller and such Seller's representatives, including, to the extent such Seller deems appropriate, such Seller's legal, professional, financial, tax and other advisors, have reviewed all documents provided to them in connection with such Seller's investment in the Seller Notes, and such Seller understands and is aware of the risks related to such investment.

(f)    Such Seller and such Seller's representatives have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Purchaser Entities and their representatives concerning the Purchaser Entities, the Seller Note Issuers and the terms and conditions of such Seller's acquisition of the Seller Notes and related matters and to obtain all additional information which such Seller or such Seller's representatives deem necessary.

(g)     Such Seller is an "accredited investor" as such term is defined in Regulation D under the Securities Act.

(h)     Such Seller has no plan or intention to sell, exchange, transfer or otherwise dispose of any of its Seller Notes in violation of the Securities Act or any state securities laws.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES REGARDING HOLDINGS, THE SUBSIDIARIES AND THE BUSINESS

Each of Holdings, Eateries, Fiesta and the Management Sellers, jointly and severally, hereby represents and warrants to the Purchaser Entities as follows.

**4.1.     Organization; Authority; Due Authorization.**

(a)     **Organization and Good Standing of Holdings.**  Holdings is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Oklahoma, and has the limited liability company power and authority to own, lease and operate the assets owned, leased and operated by it and the Business and to carry on the Business as now conducted.

(b)     **Authority to Execute and Perform Agreements.**  Each of Holdings, Fiesta and Eateries has all requisite limited liability company or corporate, as applicable, power and authority to enter into, execute and deliver this Agreement and the Other Holdings Documents, to consummate the Contemplated Transactions, and to perform fully its respective obligations hereunder and thereunder.

(c)     **Due Authorization; Enforceability.**  Each of Holdings, Fiesta and Eateries has taken all actions necessary to authorize it to execute and deliver and perform fully its obligations under this Agreement and the Other Holdings Documents and to consummate the Contemplated Transactions. This Agreement has been (and the Other Holdings Documents will be at the Closing) validly executed and delivered by each of Holdings, Fiesta and Eateries and constitutes (and, with respect to the Other Holdings Documents, will constitute upon execution and delivery thereof by each such party at the Closing) a valid and binding obligation of Holdings, Fiesta and Eateries, enforceable against Holdings, Fiesta and Eateries in accordance with its terms.

**4.2.     Capitalization of Eateries.**  Eateries' authorized capital consists solely of (A) 20,000,000 shares of Eateries Common Stock, 109.67 of which are issued and outstanding and, subject to Section 6.13, are owned of record and beneficially by its shareholders, as set forth on Schedule 4.2, in each case, free and clear of all Encumbrances, and (B) 10,000,000 shares of Preferred Stock, par value $0.002 per share, none of which are or ever have been issued or outstanding. Eateries holds 233 shares of Eateries Common Stock in its treasury. The shares listed on Schedule 4.2 are all of the shares of capital stock of Eateries that are issued and outstanding, and such shares have been duly authorized and validly issued and are fully paid and non-assessable. No other class or series of capital stock of Eateries is authorized or outstanding. In addition, (a) there are no outstanding subscriptions, warrants, calls, options, rights (including

unsatisfied preemptive rights or conversion or exchange rights), commitments or agreements to which Eateries is bound that permit or entitle any Person to purchase or otherwise to receive from or to be issued any shares of the capital stock of Eateries or any security, Equity Interest or obligation of any kind convertible into or exchangeable for any capital stock of Eateries, (b) no Person has any right to cause the purchase, redemption or repurchase of any Shares, other Equity Interests or other securities of Eateries legally or beneficially owned by it, (c) no Shares or other Equity Interests of Eateries are subject to any agreements or understandings among any Persons with respect to the voting or transfer of such Shares or other Equity Interests, (d) Eateries has not granted any registration rights to any Person with respect to its outstanding Shares or other Equity Interests, and (e) Eateries does not have outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible into or exercisable for securities having the right to vote) on any matter. Eateries has not violated the 1933 Act, any state "blue sky" or securities laws, any other similar Law or any preemptive or other similar rights of any Person in connection with the sale, issuance, cancellation or redemption of any of its capital stock.

4.3.    **Capitalization of Holdings.** All of Holdings' 8,015 issued and outstanding units of limited liability company interest are owned of record and beneficially by the Sellers as set forth on Schedule 2.4. The Interests constitute all of the Equity Interests of the Sellers that are issued and outstanding, and the Interests have been duly authorized and validly issued and are fully paid and non-assessable. No other class or series of equity interest of Holdings is authorized or outstanding. In addition, (a) there are no outstanding subscriptions, warrants, calls, options, rights (including unsatisfied preemptive rights or conversion or exchange rights), commitments or agreements to which Holdings is bound that permit or entitle any Person to purchase or otherwise to receive from or to be issued any limited liability interest of Holdings or any security, Equity Interest or obligation of any kind convertible into or exchangeable for any limited liability interest of Holdings, (b) no Person has any right to cause the purchase, redemption or repurchase of any limited liability interest or other Equity Interests of Holdings legally or beneficially owned by it, (c) no limited liability interest of Holdings is subject to any agreements or understandings among any Persons with respect to the voting or transfer of such limited liability interests, (d) Holdings has not granted any registration rights to any Person with respect to its outstanding limited liability interest or other Equity Interests, and (e) Holdings does not have outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible into or exercisable for securities having the right to vote) on any matter.

