or the Business is pending or, to the Knowledge of the Sellers and Holdings, threatened against Holdings or any Subsidiary alleging any failure to so comply, nor has any Authority indicated an intention to conduct the same. No event has occurred or circumstance exists that (with or without notice or lapse of time) constitutes or will result in a material violation by Holdings or any Subsidiary of, or a failure on the part of Holdings or any Subsidiary to comply in all material respects with, any applicable Laws in connection with the operation of the Business or ownership or use of the Assets.

(b)    Holdings and each Subsidiary possesses all material Permits required to be obtained for the operation of the Business as presently conducted, all such Permits are in full force and effect and no suspension or cancellation is, to the Knowledge of the Sellers and Holdings, threatened. Schedule 4.15(b) contains a complete and accurate list of each Permit that is held by Holdings or a Subsidiary or that otherwise relates to the Business. Each Permit listed or required to be listed in Schedule 4.15(b) is valid and in full force and effect. Except as set forth on Schedule 4.15(b), the continuation, validity and effectiveness of each Permit will not be affected by the consummation of the Contemplated Transactions.

(c)    (i) Holdings and each Subsidiary is, and has been at all times since January 1, 2004, in compliance in all material respects with all of the terms and requirements of each Permit identified or required to be identified in Schedule 4.15(b), (ii) no event has occurred or circumstances exists that may (with or without notice or lapse of time) (A) constitute or result in a violation of or a failure to comply with any material term or requirement of any Permit listed or required to be listed in Schedule 4.15(b) or (B) result in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Permit listed or required to be listed in Schedule 4.15(b), (iii) since January 1, 2004, neither Holdings nor any Subsidiary has received any written notice or other communication from any Authority or any other Person regarding (A) any actual or alleged violation of or failure to comply with any material term or requirement of any Permit or (B) any actual or proposed revocation, withdrawal, suspension, cancellation, termination or modification of any Permit, and (iv) all applications required to have been filed for the renewal of the Permits listed or required to be listed in Schedule 4.15(b) have been duly filed on a timely basis with the appropriate Authority, and all other filings required to have been made with respect to such Permits have been duly made on a timely basis with the appropriate Authority where such failure would have a material adverse effect on Holdings' or any Subsidiary's rights thereunder. The Permits listed in Schedule 4.15(b) collectively constitute all of the Permits necessary to permit Holdings and the Subsidiaries to lawfully conduct and operate the Business in the manner in which they currently conduct and operate the Business and to permit Holdings and the Subsidiaries to own or lease and use their respective Assets in the manner in which they currently own or lease and use such Assets.

(d)    Schedule 4.15(d) lists all states in which Holdings or any Subsidiary is currently registered to sell franchises. All such registrations and related filings are current and comply in all material respects with all applicable Laws. Neither Holdings nor any Subsidiary has offered to sell or has sold franchises in any state in which it was required to be registered to offer or sell franchises but was not so registered. Neither Holdings nor any Subsidiary has offered to sell or sold any franchises except in compliance in all material respects with all applicable Laws regarding franchise disclosure and pursuant to offering circulars (including any uniform franchise offering circulars) prepared and delivered to prospective franchisees or

franchise area developers in compliance in all material respects with all applicable Laws and containing information that is accurate and complete.

(e)     Part A of Schedule 4.15(e) contains a true and correct listing of each of the liquor licenses (and similar or related Permits) maintained by or for the benefit Holdings and its Subsidiaries (the "**Liquor Licenses**"), together with the name of the Person holding such Liquor License. Part B of Schedule 4.15(e) contains a true and correct listing and description of all consents, approvals, authorizations, filings and notices required to be obtained from or made with Authorities on or prior to the Closing Date in connection with the Liquor Licenses or otherwise under applicable Laws relating to the sale of alcoholic beverages (the "**Pre-Closing Liquor License Actions**"). Part C of Schedule 4.15(e) contains a true and correct listing and description of all consents, approvals, authorizations, filings and notices required to be obtained from or made with Authorities following the Closing Date in connection with the Liquor Licenses or otherwise under applicable Laws relating to the sale of alcoholic beverages (the "**Post-Closing Liquor License Actions**"). Assuming that the Acquired Companies take all of the Pre-Closing Liquor License Actions and Post-Closing Liquor License Actions in accordance with applicable Law and within the time periods described on Part C of Schedule 4.15(e), and except for any issues resulting solely or primarily from facts or circumstances relating to the Purchaser or its officers, directors or investors or solely or primarily relating to the operation of the Business following the Closing in a manner that differs than the operation of the Business prior to the Closing, (i) the consummation of the Contemplated Transactions will not result in any termination, suspension or revocation of any Liquor License and (ii) the ability of any Acquired Company to sell alcoholic beverages in each jurisdiction in which the Business is operated will continue uninterrupted as a result of the consummation of the Contemplated Transactions. The immediately preceding three sentences of this Section 4.15(e) are not intended to cover to the Liquor Licenses relating to the Garfield's restaurants located in Michigan.

4.16.   **Insurance Coverage.**   Schedule 4.16 contains a list and description of all life, fire, casualty, product liability, general liability and other insurance policies maintained by Holdings and each Subsidiary (collectively, the "**Insurance Policies**"). A true, correct and complete copy of each of the Insurance Policies has been provided to the Purchaser. Each of the Insurance Policies is in full force and effect. Holdings and each Subsidiary is in compliance with all material conditions contained in any of the Insurance Policies. The Insurance Policies will continue to be enforceable and in full force and effect immediately after the Closing Date in accordance with the terms as in effect immediately before the Closing Date. All premiums due on the Insurance Policies or renewals thereof have been paid through the Closing Date, and there is no default (including with respect to the payment of premiums or the giving of notices) by Holdings or any Subsidiary under the Insurance Policies nor, to the Knowledge of the Sellers and Holdings, except as set forth in Schedule 4.16, any default by any other party to the Insurance Policies. No event has occurred that, with notice or the lapse of time, would constitute such a breach or default by Holdings or any Subsidiary, or, to the Knowledge of Holdings and the Sellers, any other party thereto, or permit termination, modification or acceleration, under any Insurance Policy. Neither Holdings nor any Subsidiary has received any notice from the insurer denying coverage or reserving rights with respect to a particular claim currently pending or any Insurance Policy in general. Neither Holdings nor any Subsidiary has incurred any Loss that has had or would reasonably be expected to have a Material Adverse Effect on Holdings or any

Subsidiary, either individually or in the aggregate, and that was or would be covered by any Insurance Policy for which it has not properly asserted a claim under any Insurance Policy. Holdings and each Subsidiary is covered by types of insurance appropriate for the Business and its loss experience history. No outstanding recommendations have been made to Holdings or any Subsidiary by any issuer of an Insurance Policy or by any Authority exercising similar functions that requires or recommends any changes in the conduct of the Business of, or any repairs or other work to be done on or with respect to any of the properties or assets of Holdings or any Subsidiary. Schedule 4.16 describes any self-insurance arrangements affecting Holdings or any Subsidiary.

### 4.17.   Real Property.

(a)     Except as set forth in Schedule 4.17(a) hereto, neither Holdings nor any Subsidiary owns, leases, subleases, operates, manages, or possesses any real property or any interest therein.