4.4.    **Subsidiaries.**

(a)    **Subsidiaries.** Part A of Schedule 4.4(a) identifies each corporation, firm, enterprise, limited liability company, partnership, joint venture or other entity in which Holdings owns, directly or indirectly, any shares, membership interest, partnership interest or other Equity Interest (each such entity, including Eateries and Fiesta, being a "**Subsidiary**", and collectively, the "**Subsidiaries**"), the jurisdiction of incorporation, organization or formation of each Subsidiary and the jurisdictions in which each Subsidiary is authorized to do business. Part B of Schedule 4.4(a) identifies each restaurant and/or eatery owned or operated by each Subsidiary. The restaurants identified on Part B of Schedule 4.4(a) comprise (i) all restaurants operating under the "Garfield's" name in the United States, (ii) all restaurants operating under the

"Garcia's" name in the United States and (iii) all restaurants operating under the "Pepperoni Grill" name in the United States, in any such case, of which Holdings or the Management Sellers have Knowledge or with whom Holdings or any of the Subsidiaries (or any Predecessor thereof) has had within the past eight years an ownership, franchise, licensee or other Contractual relationship.

(b)    **Organization and Good Standing of the Subsidiaries.**  Each of the Subsidiaries is duly organized, validly existing, and in good standing under the laws of the State in which each such Subsidiary has been organized as set forth on Schedule 4.4(b), and has the requisite corporate, or limited liability power and authority to own, lease and operate the Assets owned, leased or operated by it and to carry on the Business as now conducted. Each Subsidiary is duly qualified to transact business as a foreign entity and is in good standing in each of the jurisdictions listed in respect of such Subsidiary on Schedule 4.4(b), which jurisdictions are the only jurisdictions in which the ownership, leasing or operation of the Assets owned, leased or operated by it or the conduct of the Business requires such qualification and the failure to so qualify would individually or in the aggregate have a Material Adverse Effect.

(c)    **Capitalization of the Subsidiaries.**  The authorized and issued capital of each Subsidiary other than Eateries and the record and beneficial owners of the issued capital of each Subsidiary other than Eateries is set forth on Schedule 4.4(c).  The issued and outstanding shares or membership interests or other Equity Interests of each Subsidiary as set forth on Schedule 4.4(c) (the "**Other Subsidiary Shares**") (i) have been in the case of each such Subsidiary that is a corporation, duly authorized and validly issued and are fully paid and non-assessable, (ii) have been in the case of each such Subsidiary that is not a corporation, duly created pursuant to the laws of the jurisdiction of such Subsidiary's organization or formation, issued and paid for in accordance with such Subsidiary's Organizational Documents and are fully paid and non-assessable, (iii) neither Holdings nor any such Subsidiary has any obligation with respect to the Liabilities of such Subsidiary by reason of holding its Other Subsidiary Shares, and (iv) except as disclosed on Schedule 4.4(c), are held of record by the Person or Persons set forth on Schedule 4.4(c) free and clear of Encumbrances. Holdings owns, directly or indirectly, as set forth on Schedule 4.4(c), through another Subsidiary, all of the Other Subsidiary Shares free and clear of Encumbrances.  There are no outstanding subscriptions, warrants, calls, options, rights (including unsatisfied preemptive rights or conversion or exchange rights), commitments or agreements to which any such Subsidiary is bound that permit or entitle any Person to purchase or otherwise to receive from or to be issued any Equity Interest in any such Subsidiary or any security or obligation of any kind convertible into or exchangeable for any Equity Interests of any such Subsidiary, nor are any Equity Interests of any such Subsidiary subject to any agreements or understandings among any Persons with respect to the voting or transfer. No Person has any right to cause the redemption or repurchase of any Equity Interests of any such Subsidiary.  No such Subsidiary has outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible into or exchangeable for securities having the right to vote) on any matter.

4.5.    **No Violation.**  The execution and delivery by each of Holdings, Fiesta and Eateries of this Agreement and the Other Holdings Documents, the consummation of the Contemplated Transactions, and the performance of Holdings, Fiesta and Eateries hereunder and thereunder will not:

(a)     violate any provision of any of the Organizational Documents of Holdings or any Subsidiary;

(b)     except as set forth in <u>Schedule 4.5</u> hereto (i) violate, conflict with or constitute a default under, require a consent under or a notice to be given under, permit the termination or acceleration of, or cause the loss of any rights or options under any (X) Disclosed Contract to which Holdings or any Subsidiary is a party or by which Holdings or any Subsidiary is bound or to which Holdings' or any Subsidiary's property may be subject or (Y) any Plan, (ii) require any authorization, consent or approval of, filing with, exemption or other action by, or notice to, any party to any Disclosed Contract to which Holdings or Subsidiary is a party or by which Holdings or any Subsidiary is bound or to which Holdings' or any Subsidiary's property may be subject, or (iii) result in the creation or imposition of any Encumbrance upon the Shares or Interests or upon any material Asset; or

(c)     except as set forth in <u>Schedule 4.5</u> or <u>Schedule 4.6</u>, require any authorization, consent or approval of, filing with, exemption or other action by, or notice to, any Authority or, assuming the taking of any action by (including the obtaining of each necessary authorization, consent or approval), or in respect of, and the making of all filings with, Authorities, in each case, as disclosed on <u>Schedule 4.5</u> or <u>Schedule 4.6</u>, violate any Law, Permit or Order applicable to Holdings or any Subsidiary.