(b)     All real property leases and subleases as to which Holdings or a Subsidiary is a party and any amendments or modifications thereof are listed in Schedule 4.17(b) hereto (each a "Lease" and collectively, the "Leases"). Schedule 4.17(b) indicates each property of which Holdings or a Subsidiary is the tenant or subtenant and the start date, expiration date and renewal terms of each Lease identified or required to be identified on Schedule 4.17(b). True and complete copies of each Lease have been provided to the Purchaser, including all notices, memoranda of lease, estoppel certificates, and subordination, non-disturbance and attornment agreements related thereto, and the Leases constitute the entire understanding relating to Holdings' and such Subsidiary's use and occupancy of the leased premises. The Leases are valid, in full force and effect and enforceable. Except as listed in Schedule 4.17(b), (i) there are no existing payment defaults or non-payment defaults on the part of Holdings or a Subsidiary or, to the Knowledge of the Sellers and Holdings, any other Person, under the Leases, (ii) neither Holdings nor any Subsidiary has received or given notice of default or claimed default with respect to any Lease, and (iii) no event has occurred or circumstances exist that (with or without notice or lapse of time) constitutes or will result in a default on the part of Holdings or a Subsidiary thereunder. Holdings and the Subsidiaries have performed all tenant or subtenant obligations under each Lease concerning the construction of tenant improvements at each property subject to such Lease, and all fees, tenant improvement allowances and other landlord concessions under each Lease have been paid or performed in full. None of the Leases prohibits the use of property subject to such Lease for the purposes each is currently used for, including, as applicable, a restaurant or eatery and no circumstances exist that would now or in the future limit such uses of such property. Neither Holdings nor any Subsidiary has granted to any Person any right, option, right of first offer or right of first refusal to lease, sublease, use or occupy all or part of any property subject to a Lease. Except as set forth in Schedule 4.17(b), there are no written or oral subleases, licenses, concessions, occupancy agreements or other Contracts granting to any Person the right of use or occupancy of the leased premises and there is no Person (other than Holdings or any Subsidiary) in possession of the leased premises. No commission or other payment is due any real estate broker by Holdings or any Subsidiary in connection with any Lease, and there are no agreements, oral or written, under which any real estate broker is entitled to any future payment or commission by Holdings, any Subsidiary or any such Person's assignees, in connection with any Lease or property subject to any lease.

**4.18.   Environmental Matters.**

(a)    Holdings and the Subsidiaries (and their respective Predecessors) have operated and currently operate the Business and the leasehold premises where the Business is operated or has been operated in compliance in all material respects with all applicable Environmental Laws.  For purposes hereof, **"Environmental Law(s)"** means any Law that relates to or otherwise imposes Liability or standards of conduct or requirements concerning discharges, emissions, releases or threatened releases of noise, odors or any pollutants, contaminants, wastes, or hazardous substances or materials (collectively, **"Hazardous Substances"**), whether or not as matter or energy, into air, water, or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Substances, including without limitation, to the extent applicable to Holdings, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., as amended, ("CERCLA"), the Superfund Amendments and Re-authorization Act of 1986, the Resource Conservation and Recovery Act of 1976, as amended, the Federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, as amended, the Clean Air Act of 1971, any so-called "Superlien" law, and any other applicable federal, state, local or foreign statutes (and any and all amendments thereto) relating to protection of human health or the environment in effect as of the date hereof.

(b)    All of the licenses, permits, approvals, certificates, authorizations and similar governmental authorizations ("Licenses") issued with respect to Holdings or any Subsidiary under or pursuant to any Environmental Law are in full force and effect, and Holdings and each Subsidiary is in compliance in all material respects with, and has fulfilled and performed its obligations under, each such License.  Neither Holdings nor any Subsidiary has any Liability for Hazardous Substances that were spilled or released at real properties currently or formerly owned, leased, used, or operated by them while they were so owned, leased, used or operated or, to the Knowledge of the Sellers and Holdings, at any other time or by any of their respective Predecessors, or at real properties to which Holdings or any Subsidiary or, to the Knowledge of the Sellers and Holdings, any of their respective Predecessors have transported or arranged for the transportation of Hazardous Substances.  Holdings has provided to Purchaser copies of all documents, reports, assessments or correspondence in the possession or under the control of Holdings, any Subsidiary, or the Management Sellers relating to Holdings' and each Subsidiary's compliance with or Liability under the Environmental Laws.

(c)    None of Holdings, any Subsidiary or any person for whose conduct they are responsible has received any notice of claim, demand or other notification or communication that Holdings or a Subsidiary or any such person is or may be responsible with respect to any investigation, abatement or cleanup of any threatened or actual release of any Hazardous Substance or alleging any violation or failure to comply with any Environmental Law.

**4.19.   Employee Matters.**

(a)    Schedule 4.19(a) sets forth, with respect to each Management Level Employee and each other full-time, salaried Employee of Holdings or a Subsidiary (including any Employee of Holdings or a Subsidiary who is on a leave of absence or on layoff status subject to recall) (i) the name of such Employee and the date as of which such Employee was

originally hired by Holdings or a Subsidiary, and whether the Employee is on an active or inactive status; (ii) such Employee's title or position; (iii) such Employee's annualized compensation as of the date of this Agreement, including base salary; and (iv) any governmental authorization that is held by such Employee and that is used in connection with the Business. Schedule 4.19(a) also indicates which of the Acquired Companies is the employer of the Employees engaged in each of the Garcia's Business, the Garfield's Business, the Pepperoni Grill Business, as well as all "corporate level" Employees.

(b)    Schedule 4.19(b) lists (i) all Persons who are currently performing services for Holdings or a Subsidiary who are classified as "consultants" or "independent contractors," (ii) the compensation of each such Person, and (iii) whether Holdings or a Subsidiary is party to an agreement with such Person (whether or not in writing). Any such agreements are listed on Schedule 4.19(b) and have been made available (or, in the case of agreements that are not in writing, a summary thereof has been delivered) to the Purchaser.

(c)    No labor union has been certified by the National Labor Relations Board, to the extent applicable, or is otherwise acting as a bargaining agent for any Employee of Holdings or any Subsidiary. Neither Holdings nor any Subsidiary is or has ever been a party to or bound by any union contract, collective bargaining agreement or similar Contract. There are no labor unions or other organizations attempting to represent any Employees of Holdings or any Subsidiary.

(d)    Schedule 4.19(d) lists all current employee manuals and handbooks, employment policy statements, employment agreements, and other materials relating to the employment of the current Employees of Holdings and each Subsidiary. Holdings has provided to the Purchaser complete copies of all such documents. Holdings and each of its Subsidiaries is in compliance with, in all material respects, all applicable Employment Agreements, consulting and other service contracts, written employee or human resources personnel policies (to the extent they contain enforceable obligations), handbooks or manuals, and severance or separation agreements. For purposes of this Agreement, "**Employment Agreements**" means the individual employment agreements including without limitation restrictive agreements and negative covenant agreements that Holdings and any Subsidiary have with their Employees, past or present, the collective bargaining agreements binding Holdings or any of its Subsidiaries including, but not limited to, letters of understanding, letters of intent, side letters, grievance settlements or other documents evidencing an obligation under a collective bargaining agreement and other written instruments with bargaining agents, employee relations committees or other similar representative organizations, if any, for employees which impose any obligations on Holdings or any Subsidiary.

(e)    Except as disclosed in Schedule 4.19(e), (i) to the Knowledge of the Sellers and Holdings, no employee of Holdings or any Subsidiary having a title of regional or restaurant manager (or equivalent) or Vice President or higher (a "**Management Level Employee**") has plans to terminate employment with Holdings or any Subsidiary, (ii) no Management Level Employee has notified or otherwise indicated to Holdings or a Subsidiary that he or she intends to terminate his or her employment with Holdings or a Subsidiary, as the case may be; (iii) Holdings or a Subsidiary does not have a present intention to terminate the employment of any Management Level Employee; (iv) no Management Level Employee of

Holdings or a Subsidiary is a party to or is bound by any employment contract, patent disclosure agreement, noncompetition agreement or other restrictive covenant or other contract with any Person that would be likely to affect in any way (A) the performance by such employee of any of his or her duties or responsibilities as a employee of Holdings or any Subsidiary, or (B) the Business or operations of Holdings and each such Subsidiary; and (v) to the Knowledge of the Sellers and Holdings, no Employee of Holdings or a Subsidiary is in violation of any term of any employment contract, patent disclosure agreement, noncompetition agreement, or any other restrictive covenant to a former employer relating to the right of any such Employee to be employed by Holdings or such Subsidiaries.

(f)    Except as disclosed in Schedule 4.19(f), (i) neither Holdings nor any Subsidiary has an established severance pay practice or policy; and (ii) no Employee of Holdings or any Subsidiary is entitled to any severance pay, bonus compensation, acceleration of payment or vesting of any equity interest, or other payment from Holdings or any Subsidiary (other than accrued salary, vacation, or other paid time off in accordance with the policies of Holdings or a Subsidiary) or the Purchaser as a result of or in connection with the Contemplated Transactions or as a result of any termination by any Acquired Company on or after the Closing of any Person employed by Holdings or any Subsidiary on or prior to the Closing Date.