4.6.     <u>Regulatory Approvals and Other Consents</u>.  <u>Schedule 4.6</u> hereto sets forth a complete list of each consent, approval, authorization, notice, filing, exemption, waiver or other requirement, required by the Organizational Documents of Holdings or any Subsidiary, any Law or other announcement or other binding action or requirement of an Authority, which must be obtained from any Person required to be made, obtained or otherwise satisfied by Holdings, any Subsidiary or any Seller in order for such Person to execute and deliver this Agreement, the Other Seller Documents or Other Holdings Documents as applicable, to perform their respective obligations hereunder and thereunder and to consummate the Contemplated Transactions.

4.7.     <u>Sufficiency of and Title to Assets</u>.  Without limiting the representations and warranties as to specific classes of Assets: (a) the Assets are sufficient for the continued conduct of the Business immediately after the Closing in the same manner as conducted prior to the Closing ordinary wear and tear excepted; (b) Holdings and each Subsidiary has good and marketable title to the Assets owned or purported to be owned by them (including all of the Assets reflected in the balance sheets included in the Financial Statements) and have the valid and enforceable right to use all of the Assets not owned by them, in each case free and clear of all Encumbrances other than Permitted Liens identified in <u>Schedule 4.7</u>.  Neither Holdings nor any of the Subsidiaries has received any notice from any Authority with respect to any taking of any of the Assets or any portion thereof or interest therein by eminent domain or otherwise, and there is no proceeding pending or, to the Knowledge of the Sellers and Holdings threatened, with respect thereto. Except as set forth on Part A of <u>Schedule 4.7</u>, Holdings does not have any direct ownership interest in any of the Assets used in connection with the Business and is not party to any Contracts entered into in connection with the Business or any Contracts with any Subsidiaries.  Except as set forth on Part B of <u>Schedule 4.7</u>, (A) the Eateries Entities have exclusive, good and marketable title to the Assets used in connection with the Garfield's Business and are not party to any other Contracts with Holdings or its other Subsidiaries, (B) the

Fiesta Entities have exclusive, good and marketable title to the Assets used in connection with the Garcia's Business and are not party to any other Contracts with Holdings or its other Subsidiaries, and (C) Roma Foods has exclusive, good and marketable title to the Assets used in connection with the Pepperoni Grill Business and is not a party to any other Contracts with Holdings or its other Subsidiaries. Except as set fort on Part C of <u>Schedule 4.7</u>, Fiesta Restaurants, Inc. is an inactive corporation with no Assets or Liabilities.

    **4.8.**    **Financial Condition; Financial Statements.** (a) <u>Schedule 4.8</u> hereto contains a true and correct copy of (i) the unaudited consolidated Pro Forma balance sheets of Holdings as of December 25, 2005, December 26, 2004 and December 28, 2003 and the related unaudited Pro Forma statements of income, changes in stockholders' equity and cash flow for the fiscal years then ended (collectively with the "**Annual Financial Statements**") and (ii) the unaudited consolidated balance sheet of Holdings as of November 26, 2006 (the "**Most Recent Balance Sheet**") and the related unaudited statement of income, changes in stockholders' equity and cash flow for the eleven (11) months then ended (together with any monthly financials delivered pursuant to Section 6.5, collectively, the "**Interim Financial Statements**", and collectively with such monthly financial statements and the Annual Financial Statements, the "**Financial Statements**")).

    (b)    The Financial Statements: (i) are consistent with the books and records of Holdings and its Subsidiaries; (ii) fairly present the consolidated financial position, on a Pro Forma or actual basis, as applicable, of Holdings and its Subsidiaries as of the dates thereof, and the consolidated results of their operations for the periods indicated therein; and (iii) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (subject to the absence of footnote disclosure and, in the case of the Interim Financial Statements, normal year-end adjustments (the effect of which will not, individually or in the aggregate, be material)).

    (c)    Neither Holdings nor any Subsidiary has any liabilities, claims or obligations of any nature, whether known or unknown, accrued, absolute, contingent, anticipated or otherwise, whether due or to become due, whether asserted or unasserted, whether liquidated or unliquidated, and whether or not required under GAAP to be accrued on the financial statements of Holdings or any of its Subsidiaries (each a "**Liability**"), that are not reflected or reserved against in the Most Recent Balance Sheet, other than those incurred after the date of the Most Recent Balance Sheet in the Ordinary Course of Business. Holdings and each Subsidiary have paid or caused to be paid or have properly reflected in the Financial Statements all refunds, overpayments, offsets, discounts and have no Liability for any refund, overpayment, offset, discount, penalty or adjustment, and no interest or penalties accruing with respect thereof, except as has been included or reserved for in the Financial Statements.