(g)    Holdings and each Subsidiary is, and has been for the last three years, in compliance in all material respects with all currently applicable Laws respecting employment and employment and hiring practices, terms and conditions of employment, immigration, occupational health and safety, wages and hours. Neither Holdings nor any Subsidiary is engaged, and has never engaged, in any unfair labor practice of any nature. The Employees of Holdings and each Subsidiary have been, and currently are, properly classified under the Fair Labor Standards Act of 1938, as amended, and under any applicable state Law.

(h)    Neither Holdings nor any Subsidiary is the subject of any Action asserting that Holdings or any Subsidiary is engaged in any unfair labor practices, has any unfair labor practice charge or complaint pending against Holdings or any Subsidiary, or has complaints before the National Labor Relations Board pending or, to the Knowledge of Holdings or the Sellers, threatened against Holdings or any of its Subsidiaries.

(i)    There are no actual, pending, or, to the Knowledge of Holdings and the Sellers, threatened unfair labor practice complaints, strikes, work stoppages, picketing, lock-outs, boycotts, slowdowns, arbitrations, grievances, complaints, charges or similar labor-related disputes or proceedings against Holdings or any Subsidiary, and there have not been any such activities or disputes or proceedings within the last three years.

(j)    There are no collective bargaining agreements, employee agreements or Employment Agreements currently being negotiated with respect to any of the Employees of the Holdings or any Subsidiary (other than day-to-day requests from Employees in the ordinary course of business).

(k)    All vacation pay or other paid leave or benefits, premiums for employment insurance, accrued wages, salaries, bonuses, incentive pays, commissions and benefit plan

payments have, in accordance with GAAP, been properly reflected and accrued in the Financial Statements and other Books and Records of Holdings and its each of its Subsidiaries.

(l)    During the past three years, neither Holdings nor any Subsidiary has effectuated a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of Holdings or any Subsidiary, and there has not occurred a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of Holdings or any Subsidiary. Neither Holdings nor any Subsidiary is presently planning to effectuate any such "plant closing" or "mass layoff."

**4.20.  ERISA/Employee Benefits.**

(a)    Schedule 4.20(a) hereto lists each Employee Plan that covers any Employee, copies of which, and a summary plan description of each of which, have been made available or furnished to the Purchaser.

(b)    Schedule 4.20(b) includes a list of each Benefit Arrangement maintained by Holdings or a Subsidiary and each ERISA Affiliate, a copy of which has been made available or furnished previously to Purchaser.

(c)    No Employee Plan or Benefit Arrangement (each a "**Plan**") is a Multiemployer Plan, a funded welfare benefit plan, as defined in Section 419 of the Code, or a "defined benefit plan," as defined in Section 3(35) of ERISA, and neither Holdings nor any Subsidiary or ERISA Affiliate has contributed or has been obligated to contribute to any such defined benefit plan in the preceding five years. Neither Holdings nor any Subsidiary or ERISA Affiliate has any agreement or commitment to create any additional Plan, enter into any additional employment agreement, or modify or change any existing Plan or employment agreement. No Plan is subject to the laws of a jurisdiction other than the United States.

(d)    With respect to each Plan, Holdings has heretofore delivered to the Purchaser true, correct and complete copies of (i) all documents which comprise the most current version of each such Plan, including any related trust agreements, insurance contracts or other funding or investment agreements and any amendments thereto, and (ii) with respect to each Plan that is an "employee benefit plan," as defined in Section 3(3) of ERISA, (A) the three most recent Annual Reports (Form 5500 Series) and accompanying schedules for each of the Plans for which such a report is required, (B) the most current summary plan description (and any summary of material modification thereto), (C) the three most recent certified financial statements for each of the Plans for which such a statement is required or was prepared, and (D) for each Plan intended to be "qualified" within the meaning of Section 401(a) of the Code, the most recent Internal Revenue Service determination letter issued with respect to such Plan, a list of which deliveries is set forth in Schedule 4.20. Since the date of delivery of the aforementioned documents, there has not been any material change in the assets or liabilities of any of the Plans or any change in their terms and operations which could reasonably be expected to affect or alter the tax status or materially affect the cost of maintaining such Plan. Each of the Plans can be amended, modified or terminated by Holdings or any Subsidiary or ERISA Affiliate within a period of 30 days, without payment of any additional compensation or amount or the additional vesting or acceleration of any such benefits, except to the extent that such vesting is

required under the Code upon the complete or partial termination of any Plan intended to be qualified within the meaning of Section 401(a) of the Code.

(e)    Holdings and each Subsidiary and ERISA Affiliate has performed and complied with all of their obligations under and with respect to the Plans and each of the Plans has, at all times, in form, operation and administration complied in all material respects with its terms, and, where applicable, the requirements of the Code, ERISA and all other applicable Laws. Each Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code is the subject of a favorable determination or opinion letter from the Internal Revenue Service on which the Acquired Companies may rely as to all current Plan terms (except for any such Plan terms as to which no such determination or opinion letter has been received but which are the subject of a pending request for such a determination or opinion or for which the deadline for requesting such a determination or opinion has not yet arrived) and nothing has occurred which reasonably could be expected to adversely affect such qualified status.

(f)    All contributions (including salary reduction contributions), premiums and other payments due prior to the date hereof with respect to any Plan that are required to have been made under the terms of the Plan or any applicable Laws have been timely made and to the extent not due have been appropriately accrued in the Financial Statements.

(g)    (i) Neither Holdings nor any Subsidiary or ERISA Affiliate has any obligation to provide health benefits or other non-pension benefits to retired or other former employees, except as specifically required by Section 4980B of the Code or Part 6 of Subtitled B of Title I of ERISA or as disclosed on Schedule 4.20, and (ii) each of Holdings, its Subsidiaries and each ERISA Affiliate has complied with the requirements of Code Section 4980B and such Part 6, the requirements of the Health Insurance Portability and Accountability Act of 1996, and all similar state Laws.

(h)    Neither Holdings nor any Subsidiary or ERISA Affiliate, nor any other "disqualified person" or "party in interest," as defined in Section 4975 of the Code and Section 3(14) of ERISA, respectively, has engaged in any "prohibited transaction," as defined in Section 4975 of the Code or Section 406 of ERISA, nor have there been any fiduciary violations under ERISA which could subject the Purchaser, Holdings, or any Subsidiary or ERISA Affiliate (or any officer, director or employee thereof) to any penalty or tax under Section 502 of ERISA or Chapter 43 of the Code.

(i)    With respect to any Plan: (i) no filing, application or other matter is pending with the IRS, the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, the United States Department of Labor or any other Authority, (ii) there is no action, suit or claim pending and, to the Knowledge of the Sellers and Holdings, there is no such claim threatened nor is there any basis for such a claim, other than routine claims for benefits, and (iii) there are no outstanding Liabilities for Taxes, penalties or fees.

(j)    Neither the execution and delivery of this Agreement nor the consummation of the Contemplated Transactions, individually or together with any other event, will: (i) entitle any current or former employee of Holdings or any Subsidiary or ERISA Affiliate to severance pay, unemployment compensation or any other payment from Holdings or

any Subsidiary, (ii) accelerate the time of payment or vesting or increase the amount of any compensation due to any such employee or former employee or (iii) directly or indirectly result in any payment made or to be made to or on behalf of any person constituting a "parachute payment" within the meaning of Section 280G of the Code, nor is Holdings or any Subsidiary party to or bound by any contract that could require it to make any payment that could constitute a "parachute payment" within the meaning of Section 280G of the Code.

(k)     There has been no modification of a Plan occurring after October 3, 2004 that has subjected or could subject to Section 409A of the Code any deferrals under such Plan that would otherwise not have been subject to Section 409A of the Code. Each Plan that is subject to Section 409A of the Code has been operated and administered in good faith compliance with Section 409A, including with the requirements of the proposed regulations issued under Section 409A of the Code, from the period beginning January 1, 2005 through the Closing Date.