    (d)    All of the financial information and financial statements provided by Holdings and the Management Sellers to the Purchaser in the conduct of the Purchaser's due diligence review and investigation of the Business: (i) are consistent with the books and records of Holdings and its Subsidiaries; (ii) fairly present the consolidated financial position of Holdings and its Subsidiaries as of the date thereof, and the results of their operations for the periods indicated therein, and (iii) has been prepared in good faith based on the books and

records of Holdings and the Subsidiaries, and is true, accurate and complete in all material respects as of the time and for the periods indicated thereon.

(e)     All accounts and notes receivable reflected on the Most Recent Balance Sheet and all accounts and notes receivable arising subsequent to the date of the Most Recent Balance Sheet and on or prior to the Closing Date, have arisen or will arise in the Ordinary Course of Business, represent or will represent legal, valid, binding and enforceable obligations to an Acquired Company and, subject only to consistently recorded reserves for bad debts established as of a date prior to the Closing Date in a magnitude and manner consistent with past practice, have been, or will be, collected or are, or will be, collectible in the aggregate recorded amounts thereof in accordance with their terms and, to the Knowledge of the Sellers and Holdings, will not be subject to any contests, claims, counterclaims or setoffs.

4.9.     **Books and Records; Internal Controls.**

(a)     The Books and Records, including without limitation the minute books and stock record books (or equivalent), of Holdings and each of the Subsidiaries, all of which have been provided to Purchaser (i) are complete and correct in all material respects, (ii) are kept in the Ordinary Course of Business in accordance with sound business practices and applicable Laws and (iii) accurately and fairly reflect, in reasonable detail, the transactions of the Business and acquisitions and dispositions of the Assets. The minute books of Holdings and each Subsidiary contain accurate and complete records of all meetings held of, and corporate action taken by, the stockholders or interest holders, the boards of directors (or equivalent), and committees of the boards of directors (or equivalent) of Holdings and each Subsidiary, and no meeting of any such stockholders or interest holders, board of directors (or equivalent), or committee has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all such Books and Records will be in possession the Acquired Companies.

(b)     Neither Holdings nor any Subsidiary has any of its records, systems, controls, data or information recorded, stored, maintained, operated or otherwise wholly or partly dependent upon or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under its exclusive ownership and direct control.

(c)     Each of Holdings and each Subsidiary maintains internal accounting controls consistent with past practice that provide reasonable assurance that (a) transactions are executed only with management's authorization; (b) transactions are recorded as necessary to permit preparation of the consolidated financial statements of Holdings and the Subsidiaries and to maintain accountability for the Assets; (c) access to the Assets is permitted only in accordance with management's authorization; (d) the reporting of the Assets is compared with existing assets at regular intervals; and (e) accounts, notes and other receivables and inventory are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(d)     Neither Holdings nor any Subsidiary is, ever has been, or has any commitment to become, party to any financial arrangement (reciprocal or otherwise) the effect of

which was, is or will be the artificial increase or decrease in one or more financial performance indicators (e.g., sales, net income, operating expense, etc.) of Holdings or any Subsidiary.

**4.10. Tax Matters.**

(a)    Each of Holdings and each Subsidiary has timely filed all Federal, state and local, domestic and foreign, income and franchise Tax Returns and all other Tax Returns required to be filed by or on behalf of each such entity in the manner prescribed by applicable Law. All such Tax Returns are complete and correct in all material respects. Each of Holdings and each Subsidiary has timely paid (or Holdings has paid on the Subsidiaries' behalf or caused the Subsidiaries to pay) all Taxes due from it or them with respect to the taxable periods covered by such Tax Returns and all other Taxes for which Holdings or any Subsidiary is or might otherwise be liable. Neither Holdings nor any Subsidiary has requested any extension of time within which to file any Tax Return which Tax Return has not yet been filed. The unpaid Taxes of Holdings and each Subsidiary (a) did not as of the date of the Most Recent Balance Sheet exceed the reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (b) will not exceed that reserve as adjusted for passage of time through the Closing Date and taken into account in the calculation of the Net Working Capital adjustment pursuant to Section 2.6 herein.

(b)    Neither Holdings nor any Subsidiary has any Liability for any Taxes of any Person other than itself (i) under Treasury Regulations Section 1.1502-6 (or any similar provision of Federal, state or local, domestic or foreign, Law), (ii) as a transferee or successor or (iii) by Contract (other than pursuant to the Leases) or otherwise. Neither Holdings nor any Subsidiary files or has ever filed any Tax Return as part of any consolidated, combined, affiliated, aggregate or unitary group.