4.21.    **Absence of Certain Changes and Events**.    Since December 25, 2005, (A) no event, change or circumstance has occurred that has had, or is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect and (B) except as set forth on Schedule 4.21, there has not been:

(a)     any transaction involving more than $100,000 entered into by Holdings or any Subsidiary other than in the Ordinary Course of Business;

(b)     any loss of or damage to any of the Assets due to fire or other casualty or other loss, whether or not insured, amounting to more than $200,000 in the aggregate;

(c)     any declaration, setting aside or payment of any dividend or other distribution with respect to any Equity Interest of Holdings or a Subsidiary, or any repurchase, redemption, retirement or other acquisition by Holdings or a Subsidiary of any outstanding Equity Interest of Holdings or any Subsidiary or any other capital contribution to or equity investment in Holdings or any Subsidiary;

(d)     any issuance or sale of any Equity Interest of Holdings or any Subsidiary or grant of any registration rights;

(e)     any discharge or satisfaction of any Encumbrance or payment or satisfaction of any Liability other than current liabilities in the Ordinary Course of Business;

(f)     the incurrence of any Encumbrance or the incurrence of any Liability other than current liabilities incurred in the Ordinary Course of Business and borrowings under existing credit facilities in the Ordinary Course of Business;

(g)     (i) any change in or amendment of the Organizational Documents of Holdings or any Subsidiary or (ii) any split, reclassification or other change in or any amendment of any term of any outstanding Equity Interest of Holdings or any Subsidiary;

(h)     any incurrence, assumption or guarantee by Holdings or any Subsidiary of any indebtedness for borrowed money, or any amendment of the terms of any such indebtedness, other than borrowings under existing credit facilities in the Ordinary Course of Business;

(i)     any making of any loan, advance or capital contributions to, or investment in, any Person other than in favor of any Subsidiary in the Ordinary Course of Business;

(j)     any sale, lease, pledge, transfer, license or other disposition of any asset or property having a value in excess of $50,000 other than the sale of inventory in the Ordinary Course of Business;

(k)     any material transaction or commitment made, or any material Contract entered into, by Holdings or any Subsidiary relating to the Business (including the acquisition or disposition of any Assets) or any relinquishment by Holdings or any Subsidiary of any material Contract or other right, other than purchases made in the Ordinary Course of Business;

(l)     (i) grant of any severance or termination pay to any manager, director, officer or employee of Holdings or any Subsidiary, (ii) entering into of any employment, severance, management, consulting, deferred compensation or other similar Contract (or any amendment to any such existing Contract) with any director, officer or employee of Holdings or any Subsidiary, (iii) change in benefits payable under existing severance or termination pay policies or employment, severance, management, consulting or other similar agreements other than in respect of non-Management level Employees in the Ordinary Course of Business, (iv) change in compensation, bonus or other benefits payable to Managers, directors, officers or other employees of Holdings or any Subsidiary, other than in respect of non-Management level Employees in the Ordinary Course of Business, or (v) change in the payment or accrual policy with respect to any of the foregoing;

(m)     any unfair labor practice, labor dispute or complaint or any activity or Action by a labor union or representative thereof to organize any employees of Holdings or any Subsidiary, or any lockouts, strikes, slowdowns, work stoppages, boycotts, picketing, arbitrations, grievances or threats thereof by or with respect to any employees of Holdings or any Subsidiary;

(n)     any sale, assignment or transfer of any Intellectual Property Asset;

(o)     any capital expenditures, or commitment to make any capital expenditures not contemplated by the capital expenditure budget set forth on Schedule 4.21(o);

(p)     payment of any amounts to, or Liability incurred to or in respect of, or sale of any properties or assets (real, personal or mixed, tangible or intangible) to, or any transaction or any Contract with, any corporation or business in which Holdings or any Subsidiary or any of its Managers or corporate officers or directors, or any "affiliate" or "associate" (as such terms are defined in the rules and regulations promulgated under the Securities Act) of any such Person, has any direct or indirect ownership interests;

(q)     any merger or consolidation of Holdings or any Subsidiary with any other Person or any acquisition by Holdings or any Subsidiary of a material amount of assets of any other Person, except for purchases of inventory in the Ordinary Course of Business;

(r)     any change in accounting methods or principles in any manner (including with respect to reserves) of Holdings or any Subsidiary;

(s)     any election or revocation by Holdings or any Subsidiary of any election as to Tax matters, any change by Holdings or any Subsidiary in any accounting method relevant to the determination of Taxes of Holdings or any Subsidiary, any settlement of any Tax Liability of Holdings or its Subsidiaries, any closing agreement relating to any Tax of Holdings or its Subsidiaries, or any consent to any extension or waiver of the limitations period applicable to any Tax claim or assessment with respect to Taxes of the Holdings or its Subsidiaries;

(t)     settled or compromised any pending or threatened Action;

(u)     any opening or closing of any restaurant or entering into or committing to enter into any new Lease by Holdings or any Subsidiary or the discontinuance of any line of business or any material business operations;

(v)     any writing up or writing down of any material Assets of Holdings or any Subsidiary or any revaluation of any inventory of Holdings or any Subsidiary;

(w)     any adoption of any Plan or, except in the Ordinary Course of Business and in accordance with the terms of any such Plan, any increase in benefits under any Plan;

(x)     any failure to make any filing, pay any fee, or take any other action necessary to maintain any Intellectual Property Assets which are material to the operation of the Business;

(y)     any agreement by Holdings or any Subsidiary to do any of the foregoing.

**4.22.    Certain Transactions.** Except as set forth on Schedule 4.22 hereto, and except for (a) relationships with Holdings or any Subsidiary as an officer, manager, director, or employee thereof (and compensation by Holdings or any Subsidiary in consideration of such services) and (b) relationships with Holdings or any Subsidiary as members or stockholders therein, none of the Managers, directors, officers, or stockholders of Holdings or a Subsidiary, or any member of any of their families, or any entity that they control or in which they own a 5%-or-more interest (as a stockholder, partner, beneficiary, or otherwise) or is or was a director, officer, employee, or trustee, is presently a party to, or was a party at any time from and after December 26, 2005, any transaction or Contract, or series of similar transactions or Contracts, with Holdings or any Subsidiary, including, without limitation, any Contract with Holdings or a Subsidiary (i) providing for the furnishing of services to or by, (ii) providing for rental of real or personal property to or from, or (iii) otherwise requiring payments to or from, any such Person or any other Person in which any such Person has or had a 5%-or-more interest (as a stockholder, partner, beneficiary, or otherwise) or is or was a director, officer, employee, or trustee. None of Holdings or a Subsidiary's officers, directors or Managers has any interest in any property, real or personal, tangible or intangible, including inventions, copyrights, trademarks, or trade names,

used in or pertaining to the Business, or any supplier, services provider, joint venturer or customer, client of Holdings or any Subsidiary, except for the normal rights of an equity owner or shareholder of Eateries or Holdings, and except for rights under existing employee benefit plans.

**4.23.** **Banking Facilities.** Schedule 4.23 hereto contains a complete and correct list of the names and locations of all banks in which Holdings or a Subsidiary has accounts or safe deposit boxes, the designation of each such account and safe deposit box, and the names of all Persons authorized to draw on or have access to each such account and safe deposit box.

**4.24.** **Suppliers.** Schedule 4.24 contains a list of all suppliers of products or services to the Business that, during the fiscal year ended December 25, 2005 or during the portion of Fiscal 2006 ended on the Most Recent Balance Sheet Date, engaged in transactions with Holdings or a Subsidiary involving an aggregate amount of $200,000 or more during either such period (each a "Material Supplier"). Except as set forth on Schedule 4.24, (i) no single supplier accounted for more than five percent (5%) of the consolidated purchases of Holdings or a Subsidiary during the last two fiscal years of Holdings and (ii) no Material Supplier has canceled or otherwise terminated, or made any written threat (or, to the Knowledge of Holdings or any Seller, threatened) to cancel or otherwise terminate, its relationship with Holdings or a Subsidiary, as applicable; or (ii) materially decreased its sale of services or supplies to Holdings or a Subsidiary, as applicable, or made any written threat (or other threat Known to Holdings or any Seller) with respect thereto.

**4.25.** **No Broker.** No broker, finder, agent or similar intermediary has acted for or on behalf of Sellers, Holdings or any Subsidiary in connection with this Agreement or the Contemplated Transactions, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any Contract with Sellers, Holdings or any Subsidiary.