(c)    Except as otherwise provided on Schedule 4.10(c), no Federal, state or local, domestic or foreign, Tax Return of Holdings or any Subsidiary is or has ever been under audit or examination by any Taxing Authority, and no written or unwritten notice of such an audit or examination has been received by Holdings or any Subsidiary. Schedule 4.10(c) identifies a list of audits or examinations by any Taxing Authority which audits or examinations are still pending or have been resolved since January 1, 2002. Each deficiency resulting from any audit or examination relating to Taxes by any Taxing Authority has been timely paid and there is no deficiency, refund Action, proposed adjustment or matter in controversy with respect to any taxes due and owing by Holdings or any Subsidiary. No issues relating to taxes were raised by the relevant Taxing Authority during any presently pending audit or examination, and no issues relating to Taxes were raised by the relevant Taxing Authority in any completed audit or examination that could reasonably be expected to recur in a later taxable period. Holdings has delivered to the Purchaser documents setting forth the dates of the most recent audits or examinations, if any, of Holdings or any Subsidiary by any Taxing Authority in respect of Federal, state and local, domestic and foreign Taxes for all taxable periods for which the statute of limitations has not yet expired. None of the Tax Returns of Holdings and any Subsidiary, for any year through December 31, 2005, have been examined by the Internal Revenue Service or other relevant Taxing Authority. No material claim has ever been made by an authority in a jurisdiction where Holdings or any Subsidiary does not file Tax Returns that Holdings or any

Subsidiary is or may be required to file Tax Returns by that jurisdiction, and, to the Knowledge of the Sellers and Holdings, there is no basis for any such claim to be made.

(d)    There is no Contract or other document extending, or having the effect of extending, the period of assessment or collection of any Taxes and no power of attorney with respect to any Taxes has been executed or filed with any Taxing Authority by or on behalf of Holdings or any of its Subsidiaries.

(e)    No Liens for Taxes exist with respect to any Assets, except for statutory Liens for taxes not yet due.

(f)    Neither Holdings nor any Subsidiary is a party to or bound by any tax sharing agreement, tax indemnity obligation or similar agreement, arrangement or practice with respect to Taxes (including any advance pricing agreement, closing agreement or other agreement relating to Taxes with any Taxing Authority). Holdings has made all Tax and other distributions which are or may be required by Holding's limited liability company agreement or otherwise, and no such distributions will be required prior to the Closing Date or after the Closing Date with respect to any period (or portion thereof) ending on or before the Closing Date.

(g)    Neither Holdings nor any Subsidiary will be required to include in a taxable period ending on or after the Closing Date taxable income attributable to income that accrued in a taxable period prior to the Closing Date but was not recognized in such prior taxable period, or exclude any item of deduction or loss from taxable income for any taxable period (or portion thereof) ending on or after the Closing Date as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting or Section 481 of the Code or any comparable provision of state or local, domestic or foreign, tax Law or for any other reason. Neither Holdings nor any Subsidiary is or ever has been required to make any adjustment pursuant to Code Section 481(a) (or any predecessor provision) or any similar provision of state, local or foreign Tax Law by reason of any change in any accounting methods, and will not be required to make such an adjustment as a result of the Contemplated Transactions, and there is no application pending with any Taxing Authority requesting permission for any changes in any of its accounting methods for Tax purposes. To the Knowledge of the Sellers and Holdings, no Taxing Authority has proposed any such adjustment or change in accounting method.

(h)    Each of Holdings and each Subsidiary has materially complied in with all applicable Laws relating to the payment and withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 3121 and 3402 of the Code or similar provisions under any Federal, state or local, domestic or foreign, Laws) and has, within the time and the manner prescribed by Law, withheld from and paid over to the proper Taxing Authority all amounts required to be so withheld and paid over under applicable Laws.

(i)    Neither Holdings nor any Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code or made an election under

Section 897(i) of the Code to be treated as a domestic corporation for purposes of Sections 897, 1445 and 6039C of the Code.

(j)     No property owned by Holdings or any Subsidiary (i) constitutes "tax exempt use property" within the meaning of Section 168(h)(1) of the Code or (ii) is tax exempt bond financed property within the meaning of Section 168(g) of the Code. Neither Holdings nor any Subsidiary is a party to any lease made pursuant to Section 168(f)(8) of the Code, as in effect prior to the date of enactment of the Tax Equity and Fiscal Responsibility Act of 1982, and none of the assets of Holdings or any Subsidiary is subject to a lease under Section 7701(h) of the Code or under any predecessor section.

(k)     Neither Holdings nor any Subsidiary has ever (i) made an election under Section 1362 of the Code to be treated as an S corporation or a qualified subchapter S subsidiary for Federal income tax purposes or (ii) made a similar election under any comparable provision of any Federal, state, local, domestic or foreign, tax Law.

(l)     Neither Holdings nor any Subsidiary has ever (i) made an election under Treasury Regulation Section 301.7701-3(c) to be treated as a partnership or disregarded entity for Federal income tax purposes or (ii) made a similar election under any comparable provision of any Federal, state, local, domestic or foreign, tax Law. Holdings has at all times since its formation been treated as a partnership for U.S. federal income tax purposes. Schedule 4.10(l) sets forth the name and the U.S. federal income tax classification of each Subsidiary.