**4.26.** **Prior Claims Relating to Health Matters.** Except as set forth on Schedule 4.26, (i) since January 1, 2005, there have been no events or occurrences of defective or contaminated products sold by Holdings or any Subsidiary that have resulted in any death, injury or illness to any Person and no claims have been asserted with respect to any such events or occurrences since January 1, 2005 and (ii) to the Knowledge of the Sellers and Holdings, there are no investigations pending or threatened with respect to any such events or occurrences. None of the events or occurrences described on Schedule 4.26 have had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.27.** **Disclosure; Information Supplied.** None of Holdings, Eateries, Fiesta or the Sellers has failed to disclose to the Purchaser in writing any fact that could reasonably be expected to have a Material Adverse Effect on Holdings or any Subsidiary or their respective businesses, properties, assets, Liabilities, earnings, capitalization, stockholders' equity, operations, condition (financial or otherwise), licenses, franchises or prospects. No representation or warranty contained in this Agreement, and no statement contained in any document, certificate or schedule furnished or to be furnished to the Purchaser or any of its representatives pursuant to this Agreement, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to be stated therein or

necessary in order to make the statements herein or therein, in light of the circumstances under which it was or will be made, not misleading. The financial information delivered to the Purchaser by or on behalf of Sellers or Holdings has been prepared in good faith based on the books and records of Holdings and the Subsidiaries, and is true, accurate and complete as of the time and for the periods indicated thereon.

**4.28.** **Chiuchiarelli Share Transfer Agreement.** Each of the representations and warranties of the parties thereto set forth in the Chiuchiarelli Share Transfer Agreement are true and correct.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ENTITIES

The Purchaser Entities, jointly and severally, represent and warrant to the Sellers, Holdings, Eateries and Fiesta as follows:

**5.1.** **Due Organization.** The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Eateries Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the State of Oklahoma. Fiesta Merger Sub is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

**5.2.** **Authority to Execute and Perform Agreements.** Each Purchaser Entity has all requisite limited liability company or corporate, as the case may be, power and authority to enter into, execute and deliver this Agreement and to perform fully its obligations hereunder.

**5.3.** **Due Authorization; Enforceability.** The execution and delivery of this Agreement and the Other Purchaser Documents and the consummation of the Contemplated Transactions by each Purchaser Entity have been duly and validly authorized by all necessary action on the part of each Purchaser Entity and no other proceedings on the part of any Purchaser Entity are necessary to authorize this Agreement and the Other Purchaser Documents or consummate the Contemplated Transactions. This Agreement has been, and the Other Purchaser Documents will be at the Closing, validly executed and delivered by each Purchaser Entity, and constitutes (and, with respect to the Other Purchaser Documents, will constitute upon each such Purchaser Entity's execution and delivery thereof) a valid and binding obligation of each Purchaser Entity, enforceable against each Purchaser Entity in accordance with its terms.

**5.4.** **No Violation.** Neither the execution and delivery of this Agreement nor the consummation of the Contemplated Transactions by any Purchaser Entity will (a) violate any provision of the Organizational Documents of any Purchaser Entity, as amended to date; (b) violate, conflict with, or constitute a default under any material Contract to which any Purchaser Entity is a party or by which it or its property is bound; (c) require the consent of any party to any material Contract to which any Purchaser Entity is a party by which it or its property is bound; or (d) to the knowledge of any Purchaser Entity violate any Laws or Order to which Purchaser or its property is subject.

**5.5.** **No Broker.** Except as set forth on Schedule 5.5, no broker, finder, agent or similar intermediary has acted for or on behalf of any Purchaser Entity in connection with this Agreement or the Contemplated Transactions, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any Contract with any Purchaser Entity.

**ARTICLE VI.**

**PRE-CLOSING COVENANTS OF THE PARTIES**

**6.1.** **Commercially Reasonable Efforts.** Subject to the terms and conditions of this Agreement, each party will use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Contemplated Transactions (including satisfaction, but not waiver, of the closing conditions set forth in ARTICLE IX). In furtherance of the foregoing, Holdings, Eateries and Fiesta shall and, together with the Management Sellers, shall cause each Subsidiary to use commercially reasonable efforts to cooperate with the Purchaser Entities in their efforts to obtain the financing necessary for the Contemplated Transactions. The parties also agree to execute and deliver such other documents, certificates, agreements and other writings and to use commercially reasonable efforts to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Contemplated Transactions. Notwithstanding the foregoing, none of the parties shall be required to expend any material amounts or incur any material Liabilities in order to comply with their respective obligations under this Section 6.1.

**6.2.** **Conduct of the Business.**

(a)    Except as specifically required by this Agreement or necessary in connection with the Chiuchiarelli Share Transfer, from the date hereof until the Closing Date, Holdings and each Subsidiary shall conduct the Business in the Ordinary Course of Business and shall use their commercially reasonable efforts to keep the Business and Assets intact, including all present operations, physical facilities, working conditions and relationships and goodwill with lessors, licensors, suppliers, customers, employees, indemnity insurance companies, and others having business dealings with the Business. Without limiting the generality of the foregoing, except as specifically required by this Agreement, from the date hereof until the Closing Date, neither Holdings nor any Subsidiary will (except as necessary to comply with this Agreement):

(i)    adopt or propose any change in their respective Organizational Documents or effect a split, reclassification or other change in capital stock or limited liability company interests;

(ii)    declare, set aside or pay any dividend or make any other distribution with respect to any Equity Interest of Holdings or a Subsidiary, or repurchase, redeem, retire or otherwise acquire any outstanding Equity Interest of Holdings or any Subsidiary or make any other capital contribution to or equity investment in Holdings or any Subsidiary;

(iii)    merge or consolidate with any other Person or acquire a material amount of assets of any other Person, except for purchases of inventory in the Ordinary Course of Business;

(iv)    sell, lease, license or encumber or otherwise dispose of any material assets or property except inventory in the Ordinary Course of Business;

(v)    liquidate or dissolve;

(vi)    effect any direct or indirect redemption, purchase or other acquisition of any Equity Interest of Holdings or any Subsidiary, or declare, set aside or pay any dividend or make any other distribution of assets of any kind whatsoever with respect to any Equity Interest of Holdings or any Subsidiary;

(vii)    issue any Equity Interest, or grant any registration rights;

(viii)    incur or amend terms of any indebtedness for money borrowed or become liable in respect of any Guarantee, except for borrowings under existing credit facilities in the Ordinary Course of Business;

(ix)    take or omit to take any actions reasonably expected to cause, or allow, changes in Holdings' or any Subsidiary's consolidated working capital other than in the Ordinary Course of Business;

(x)    make any loan, advance or capital contributions to, or investment in, any Person other than in favor of any Subsidiary in the Ordinary Course of Business;

(xi)    make or commit to make any capital expenditures;

(xii)    (A) increase the amount of any bonus, salary or other compensation to any director, officer or other employee other than increases in the Ordinary Course of Business and consistent with existing Employment Agreements with respect to any non-executive employee whose annual salary is less than $100,000, (B) enter into or amend any employment, management, consulting, severance or similar agreement with or pay any severance or similar amount to any director, officer or other employee, (C) except in the Ordinary Course of Business, increase the amount of any bonus, salary or other compensation to any other employee or enter into any employment, management, consulting, severance or similar agreement with or pay any severance or similar amount to any other employee, or (D) adopt, amend or increase benefits under any Plan;

(xiii)    terminate the employment of or hire any Management Level Employee;

(xiv)    (X) materially amend, modify or otherwise change the terms of any Lease or Disclosed Contract, (Y) cancel, waive or relinquish any material claims or rights under any Lease or Disclosed Contract or (Z) enter into any new Lease or Disclosed Contract;

(xv)    change accounting methods or principles in any manner (including with respect to reserves), except as required by GAAP;

(xvi)    make or revoke any election as to Tax matters, change any accounting method relevant to the determination of Taxes, settle any Tax Liability of Holdings or its Subsidiaries, enter into any closing agreement relating to any Tax of Holdings or its Subsidiaries, or consent to any extension or waiver of the limitations period applicable to any Tax claim or assessment with respect to Taxes of the Holdings or its Subsidiaries;

(xvii)    open any restaurant or enter into any new line of business or close any restaurant or discontinue any line of business or any material business operations;

(xviii)    settle or compromise any pending or threatened Actions or otherwise satisfy any material Liabilities (other than the payment of current Liabilities in the Ordinary Course of Business);

(xix)    write up or write down any material Assets or revalue any inventory;

(xx)    fail to make any filing, pay any fee, or take any other action necessary to maintain any Intellectual Property Asset or Intellectual Property License which are material to the operation of the Business;

(xxi)    amend or otherwise modify any Management Seller Termination Agreement or any Other Manager Amended and Restated Employment Agreement; or

(xxii)    agree, whether or not in writing, to do any of the foregoing.