(m)     Schedule 4.10(m) sets forth with respect to Holdings and each Subsidiary as of the most recent practicable date, (i) the tax bases of each of Holdings and each Subsidiary in its Assets (including any intangible assets), (ii) the amount of any net operating losses, unused investment or other credits, unused foreign tax credits or excess charitable contributions of Holdings or any Subsidiary for Federal income tax, alternative minimum tax or any other tax purposes (including dates of expiration of such items, any limitations on such items and all Schedules M-1 prepared or filed by Holdings or any Subsidiary), (iii) the amount of any deferred gain or loss allocable to Holdings or any Subsidiary arising out of any deferred intercompany transactions, (iv) a list, by type of Tax, of each state, county, local, municipal, domestic or foreign jurisdiction in which Holdings or any Subsidiary (A) files, is required to file, or has been required to file a Tax Return relating to state and local income, franchise, license, excise, net worth property and sales and use taxes, (B) is required to register for tax purposes, (C) is or has been liable for any taxes on a "nexus" basis at any time for taxable periods ending after December 31, 2001 (with detail on the type of connections in each respective jurisdiction), or (D) is qualified to do business, and (v) each state, county, local, municipal, domestic or foreign jurisdiction (A) in which any property of Holdings or any Subsidiary is located or regularly used, or (B) in which any employee of Holdings or any Subsidiary is regularly present.

(n)     On or prior to the Closing, each of Holdings and each Subsidiary will have provided all information concerning cross-border related party transactions.

(o)     Neither Holdings nor any Subsidiary has constituted either a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in any distribution of stock qualifying or intended to qualify for tax-free treatment under

Section 355 of the Code (i) within the two-year period ending on the date of this Agreement or (ii) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the Contemplated Transactions.

(p)    Holdings has delivered to Purchaser (i) complete and correct copies of all material Tax Returns of Holdings and each Subsidiary relating to Taxes for all taxable periods for which the applicable statute of limitations has not yet expired and (ii) complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, and any similar documents, submitted by, received by or agreed to by or on behalf of Holdings and/or any Subsidiary, and relating to Taxes for all taxable periods for which the statute of limitations has not yet expired.

(q)    No amount or other entitlement that could be received (whether in cash or property or the vesting of property) as a result of any of the Contemplated Transactions (alone or in combination with any other event) by any person who is a "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G-1) under any agreement or arrangement currently in effect would be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) and no such disqualified individual is entitled to receive any additional payment from Holdings or any Subsidiary or any other Person in the event that the excise tax required by Section 4999(a) of the Code is imposed on such disqualified individual.

(r)    Holdings and each Subsidiary has disclosed on its Federal income tax returns and reports all positions taken therein that could give rise to a substantial understatement of Federal income tax within the meaning of Section 6662 of the Code.

(s)    Neither Holdings nor any Subsidiary is, or has ever been, a personal holding company within the meaning of Section 542 of the Code and neither Holdings nor any Subsidiary has ever been a foreign personal holding company within the meaning of Section 552 of the Code.

(t)    Neither Holdings nor any Subsidiary has ever participated in any reportable transaction, as defined in Treasury Regulations Section 1.6011-4(b)(1), required to be reported in a disclosure statement pursuant to Treasury Regulations Section 1.6011 4.

(u)    Since the date of incorporation or formation, as applicable, there has been no change in ownership of Holdings or any Subsidiary within the meaning of Section 382(g) of the Code.

(v)    Holdings and each Subsidiary had properly and in a timely manner documented their transfer pricing methodology in compliance with Section 482 (and any related sections) of the Code, the Treasury regulations promulgated thereunder and any comparable provisions of state, local, domestic or foreign Tax Law.

**4.11.    Legal Proceedings.**

(a)    Except as set forth on Schedule 4.11 (which matters have not had, and are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect), neither Holdings nor any Subsidiary is a party to any, and there are no pending or, to the Knowledge of the Sellers and Holdings, threatened, Actions against or otherwise affecting Holdings, any Subsidiary, or any of the Assets or Business, or that challenges the validity or propriety of, or seeks to alter or materially delay the consummation of the Contemplated Transactions. No circumstances or occurrences, event or set of events exist, nor has Holdings received any notice of any occurrence, event or set of events that can be reasonably expected to the form the basis of an Action against or otherwise affecting Holdings, any Subsidiary, or any of the Assets or Business which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or challenging the validity or propriety of the Contemplated Transactions.

(b)    Schedule 4.11 contains a complete and accurate list of each Order to which Holdings, any Subsidiary or any of the Assets is subject. Holdings and each Subsidiary is, and at all times since the issuance of such Order has been, in compliance in all material respects with all of the terms and requirements of each Order identified or required to be identified in Schedule 4.11. Neither Holdings nor any Subsidiary is in material default under, and no event has occurred or circumstance exists that (with or without notice or lapse of time) constitutes or will result in a violation of or a default under, any Order identified or required to be in Schedule 4.11.

(c)    Except as set forth on Schedule 4.11, there is no Action that Holdings or any Subsidiary intends to initiate.

**4.12.    Tangible Personal Property.**

(a)    Schedule 4.12 hereto sets forth a list, including the location of each item, of Tangible Personal Property owned by Holdings or any Subsidiary having either a depreciated book value or estimated fair market value in excess of $50,000, or used in the Business and having rental, license or other payments therefor in excess of $50,000 per year. The Tangible Personal Property disclosed in Schedule 4.12 includes substantially all of the tangible personal property used in the operation of the Business as currently conducted.