(b)    The Sellers will cause Holdings and each Subsidiary to comply with Section 6.2(a).

(c)    Each of Eateries and Fiesta will comply and cause their respective Subsidiaries to comply with this Section 6.2.

**6.3.    Conduct of Sellers.**

(a)    None of Holdings, Eateries or Fiesta will, and the Management Sellers will not, and will not permit Holdings or any Subsidiary to, (a) take or agree or commit to take any action that would make any representation and warranty made by the Management Sellers, Holdings, Eateries or Fiesta under this Agreement on the date of its execution and delivery inaccurate in any respect at, or as of any time prior to, the Closing Date, or (b) omit or agree or commit to omit to take any action necessary to prevent any such representation or warranty from being inaccurate in any respect at any such time.

(b)    No Seller will (a) take or agree or commit to take any action that would make any representation and warranty made by such Seller under Article III hereof on the date of the execution and delivery of this Agreement inaccurate in any respect at, or as of any time prior

to, the Closing Date, or (b) omit or agree or commit to omit to take any action necessary to prevent any such representation or warranty from being inaccurate in any respect at any such time

6.4.   **Notices of Certain Events; Continuing Disclosure.**  Holdings, Eateries, Fiesta and the Sellers will promptly notify the Purchaser of:

(a)   any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(b)   any notice or other communication from any Authority in connection with the Contemplated Transactions; and

(c)   any notice of any Action commenced or, to the Knowledge of the Sellers and Holdings, threatened against, or relating to or involving or otherwise affecting Holdings or any Subsidiary, or the Business or the Assets, or that relates to the consummation of the Contemplated Transactions, or any developments relating to any Action disclosed pursuant to Section 4.11; and

(d)   any event or circumstance that could reasonably be expected to result in a breach of, or inaccuracy in, any of the Holdings' or the Sellers' representations and warranties; provided, however, that no such disclosure will be deemed to prevent or cure any such breach of, or inaccuracy in, amend or supplement any Schedule to, or otherwise disclose any exception to, any of the representations and warranties set forth in this Agreement.

6.5.   **[Intentionally Omitted.]**

6.6.   **Filings.**  The parties hereto shall cooperate with each other (a) in determining whether any action by or in respect of, or filing with or notice to, any Authority is required, or any actions, consents, approvals or waivers are required to be obtained from or notices given to any party to any Contracts to which Holdings or any Subsidiary is party or by which any of them is bound, in connection with the execution and delivery of this Agreement or the consummation of the Contemplated Transactions and (b) in taking such actions, giving such notices or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

6.7.   **Exclusivity.**  During the period commencing on the date hereof through the earlier to occur of the Closing or the termination of this Agreement, the Sellers and Holdings, Eateries and Fiesta agree that they will not, and they will cause each of their respective Affiliates and the Managers, directors, officers and representatives not to, directly or indirectly, (a) initiate, solicit, encourage, discuss, negotiate or respond affirmatively to any inquiries, proposals or offers (whether initiated by them or otherwise) with respect to (i) the acquisition of any shares of limited liability interest, capital stock or any other voting securities of Holdings or any Subsidiary or any interest therein by a third party; (ii) the acquisition of all or a material portion of the assets and properties of Holdings or any Subsidiary, (iii) the merger, consolidation or business combination of Holdings or any Subsidiary or (iv) the liquidation, dissolution, recapitalization or reorganization of Holdings or any Subsidiary (each, a "**Potential Transaction**") from any Person or provide information to any Person in connection with a

Potential Transaction or (b) enter into any Contract with any Person other than Purchaser or its designee or assignee concerning or relating to a Potential Transaction. Sellers shall terminate any existing discussions with respect to a Potential Transaction Sellers shall not amend or terminate, or waive any rights of Sellers, Holdings or any Subsidiary under, any existing confidentiality agreement. In the event that a third party contacts any of the persons or entities referred to in this Section 6.7 with respect to a Potential Transaction, Holdings or such Seller shall promptly notify the Purchaser in writing of such contact and, if known, the material terms of the Potential Transaction.

**6.8.** **Access.** From the date hereof until the Closing, Holdings, Eateries and Fiesta shall and, together with the Management Sellers, shall cause their respective Subsidiaries to: (i) afford to the officers, employees, representatives and financing sources of the Purchaser Entities reasonable access during normal business hours to the Assets, Books and Records and other documents (including accountants' work papers) of Holdings and its Subsidiaries; (ii) furnish the Purchaser Entities, their representatives and financing sources with copies of all such Contracts, Books and Records and other existing documents and data as the Purchaser Entities and/or their representatives and financing sources may reasonably request; and (iii) make available during normal business hours to the Purchaser Entities and/or their representatives and financing sources the appropriate individuals (including management personnel, attorneys, accountants and other professionals) for discussion of the Business, Assets, prospects and personnel of Holdings and its Subsidiaries as any of them may reasonably request. The Purchaser Entities shall use their commercially reasonable efforts to conduct its due diligence investigation of Holdings, the Acquired Companies, the Assets and the Business in a manner that does not unreasonably interfere with the normal business activities of Holdings or any Subsidiary. Notwithstanding anything to the contrary set forth herein, the Purchaser Entities shall not contact any third party vendors of Holdings or any Subsidiary, including any landlords or lenders thereof without the express consent of Holdings.

**6.9.** **Transfers.** From the date hereof until the Closing, neither Holdings nor any Seller shall transfer or encumber any Shares or Interests.

**6.10.** **Audit of the 2006 Financial Statements.** The Purchaser shall cause the 2006 Financial Statements to be audited by Deloitte & Touche, LLP, unless such independent accounting firm is unwilling to perform such audit or unwilling to perform such audit on reasonably acceptable engagement terms.

**6.11.** **Continuation of Certain Benefits.** During the period beginning on the Closing Date and ending on the thirty-six (36) month anniversary of the Closing Date, the Acquired Companies shall contribute to the premium cost of each of the Management Seller's participation in the group medical and dental plans of the Acquired Companies listed on Schedule 6.11 (as such plans may be amended, modified, supplemented, replaced or otherwise changed in the discretion of the Acquired Companies from time to time, the "Specified Plans") in the same relative proportions as are listed on Schedule 6.11. Notwithstanding the foregoing, (a) this Section 6.11 shall not be deemed to limit any other rights of any Management Seller to continue participation in the Specified Plans under applicable Law or applicable plan terms and (b) in the event the Acquired Companies discontinue the Specified Plans or the Management Sellers are deemed not eligible to participate in the Specified Plans, the Acquired Companies will pay to the

Management Sellers on a monthly basis the cost equivalent premium value as of the date of such occurrence.

**6.12.** **Name Change.** On the Closing Date, Holdings shall change its limited liability company name to a new name that does not include the word "Eateries".

**6.13.** **Share Transfer.** On December 26, 2006, Claudio Chiuchiarelli, Joanette Chiuchiarelli, Jacquiline Chiuchiarelli, who collectively own of record and beneficially 17 Shares, and Holdings entered into the Stock Purchase Agreement attached hereto as **Exhibit D** (together with the releases, consents and other documents to be executed and delivered in connection therewith, forms of which are included in **Exhibit D**, the "**Chiuchiarelli Share Transfer Agreement**") pursuant to which Claudio Chiuchiarelli, Joanette Chiuchiarelli, Jacquiline Chiuchiarelli will transfer, prior to the Eateries Merger Effective Time, such 17 Shares to Holdings on the terms and conditions set forth in the Share Transfer Agreement (the "**Chiuchiarelli Share Transfer**"). Holdings will not agree to any amendment, modification or waiver of, or grant and consent to any deviation from, any provision of the Chiuchiarelli Share Transfer Agreement without the prior written consent of the Purchaser.

**ARTICLE VII.**

**COVENANTS OF THE PARTIES**

The parties hereto covenant and agree with each other as follows:

**7.1.** **[Intentionally Omitted]**

**7.2.** **Publicity.** No publicity release or announcement concerning this Agreement or the transactions contemplated hereby shall be issued without advance written approval of the form and substance thereof by the Purchaser and the Sellers' Representatives; provided, however, that such restrictions shall not apply to any disclosure required by any Authority, applicable Law or the rules of any securities exchange which may be applicable.