(b)    All of the Tangible Personal Property has been maintained in accordance with normal industry practice and in compliance in all material respects with all applicable Laws and requirements of applicable Contracts and are in good operating condition, normal wear and tear excepted and are suitable for the uses to which they are being put. None of the buildings, structures or equipment owned or used by Holdings or any of the Subsidiaries is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that, except as set forth in Schedule 4.12, are not in excess of $10,000 individually or $50,000 in the aggregate.

**4.13.    Intellectual Property.** Schedule 4.13 (which is prepared on an entity by entity basis) hereto sets forth a correct and complete identification of all of the following assets or interests that are owned by Holdings or any Subsidiary (or in which Holdings or any Subsidiary

has an interest, including a right of use) and used in the conduct of the Business (the "**Intellectual Property Assets**"): (i) all registered and unregistered fictitious business names, trademarks, service marks, trade names, logos, proprietary designs and slogans, including without limitation all such rights to "Garfield's", "Garcia's", and "Pepperoni Grill"; (ii) patents and associated inventions, industrial models, processes and designs, technical information, know-how and operating, maintenance or other manuals and registrations and applications for any of the foregoing; (iii)"software" and associated documentation; (iv) trade secrets; (v) copyrights, (vi) domain names and (v) each registration, application, license, common law right and Contract relating to any of the foregoing (the "**Intellectual Property Licenses**"). Except as indicated in Schedule 4.13:

(a)    except as set forth in Schedule 4.13(a), all of the Intellectual Property Assets were developed by employees of, or consultants retained by, Holdings or a Subsidiary, and Holdings and its Subsidiaries have taken reasonable actions to obtain, maintain and protect the Intellectual Property Assets, including obtaining the assignment of rights to the Intellectual Property Assets from all employees and contractors who invented, authored or otherwise contributed thereto, and taking commercially reasonable steps to maintain the secret and confidential nature of any trade secrets or confidential information in their possession, custody or control;

(b)    Holdings or a Subsidiary, as identified on Schedule 4.13, is the sole owner of all right, title and interest in and to each Intellectual Property Asset (except for Intellectual Property Assets licensed to the Companies under an Intellectual Property License), including without limitation all such right, title and interest in and to "Garfield's", "Garcia's", and "Pepperoni Grill", free and clear of all Encumbrances (other than Permitted Liens identified on Schedule 4.13) and with absolute right of use without seeking the approval or consent of any Person and without payment, and shall continue to have such right upon the completion of the Contemplated Transactions;

(c)    the Intellectual Property Assets are all those necessary for the operation of the Business;

(d)    Holdings has provided the Purchaser with reasonable access to correct and complete copies of all of the Intellectual Property Assets and of all other written documentation available to Holdings evidencing Holdings' or a Subsidiary's ownership thereof or interest therein;

(e)    all registrations and applications for the Intellectual Property Assets are in full force and effect, and neither Holdings nor any Sellers has any Knowledge or reason to believe that any item of Intellectual Property is abandoned, invalid or unenforceable;

(f)    none of the Intellectual Property Assets is subject to any outstanding Order limiting the scope or use thereof or declaring any of the Intellectual Property Assets abandoned, and none of the Intellectual Property Assets is subject to any outstanding Action that is seeking to limit the scope or use thereof or to declare any of the Intellectual Property Assets abandoned, and to the Knowledge of Holdings and the Sellers, no facts or circumstances exist as a valid basis for same;

(g)    to the Knowledge of Holdings and the Sellers, there are no infringing or diluting uses of the Intellectual Property Assets by third parties, and no investigations are pending concerning the possibility of such infringing or diluting use, and to the Knowledge of Holdings and the Sellers, no facts or circumstances exist as a valid basis for same;

(h)    except as set forth in <u>Schedule 4.13(h)</u>, neither Holdings nor any Subsidiary has granted any license, franchise, permit or other right to any Person to use any of the Intellectual Property Assets;

(i)    the conduct of the Business has not and does not infringe upon, misappropriate or conflict with any intellectual property of any Person, and there are no pending or, to the Knowledge of the Sellers or Holdings, threatened claims or Actions alleging that Holdings, any Subsidiary or the operation of the Business infringes, misappropriates or conflicts with the intellectual property rights of any Person, and to the Knowledge of Holdings and the Sellers, no facts or circumstances exist as a valid basis for same;

(j)    there are no pending Actions or other adversarial proceedings, and there are no disputes or disagreements involving any Intellectual Property Asset that could if adversely determined reasonably be expected to result in a Material Adverse Effect, and, to the Knowledge of the Sellers and Holdings, no such Action or other adversarial proceeding is threatened; and

(k)    (A) Holdings and its Subsidiaries maintain policies and procedures regarding the security and privacy of data on or regarding individuals that are commercially reasonable and, in any event, in compliance in all material respects with all applicable Laws; (B) to the Knowledge of Holdings and the Sellers there has been no material security breaches relating to, violations of any security policy regarding or any unauthorized access of any data containing the personally identifiable information of individuals; and the use and dissemination by Holdings and its Subsidiaries of any such data (including consumers of its or its customers' products and services, or users of any web sites) is in compliance in all material respects with all applicable privacy policies and Laws; and (C) the Contemplated Transactions will not violate in any material respect any applicable privacy policy or Laws relating to the use, dissemination, or transfer of data on or regarding individuals