**7.3.** **Access to Records.** Until December 31, 2013, the Purchaser agrees to cause the Acquired Companies to permit the Sellers' Representatives, their attorneys, accountants, agents and designees, such access to, and right to copy, such financial and accounting Books and Records of the Acquired Companies that relate to a period ending on or prior to the date of Closing as Sellers' Representatives may deem reasonably necessary in connection with the defense of any actual or threatened litigation, other than between or among the parties hereto, or the preparation of any Tax Returns of the Sellers (provided that nothing herein shall require the Purchaser or any Acquired Company to maintain or make available any portion of the Books and Records that are then more than six years old). Any such examination and copying shall be at the expense of the Sellers, shall be performed at the place where such financial and accounting Books and Records are regularly maintained by the Acquired Companies and shall not unreasonably interfere with the normal business activities of the Purchaser or any Acquired Company. The Purchaser shall notify the Sellers' Representatives if at any time prior to December 31, 2013 it or any Acquired Company intends to destroy any or all of the financial and accounting Books and Records of the Acquired Companies that relate to a period ending on or

prior to the Closing Date and that are then less than six years old, and the Sellers' Representatives shall have the right to review and remove such financial and accounting Books and Records at the Sellers' expense. All information obtained by the Sellers' Representatives pursuant to this Section 7.3 shall be subject to Section 7.4.

**7.4.    Confidentiality, Non-Competition and Non-Solicitation.**

(a)    The Sellers acknowledge and agree that the confidential information and business relationships of Holdings and each Subsidiary are necessary for the Acquired Companies to continue to operate the Business being transferred hereunder. Each Seller shall hold strictly confidential and shall not disclose any confidential or proprietary information concerning the Business and affairs of Holdings or any Subsidiary and immediately prior to the Closing shall deliver to the Purchaser any materials containing any such confidential or proprietary information in the possession of such Seller. The Sellers acknowledge and agree that such confidential or proprietary information (including without limitation all ideas, know-how, concepts, techniques and methodologies contained therein) belong exclusively to the Acquired Companies. The Sellers recognize and acknowledge the competitive value and confidential nature of such information and the damage that could result to the Acquired Companies if any of such information is disclosed to any third party or used for any purpose other than for the benefit of the Acquired Companies.

(b)    The Sellers further acknowledge and agree that each Acquired Company has a reasonable, necessary and legitimate business interest in protecting its goodwill, confidential information and business relationships and that the following covenants are reasonable and necessary to protect such business interests and are given as an inducement to the Purchaser Entities to consummate the Contemplated Transactions and for other good and valuable consideration hereunder, the sufficiency of which is expressly acknowledged.

(c)    During the Non-Compete Period (as defined below), the Management Sellers shall not, in the United States, directly or indirectly, alone or as a partner, joint venturer, officer, director, employee, consultant, agent, independent contractor or stockholder of any company or business:

(i)    (X) engage in any business activity constituting or relating to the operation of a full service Mexican restaurant or restaurants or any casual dining, full service restaurant or restaurants similar to Garfield's (other than as an owner of (a) not more than one percent of the shares of stock of any publicly traded company), (b) a sports theme or breakfast full service restaurant, including Coach's or IHOP, and (c) any quick service restaurant including Sonic), or (Y) engage in any mall-based restaurant business activity (other than any such business activity operated exclusively in a mall-based food court or occupying interior mall space equal to or less than 2,800 square feet),

(ii)    solicit, induce or attempt to solicit or induce any vendor, supplier or customer of Holdings or any Subsidiary to terminate or otherwise cease its relationship with any Acquired Company, or

(iii)  recruit, solicit, participate in hiring or hire any person who is an employee of any Acquired Company or was an employee of Holdings or any Subsidiary within six months of the Closing Date, unless such employee has been terminated by an Acquired Company subsequent to Closing.

(d)  For purposes of this Agreement, the "**Non-Compete Period**" shall begin on the Closing Date and continue with respect to a Management Seller until December 31, 2009.

(e)  Each Management Seller acknowledges and agrees that the portion of the Aggregate Purchase Price received directly and indirectly by such Management Seller or its Affiliates hereunder is adequate and sufficient consideration for the promises and covenants contained in this Section 7.4.

(f)  The parties hereto agree that the duration and geographic scope of the non-competition provision set forth in this Section 7.4 are reasonable. In the event that any court determines that the duration or geographic scope, or both, are unreasonable and that such provision is to that extent unenforceable, the parties hereto agree that the provision shall remain in full force and effect for the greatest time period and in the greatest area that would not render it unenforceable. The parties intend that this non-competition provision shall be deemed to be a series of separate covenants, one for each and every county of each and every state of the United States of America and each and every political subdivision of each. The Sellers also agree that damages are an inadequate remedy for any breach of this provision and that the Purchaser and any Acquired Company shall, whether or not it is pursuing any potential remedies at law, be entitled to equitable relief in the form of preliminary and permanent injunctions without bond or other security upon any actual or threatened breach of the foregoing non-competition provisions.

7.5.  **Certain Provisions Relating to the Seller Notes.**

(a)  All of the Fiesta Notes to be issued by the Fiesta Merger Surviving Company shall be issued a part of the same series of notes and shall be subject to amendment, modification or restatement to the extent such amendment, modification or restatement is approved by the Sellers' Representatives and the Fiesta Merger Surviving Company and notice thereof is provided to the holders thereof. Each such Seller Note shall be subject to (i) the terms and provisions of this Agreement, which shall be incorporated by reference therein, including the provisions of this Section 7.5 and Articles VIII and X hereof and (ii) the subordination provisions contained on Annex A to such Seller Note (as the same may be amended, modified or supplemented from time to time by written agreement of (A) the Note Issuer, (B) the Sellers' Representative and (C) the requisite holders of "Senior Debt" (as defined on Annex A thereto) or a duly authorized agent for such holders of "Senior Debt", in either case, as provided in such Annex A.

(b)  All of the Eateries Notes to be issued by the Final Eateries Surviving Corporation shall be issued a part of the same series of notes and shall be subject to amendment, modification or restatement to the extent such amendment, modification or restatement is approved by the Sellers' Representatives and the Final Eateries Surviving Corporation and notice thereof is provided to the holders thereof. Each such Seller Note shall be subject to (i) the terms and provisions of this Agreement, which shall be incorporated by reference therein, including the

provisions of this Section 7.5 and Articles VIII and X hereof and (ii) the subordination provisions contained on Annex A to such Seller Note (as the same may be amended, modified or supplemented from time to time by written agreement of (A) the Note Issuer, (B) the Sellers' Representative and (C) the requisite holders of "Senior Debt" (as defined on Annex A thereto) or a duly authorized agent for such holders of "Senior Debt", in either case, as provided in such Annex A.

    **7.6.**    **Certain Liquor Licenses.**   Prior to the Closing, the Liquor License held by Eateries, Inc. for the Eau Claire, Wisconsin Garfield's and the Liquor License held by Best Restaurants II, LLC for the Layton, Utah Garcia's will each be transferred to Holdings and, in each case, held by Holdings until all appropriate Pre-Closing Liquor License Actions and Post-Closing Liquor License Actions relating to such store have been completed. In connection therewith, Holdings shall enter into the management agreements and consulting agreements attached as Exhibit 7.6 hereto at the Closing.

**ARTICLE VIII.**

**TAX MATTERS**

    **8.1.**    **Tax Indemnity.**

    (a)    The Management Sellers, jointly and severally, and all of the other Sellers, severally but not jointly, shall indemnify and hold harmless each Purchaser Indemnitee against all Taxes and against and from any and all Losses imposed on the Purchaser or any Acquired Company, or their Affiliates arising out of, with respect to, in connection with, or as a result of: (i) Pre-Closing Taxes imposed on any Acquired Company, or any of their Affiliates for any Pre-Closing Tax Period; (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Acquired Company is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 or any analogous or similar state, local, or foreign Law, (iii) any and all Taxes of any Person imposed on any Acquired Company as a transferee or successor, by Contract, or otherwise (with respect to transactions, actions or events occurring, or Contracts entered into, on or before the Closing Date), (iv) the transfers and distributions contemplated by Section 7.6, and (v) any breach of warranty or misrepresentation under Section 4.10; provided, however, that the Sellers will be liable only to the extent that such Losses exceed the amount of Taxes taken into account in determining the Net Working Capital adjustment pursuant to Section 2.6 herein. For the avoidance of doubt, none of the restrictions on the indemnification obligations of the Sellers in Section 10.3 herein shall apply to the indemnification in this Section 8.1(a).