4.14.    <u>Contracts</u>.    (a) <u>Schedule 4.14(a)</u> hereto sets forth a complete and accurate list of all Contracts to which Holdings or any Subsidiary is a party, or by which any of their respective Assets are bound or subject (individually, a "**Disclosed Contract**", and collectively, the "**Disclosed Contracts**"), including without limitation:

(i)    each Contract that involves performance of services by Holdings or any Subsidiary of an amount or value in excess of $50,000;

(ii)    each Contract that involves performance of services or delivery of goods or materials to Holdings or any Subsidiary of an amount or value in excess of $50,000;

(iii)    each Contract that involves expenditures or receipts of or by Holdings or any Subsidiary in excess of $50,000;

(iv)    each loan Contract, promissory note, bond, letter of credit or other instrument or agreement evidencing Debt or any Guarantee (specifically identifying any Guarantee provided by or for the benefit of any Person other than Holdings or a Subsidiary);

(v)    each Contract (or group of related Contracts) under which any Asset is subject to an Encumbrance;

(vi)    each lease, sublease, rental or occupancy Contract, license, installment and conditional sale Contract, and other Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property, including the Leases, but except for any personal property lease having payments of less than $100,000 and with a term of less than one year;

(vii)    each Intellectual Property License and each Insurance Policy;

(viii)    each collective bargaining Contract and Contract with any labor union or other employee representative of a group of employees;

(ix)    each joint venture, partnership, limited liability company and other Contract (however named) involving a sharing of profits, losses, costs or Liabilities by Holdings or any Subsidiary with any other Person;

(x)    each Contract containing covenants that in any way purport to restrict the business activity of Holdings, any Subsidiary or any officer, director, employee, consultant or contractor thereof or limit the freedom of Holdings, any Subsidiary or any officer, director, employee, consultant or contractor thereof to engage in any line of business or to compete with any Person;

(xi)    each Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(xii)    each Contract for individual capital expenditures in excess of $50,000 or aggregate capital expenditures in excess of $100,000;

(xiii)    each employment, consulting, management, separation, severance or similar Contract with employees of, or consultants or independent contractors to, Holdings or any Subsidiary (including all Employment Agreements);

(xiv)    each Contract related to the franchising activities of Holdings or any Subsidiary;

(xv)    each Contract relating to the acquisition or disposition of (i) any current or former business of Holdings or any Subsidiary (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (ii) any asset other than in the Ordinary Course of Business;

(xvi)    each Contract under which Holdings or any Subsidiary is, or may become, obligated to pay any amount in respect of indemnification obligations, purchase price adjustment or otherwise in connection with any (i) acquisition or disposition of assets or securities (other than the sale of inventory in the Ordinary Course of Business), (ii) merger, consolidation or other business combination, or (iii) series or group of related transactions or events of the type specified in clauses (i) and (ii) above;

(xvii)    each agreement or contract that affects the consummation of the Contemplated Transactions; and

(xviii)    each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    Except as disclosed in the list set forth in Schedule 4.14, (i) each Disclosed Contract is the valid and binding obligation of Holdings or a Subsidiary and, to the Knowledge of the Sellers and Holdings, each other Person or party thereto, enforceable in accordance with its terms, and is in full force and effect, (ii) there exists no material breach of or default by Holdings or a Subsidiary, as the case may be, under any Disclosed Contract, (iii) there has not occurred any event or events that, with the lapse of time or the giving of notice or both, would constitute a material default by Holdings or any Subsidiary under any Disclosed Contract, (iv) to the Knowledge of the Sellers and Holdings, no other Person party to any Disclosed Contract is now in breach of or default under any material term thereof or has breached or defaulted under any material term thereof (which breach or default remains uncured as of the date hereof), and (v) to the Knowledge of the Sellers and Holdings, there has not occurred any event or events that, with the lapse of time or the giving of notice or both, would constitute a material default by any other party under any Disclosed Contract.

(c)    Neither Holdings nor any Subsidiary has received any notice (i) of any anticipated breach of or default under any material term thereof by any Person party to any Disclosed Contract; or (ii) that any Person party to any Disclosed Contract currently intends to cancel, terminate or renegotiate such Disclosed Contract or to exercise or not to exercise any option thereunder. No claim has been asserted or, to the Knowledge of the Sellers and Holdings, threatened that is adverse to the rights of Holdings or any Subsidiary under any Disclosed Contract. Except as set forth on Schedule 4.14(c), the continuation, validity and effectiveness of each Disclosed Contract will not be affected by the Closing.

(d)    Copies of each of the written Disclosed Contracts, together with all amendments, modifications or other changes thereto have been provided to the Purchaser. Neither Holdings nor any Subsidiary is a party to any material oral Contract.

4.15.    **Compliance With Laws.**

(a)    Except as otherwise disclosed to the Purchaser in writing (in a document specifically referring to this Section 4.15) prior to the date hereof in accordance with Section 13.1, Holdings and each Subsidiary has complied in all material respects with all applicable Laws in connection with the operation of the Business or ownership or use of the Assets and no investigation, inquiry, audit or review by any Authority with respect to Holdings, any Subsidiary