    (b)    The Purchaser, following the Closing, the Acquired Companies, shall indemnify and hold harmless the Sellers against any Post-Closing Taxes and from any and all Loss imposed on Holdings, each Subsidiary, or their Affiliates arising out of, with respect to, in connection with, or as a result of any breach of any of the Purchaser's covenants in this Article VIII.

8.2.   **Tax Returns and Pre-Closing Periods.**

(a)    The Sellers' Representatives shall prepare or cause to be prepared and file or cause to be filed, at the Acquired Companies' cost, all federal and state income Tax Returns of the Acquired Companies for all tax periods ending on or prior to the Closing Date that are due to be filed after the Closing Date.  At least twenty (20) days prior to the filing date of any such Tax Returns, the Sellers' Representatives shall provide copies of such Tax Returns to the Purchaser for the Purchaser's review and approval, which such approval shall not be unreasonably withheld.

(b)    The Purchaser shall prepare or cause to be prepared and file or cause to be filed all federal and state income Tax Returns of the Acquired Companies for all Straddle Periods.  At least twenty (20) days prior to the filing date of any such Tax Returns, the Purchaser shall provide copies of such Tax Returns to the Sellers' Representative for its review.  To the extent the Sellers' Representative objects to any items that relate to the Pre-Closing Tax Period on such Tax Returns, the Purchaser and the Sellers' Representative shall work to resolve mutually any such disagreement.

(c)    All such Tax Returns shall be prepared in accordance with past practices and customs of Holdings and its Subsidiaries except to the extent otherwise required by Law.

8.3.   **Refunds.**

(a)    Any Tax refund (including interest with respect thereto) relating to any Acquired Company for any Pre-Closing Tax Period (except for any refund included on the Financial Statements or taken into account in determining any Net Working Capital adjustment pursuant to Section 2.6 hereof, which shall be the property of the Purchaser, and if paid to any Seller, shall be paid over promptly to the Purchaser) shall be the property of the Sellers, and if received by the Purchaser or any Acquired Company shall be paid over to the Sellers' Representatives within five (5) Business Days of receipt of such refund, provided, however, that the Purchaser shall have the right to offset the amount of any Loss for which indemnification is due to the Purchaser under this Article VIII and the amount of all then pending claims made by the Purchaser under this Article VIII against any such Tax refund received by the Purchaser or any Acquired Company.  Notwithstanding the foregoing sentence, any Tax refund (or equivalent benefit to the Sellers through a reduction in Tax Liability) for a Pre-Closing Tax Period arising out of the carryback of a loss or credit incurred by any Acquired Company or any of their Affiliates in a Post-Closing Tax Period shall be the property of the Purchaser and, if received by any Seller, shall be paid over promptly to the Purchaser.

(b)    The Sellers' Representatives and the Purchaser shall not amend any Tax Return of Holdings or any Subsidiary for any Pre-Closing Tax Period without the prior written consent of the other, which consent shall not be unreasonably withheld or delayed.

8.4.   **Contests.**

(a)    After the Closing Date, the Purchaser shall promptly notify the Sellers' Representatives in writing of any written notice of a proposed assessment or claim with respect to any inquiry, assessment, contest, proceeding or litigation (a "**Contest**") that, if determined

adversely to any Acquired Company, or any of their respective Affiliates, would be grounds for indemnification by the Sellers under this Article VIII.

(b)    After the Closing Date, in the case of a Contest that relates to a Pre-Closing Tax Period, the Sellers through the Sellers' Representatives and the Purchaser shall jointly control such Contest.

(c)    Neither any Seller nor the Purchaser shall enter into any compromise or agree to settle any claim pursuant to any Contest referred to in Section 8.4(b) that would adversely affect the other party for such year or a subsequent year without the written consent of the other party, which consent shall not be unreasonably withheld or delayed. The Purchaser and the Sellers (through the Sellers' Representatives) agree to cooperate, and the Purchaser agrees to cause the Acquired Companies to cooperate, in the defense against or compromise of any claim in any Contest.

8.5.    **Time of Payment.**

(a)    Payment of any amounts due under this Article VIII in respect of Taxes shall be made (i) at least three (3) Business Days before the due date of the applicable estimated or final Tax Return required to be filed by Holdings, any Subsidiary or any of their respective Affiliates that shows Taxes due for which the Purchaser is or the Sellers are responsible under Section 8.1, and (ii) within three (3) Business Days following an agreement between the Sellers (through the Sellers' Representatives) and the Purchaser that an indemnity amount is payable, an assessment of a Tax by a Taxing Authority, or a "determination" having been made as such term is defined in Section 1313(a) of the Code.

(b)    If Liability under this Article VIII is in respect of reasonable costs or expenses other than Taxes, payment of any amounts due under this Article VIII shall be made within five (5) Business Days after the date when the relevant entity has been notified that such entity has a Liability for a determinable amount under this Article VIII and is provided with calculations or other materials that are sufficient to support such Liability.

8.6.    **Cooperation and Exchange of Information.**

(a)    The Sellers' Representatives and the Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a Liability for Taxes or a right to a refund of Taxes, or participating in or conducting any Contest in respect of Taxes. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by any Taxing Authority.

(b)    Any information obtained under this Section 8.6 shall be kept confidential in accordance with Section 7.4, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting a Contest.

8.7.    **Conveyance Taxes**.

(a)    Any real property transfer, gains, sales, use, transfer, value added, stock transfer, or stamp taxes, any transfer, recording, registration or other fees, and any similar Taxes that become payable in connection with the transactions contemplated by this Agreement ("**Conveyance Taxes**") shall be borne by the Sellers.

(b)    The parties shall file such applications and documents as shall permit any such Conveyance Tax to be assessed and paid on or prior to the Closing Date in accordance with any available pre-sale filing procedure.    The Purchaser, Holdings, and the Sellers' Representatives, as appropriate, shall execute and deliver all instruments and certificates necessary to comply with any filing requirements relating to any such Conveyance Taxes.

8.8.    **Miscellaneous**.

(a)    Notwithstanding any provision in this Agreement to the contrary, the obligations of Sellers to indemnify and hold harmless the Purchaser and each Acquired Company, or their Affiliates pursuant to this Article VIII shall survive until the expiration of the applicable statute of limitations with respect to the Tax Liabilities in question, after giving effect to any extensions or waivers, plus 60 days.

(b)    For purposes of this Article VIII, all Taxes of the Acquired Companies for all Pre-Closing Tax Periods shall be determined without regard to the carryback of any net operating loss, capital loss, general business credit or other tax attribute from a Post-Closing Tax Period.

(c)    Notwithstanding any provision in this Agreement to the contrary, the obligations of the Purchaser to indemnify and hold harmless the Sellers pursuant to this Article VIII shall survive until the expiration of the applicable statute of limitations with respect to the Tax Liabilities in question, after giving effect to any extensions or waivers plus 60 days.

8.9.    **Tax Dispute Resolution**.    Each of the parties hereto agrees that the total consideration, as determined for tax purposes, for the acquisition by the Purchaser of the assets of Eateries Holdings, LLC, will be allocated among the assets of Eateries Holdings, LLC in accordance with Section 1060 of the Code and the rules and regulations promulgated thereunder. The Purchaser will provide to the Sellers' Representative within 90 days after the Closing Date a schedule that sets forth the proposed allocations and calculations of such amounts for tax purposes (the "**Allocation Statement**") for the Sellers' Representative's review and comment. The Purchaser and the Sellers' Representative agree to cooperate reasonably and in good faith to promptly resolve any disagreement they may have regarding the Allocation Statement. Except as otherwise required by applicable Law, the parties hereto will file all Tax Returns and information reports in a manner consistent with the Allocation Statement. The parties hereto will promptly inform one another of any challenge by any Taxing Authority to any allocation or calculation made in accordance with the Allocation Statement, and the parties agree to consult and keep one another informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.