## ARTICLE IX.

## CONDITIONS TO CLOSING

**9.1.    Conditions to the Obligations of each Party**.    The obligations of the parties hereto to consummate the Fiesta Merger and the Eateries Mergers are subject to the satisfaction of the following conditions:

(a)    No provision of any Law and no Order shall prohibit the consummation of the Closing; and

(b)    Each other party to this Agreement shall have executed and delivered each of the ancillary agreements, documents and instruments required to be delivered by it at the Closing.

**9.2.    Conditions to the Obligations of the Purchaser Entities**.    The obligations of the Purchaser Entities to consummate the Fiesta Merger and the Eateries Mergers are subject to the satisfaction of the following further conditions:

(a)    Holdings, Eateries, Fiesta and the Sellers shall have performed in all material respects all of their obligations hereunder required to be performed by them on or prior to the Closing Date;

(b)    The representations and warranties of Holdings, Eateries, Fiesta and the Sellers contained in this Agreement shall be true and correct as of the date hereof and at and as of the Closing Date as though made at and as of the Closing Date (or to the extent expressly made as of an earlier date, as of such date).

(c)    On or before the Closing Date, the Acquired Companies shall have received all material Permits, Licenses, consents, authorizations or approvals from, and shall have filed all notices and materials with, any Authority that are necessary or appropriate in the good faith opinion of the Purchaser to consummate the Contemplated Transactions in accordance with applicable Law and no such Permit, License, consent, authorization or approval shall have been revoked or otherwise rejected.

(d)    [Intentionally Omitted]

(e)    On or before the Closing Date, the Acquired Companies shall have received a consent and estoppel (each to be in the form previously agreed to by the Purchaser with only such changes thereto as are specifically agreed to by the Purchaser in writing) ("**Landlord Consents**") with respect to at least 25 of the 27 Leases listed on Schedule 9.2(e) (the "**Minimum Consent Requirement**"), and such Landlord Consents shall be in full force and effect.

(f)    Since the date of this Agreement, there will have occurred no events nor will there exist circumstances that singly or in the aggregate have resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

(g)    No Action, investigation, inquiry or other proceeding by or before any Authority or any other Person or any other legal or administrative proceeding shall be pending or threatened which questions the validity or legality of Contemplated Transactions, or seeks to restrain any such transaction or to recover any damages in connection therewith.

(h)    All corporate, Board of Directors, stockholder, manager, member and other proceedings required to be taken to authorize the Sellers, Holdings and the Subsidiaries to carry out this Agreement and the Contemplated Transactions shall have been taken.

(i)    The Purchaser shall be satisfied, in its sole discretion that the appropriate Acquired Companies have all right, title and interest to the trademarks "Garfield's" and "Garcia's" and that such marks have been properly registered with the United States Patent and Trademark Office and in all other jurisdictions reasonably determined by the Purchaser to be material to the Business.

(j)    The Sellers shall have delivered to the Purchaser evidence, in form and substance reasonably satisfactory to the Purchaser, of the termination of all agreements among the Sellers and/or Holdings, on the one hand, and any Subsidiary, on the other hand, each of which is identified on Schedule 9.2(j).

(k)    The Purchaser shall be satisfied in its sole and absolute discretion with the results of its business, legal, tax and accounting due diligence review of Holdings and each Subsidiary, the Assets and the Business.

(l)    The Purchaser Entities shall have obtained, on terms and conditions satisfactory to them (in their sole and absolute discretion), debt and equity financing sufficient to consummate the Contemplated Transactions and pay all related fees and expenses payable by them in connection therewith.

(m)    No shareholder of Eateries shall have exercised its rights to seek appraisal under Section 1091 of the OGCA.

(n)    The Pre-Closing Reorganization Transactions shall have been completed in accordance with this Agreement to the satisfaction of the Purchaser and its counsel.

(o)    Holdings shall have delivered to the Purchaser evidence, in form and substance reasonably satisfactory to the Purchaser, of the termination of the Rewards Network Agreements on terms and conditions reasonably satisfactory to the Purchaser.

(p)    The Management Seller Termination Agreements and the Other Manager Amended and Restated Employment Agreements shall be in full force and effect and none shall have been amended or otherwise modified.

(q)    The Chiuchiarelli Share Transfer shall have been consummated in accordance with the terms and conditions set forth in the Chiuchiarelli Share Transfer Agreement.

**9.3.**   **Conditions to the Obligations of Holdings, Eateries, Fiesta and the Sellers.** The obligations of the Sellers, Holdings, Fiesta and Eateries to consummate the Fiesta Merger and the Eateries Mergers are subject to the satisfaction of the following further conditions:

(a)   Each of the Purchaser Entities shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date; and

(b)   The representations and warranties of the Purchaser Entities contained in this Agreement shall be true and correct as of the date hereof and at and as of the Closing Date as through made on and as of the Closing Date (or, to the extent expressly made as of an earlier date, as of such date).

(c)   The Minimum Consent Requirement shall have been satisfied.

## ARTICLE X.

## SURVIVAL; INDEMNIFICATION

**10.1.**   **Survival.**

(a)   Notwithstanding any right of the Purchaser Entities to investigate the affairs of Holdings, each Subsidiary and the Business, or any knowledge acquired (or capable of being acquired) by any Purchaser Entity in conducting such investigation, the Purchaser Entities have the right to rely upon the representations, warranties, covenants and agreements of Holdings, Eateries, Fiesta and the Sellers contained in this Agreement and the rights of the Purchaser Indemnitees hereunder shall not be affected by any such investigation or knowledge.

(b)   The representations and warranties of Holdings, Fiesta, Eateries and the Sellers set forth in Article III (Representations and Warranties of the Sellers Regarding the Shares and Interests of the Sellers), Section 4.1 (Organization; Authority; Due Authorization), Section 4.2 (Capitalization of Eateries), Section 4.3 (Capitalization of Holdings), Section 4.4 (Subsidiaries), Section 4.5(a) (No Violation – Organizational Documents), Section 4.7 (Sufficiency of and Title to Assets) and Section 4.25 (No Broker) shall survive indefinitely (the "**Core Representations**").

(c)   The representations and warranties set forth in Section 4.5(c) (No Violation – Governmental Approvals), Section 4.6 (Regulatory Approvals and Other Consents) and Section 4.10 (Tax Matters) shall survive until sixty (60) days following the expiration of all applicable statutes of limitations (including all periods of extension, whether automatic or permissive).

(d)   All other representations and warranties of the parties set forth in this Agreement shall terminate and expire 24 months after the Closing Date.

(e)   Notice with respect to any claim in respect of any inaccuracy in or breach of any representation or warranty shall be in writing and shall be given to the party against which such claim is asserted. Any representation or warranty shall survive the time it would otherwise

terminate pursuant to this Section 10.1 to the extent that the party claiming indemnification for such breach shall have delivered to the other party written notice setting forth with reasonable specificity the basis of such claim prior to the expiration of such time pursuant to this Section 10.1.

(f)    Notwithstanding anything to the contrary, all covenants of the parties set forth in this Agreement shall survive in accordance with their terms and the right of any Person to bring a claim with respect thereto based on a breach of such covenant shall survive (x) in the case of any covenant that by its terms is to be performed in whole prior to the Closing, for 24 months after the Closing and (y) in the case of any covenant that by its terms is to be performed in whole or in part after the Closing, for 24 months following the term in which such covenant was to be performed.

**10.2.    Obligation to Indemnify.**

(a)    **Indemnification by Holdings, Eateries, Fiesta and the Sellers.** Subject to the limitations set forth in Section 10.3, prior to the Closing, Holdings, Eateries and Fiesta, jointly and severally, and after the Closing, Holdings and the Management Sellers, jointly and severally, and the other Sellers, severally (based on each such other Seller's Proportional Percentage) and not jointly, will indemnify, reimburse, defend, and hold harmless the Purchaser, each Acquired Company and each of their successors and assigns in interest, and each of their respective officers, directors, partners, stockholders, members, managers, employees, agents, advisors, controlling persons, and Affiliates (collectively, the "**Purchaser Indemnitees**") from and against, and will pay to the Purchaser Indemnitees the amount of, any Losses, incurred by any of them based upon, arising out of or otherwise, directly or indirectly, relating to, resulting from or in respect of:

(i)    any inaccuracy in or breach of any representation or warranty of Holdings, Eateries, Fiesta or the Sellers contained in Article III or Article IV of this Agreement (other than Section 4.10, which is covered in Section 8.1), the Schedules hereto, or any representation or warranty of Holdings, Eateries, Fiesta or the Sellers contained in any Other Sellers Document, Other Holdings Document, or any certificate delivered by or on behalf of the Sellers or Holdings or any Subsidiary pursuant to this Agreement with respect to such representations or warranties, in each case as such representation or warranty would read if all qualifications as to materiality, including each reference to the defined term "Material Adverse Effect," were deleted therefrom;

(ii)    any fraud or intentional misrepresentation by Holdings, any Subsidiary or any Seller or any breach by Holdings, Eateries, Fiesta or any Seller of any covenant or obligation of Holdings, Eateries, Fiesta or any Seller contained in this Agreement or any Other Holdings Document or Other Seller Document;

(iii)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any Contract alleged to have been made by any such Person with Holdings, any Subsidiary or a Seller (or any Person acting on their behalf) in connection with any of the Contemplated Transactions;

(iv)    any claims made or Actions brought by or on behalf of any current or former holder of Equity Interests or other securities of Holdings (or any Subsidiary (or any Person who alleges to have been or to be a holder of any such Equity Interests or other securities) in connection with, arising out of or relating to the Contemplated Transactions (including any exercise of dissenter's appraisal rights or any claim or assertion by any Seller alleging that the indemnification provisions of Article VIII or this Article X or the set-off provisions of any Seller Note are not enforceable against such Person), any events or circumstances existing, occurring or arising prior to the Closing, any actual or alleged ownership interest of any such Person in Holdings or any Subsidiary or otherwise (other than claims rightfully brought by Sellers under Section 10.2(c) below);

(v)    any claims made or Actions brought by or on behalf of any current or former franchisee of a Garfield's, Garcia's or Pepperoni Grill restaurant to the extent arising out of or relating to or in connection with any events or circumstances existing, occurring or arising prior to the Closing;

(vi)    any claims or Actions related to or arising out of the sale by Holdings or any Subsidiary (or any franchisee thereof) of any food products prior to the Closing;

(vii)    any Retained Liabilities as of the Closing Date or arising out of or relating to or in connection with any events or circumstances existing, occurring or arising prior to the Closing;

(viii)    the failure to obtain prior to the Closing the Landlord Consents relating to (A) the leased real property used in the operation of the Garfield's restaurant located in Sioux City, Iowa or (B) the leased real property used in the operation of the Garfield's restaurant located in Fayetteville, Arkansas; provided that, solely for purposes of this clause (viii), Losses subject to indemnification shall not include (x) any damages based on lost profits, lost revenues or lost earnings, increases in operating costs or operating expenses or any diminution in value or (y) any attorneys' fees (other than those incurred in connection with the defense of any Action arising out of or relating to the failure to obtain such Landlord Consents); and

(ix)    any release of any rights or claims of any tenant or sub-tenant or any Liabilities or duties of any landlord or sublessor contained in any Landlord Consent.

(b)    After the Closing, no Acquired Company shall have any Liability to Holdings or any Seller (or the successors or assigns thereof) with respect to any Losses suffered by a Purchaser Indemnitee which may give rise to a claim for indemnification under this Section 10.2 and neither Holdings nor any Seller shall have any right to indemnification or contribution against any Acquired Company or assert a defense to such Seller's indemnification obligations under this Section 10.2 by virtue of the fact that any Acquired Company is a party to, and has made representations and warranties in, this Agreement or otherwise.

(c)    **Indemnification by Purchaser.**    Before the Closing, the Purchaser Entities, jointly and severally, and after the Closing, the Purchaser Entities and the Acquired Companies, jointly and severally, will indemnify, reimburse, defend and hold harmless the Sellers and each of their successors and assigns in interest, and each of their respective officers, directors, trustees, partners, stockholders, members, managers, employees, agents, advisors, controlling persons, and Affiliates (collectively, the "**Seller Indemnitees**") from and against and will pay to the Seller Indemnitees the amount of, any Losses, incurred by any of them based upon, arising out of or otherwise, directly or indirectly, relating to, resulting from or in respect of:

(i)    any inaccuracy in or breach of any representation or warranty made by any Purchaser Entity in this Agreement, any Other Purchaser Document or in any certificate delivered by any Purchaser Entity pursuant to this Agreement with respect to such representations and warranties;

(ii)    any breach by any Purchaser Entity of any covenant or obligation of any Purchaser Entity contained in this Agreement or any Other Purchaser Document; and

(iii)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with any Purchaser Entity (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

In addition, following the Closing the Acquired Companies, jointly and severally, shall indemnify the Management Sellers from any Losses incurred by such Management Sellers as a result of such Management Sellers remaining as signatories to any Liquor Licenses unless such Losses would otherwise be subject to indemnification under Section 10.2(a) above.   In addition, throughout the period during which the Management Sellers remain as signatories to any Liquor Licenses, the Acquired Companies shall use all commercially reasonable efforts to maintain their existing liquor license and general liability insurance coverage (or secure replacement policies providing the same or a higher level of coverage as compared to such current policies).

**10.3.    Limitations on Indemnification.**

(a)    Following the Closing, the Purchaser Indemnitees shall not be entitled to indemnification for Losses pursuant to (W) Section 10.2(a)(i), (X) Section 10.2(a)(v), (Y) 10.2(a)(vi) or (Z) 10.2(a)(vii) unless and until the total of all Losses incurred by Purchaser Indemnitees under such Sections exceeds an aggregate amount of $400,000 (the "**General Basket**"), in which event the Purchaser Indemnitees will be entitled to indemnification of all Losses in excess of the General Basket; provided, however, that the General Basket not shall apply to Losses based upon, arising out of, relating to, resulting from or in connection with any inaccuracy in or breach of any of the Core Representations, any inaccuracy in or breach of the representations and warranties set forth in Section 4.15(e) or any fraud or intentional misrepresentation on the part of Holdings, Eateries, Fiesta or any Seller; provided, further, that if any Loss is subject to indemnification pursuant to any of Section 10.2(a)(ii), Section 10.2(a)(iii), Section 10.2(a)(iv), Section 10.2(a)(viii) or Section 10.2(a)(ix) (which are not subject to the

General Basket) as well as any of Section 10.2(a)(i), Section 10.2(a)(v), Section 10.2(a)(vi) or Section 10.2(a)(vii) (which are subject to the General Basket), the General Basket shall not apply.

(b)    The maximum aggregate amount payable by Holdings, Fiesta and Eateries (prior to Closing) or Holdings and the Sellers (following the Closing) as indemnity pursuant to (i) Section 10.2(a)(i), (ii) Section 10.2(a)(v), (iii) 10.2(a)(vi), (iv) 10.2(a)(vii), (v) 10.2(a)(viii) and (vi) Section 10.2(a)(ix), and the maximum aggregate amount payable by the Purchaser pursuant to Section 10.2(c)(i), shall not (in either case) exceed the sum of $3,000,000 plus the EBITDA Amount, if any (in each case, a "Cap"), provided, however, that the cap for Losses based upon, arising out of, resulting from, relating to or in connection with any inaccuracy in or breach of any Core Representations shall be the Aggregate Purchase Price and no Cap shall apply to Losses based upon, arising out of, resulting from, relating to or in connection with any fraud or intentional misrepresentation on the part of Holdings, Eateries, Fiesta or any Seller.

(c)    Neither the General Basket nor any Cap shall apply to Losses (X) subject to indemnification under Section 10.2(a)(ii), Section 10.2(a)(iii), Section 10.2(a)(iv) or 10.2(c)(ii) through (iii), (Y) based upon fraud or intentional misrepresentation, or (Z) any non-fulfillment or non-performance on the part of any party hereto of any covenant or agreement contained in this Agreement.    The General Basket shall not apply to Losses subject to indemnification under Section 10.2(a)(viii) or Section 10.2(a)(ix).    Until such time as the outstanding indebtedness thereunder has been reduced to zero, payment of indemnified amounts to the Purchaser Indemnities for indemnification claims subject to the Cap shall be accomplished by set off against the Seller Notes as provided in Section 10.4.

(d)    In no event shall any Seller, other than a Management Seller (each of whom's indemnification obligations hereunder is joint and several) be liable hereunder in an aggregate amount in excess of its Proportional Percentage of the Aggregate Purchase Price nor shall any Seller, other than a Management Seller (each of whom's indemnification obligations hereunder is joint and several), be liable hereunder with respect to any particular Loss, in excess of such indemnifying Seller's Proportional Percentage of such Loss.

(e)    In no event shall any Purchaser Entity be liable hereunder to any Seller in an amount in excess of such Seller's Proportional Percentage of the Cap.

(f)    Except as otherwise provided in this Agreement (including in Articles II, VIII, XI and XIII) and in the Sellers Notes, the provisions of this Article X are the sole and exclusive remedy of the parties with respect to any breaches of the covenants contained in this Agreement or the representations and warranties contained in this Agreement or any Other Purchaser Document, Other Holdings Document, Other Seller Document or any certificate delivered by or on behalf of a party hereto with respect to such representations and warranties, other than with respect to claims based on conduct constituting fraud or intentional misrepresentation.    A party seeking indemnification hereunder shall use commercially reasonable efforts to mitigate any Losses incurred by such party after becoming aware of any event that could reasonably be expected to give rise to any such Losses.    Any amounts payable pursuant to this Article X shall be net of (X) any insurance proceeds actually recovered from third parties, (Y) any specific reserves actually included in the Estimated Closing Balance Sheet

and taken into account in the final determination of New Working Capital pursuant to Section 2.6 with respect to the indemnifiable Losses relating thereto and (Z) any Tax savings realized in the year in which such loss incurred by such indemnified party with respect thereto.

(g)    Notwithstanding anything to the contrary contained in Section 10.2(a)(i), in the event of any inaccuracy in or breach of the representations and warranties set forth in Section 4.15(e), the Purchaser Indemnities shall not be entitled to indemnification for any Losses arising out of or resulting from the termination, suspension or revocation of any Liquor License or the interruption of the ability of any Acquired Company to sell alcoholic beverages unless and until such Losses exceed $200,000. For the avoidance of doubt, Losses subject to the foregoing basket shall not be further subject to the General Basket.

(h)    If, in connection with any determination of the amount of any Losses subject to indemnification under Section 10.2, it becomes necessary to calculate the amount lost profits resulting from a suspension or termination of liquor sales at any restaurant, so long as such store was in existence on January 1, 2005, it shall be assumed that such sales would have been the same as the liquor sales for the same comparable period in the preceding fiscal year.

(i)    Notwithstanding anything to the contrary contained in Section 10.2(a)(viii)(B), the Purchaser Indemnities shall not be entitled to indemnification for any Losses arising out of or resulting from the termination of the Fayetteville, Arkansas Lease unless and until such Losses exceed $400,000. For the avoidance of doubt, Losses subject to the foregoing basket shall not be further subject to the General Basket. The parties agree that the Sellers' Representatives and the Purchaser shall cooperate with each other in good faith and jointly make all material decisions relating to the contemplated post-Closing discussions and negotiations with the landlord for the Fayetteville, Arkansas and Sioux City, Iowa restaurants (it being understood that Richard Cervera shall initially take the lead in such discussions).

10.4.    <u>Set-Off</u>. Subject to the limitations contained in Section 10.3, the Seller Note Issuers shall have the right to set-off against any outstanding indebtedness under the Seller Notes any amounts payable to any Purchaser Indemnitee under Section 8.1 and Section 10.2 (in which case the indebtedness under the applicable Seller Notes shall be reduced by the amount of such set-off).

10.5.    <u>Procedure for Indemnification - Third Party Claims</u>.

(a)    Promptly after receipt by an indemnified party under this Article X of notice of the assertion of a claim or commencement of any Action by any Person who is not a party to this Agreement (a "**Third Party Claim**") against such indemnified party, such indemnified party will, if a claim is to be made against an indemnifying party under this Article X, give notice to the indemnifying party of the commencement of such Third Party Claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any Liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such Action is actually and materially prejudiced by the indemnified party's failure to give such notice.

(b)    If a Third Party Claim is brought against an indemnified party and such indemnified party gives notice to the indemnifying party of the commencement of such Third Party Claim, the indemnifying party will be entitled to participate in the defense of such Third Party Claim, and to the extent that the indemnifying party wishes, assume the defense of such Third Party Claim with counsel satisfactory to the indemnified party (provided that the indemnifying party shall not be entitled to assume such defense if (i) the indemnifying party is also a party to such Third Party Claim and the indemnified party determines in good faith that joint representation would be inappropriate, (ii) indemnification is sought under Section 10.2(a) and the then remaining indebtedness under the Seller Notes is insufficient in the reasonable good faith judgment of the indemnified party to cover the potential Losses associated with such Third Party Claim, (iii) the Third Party Claim seeks, in whole or in part, an injunction or other equitable relief against the indemnified party or (iv) such Third Party Claim involves Taxes), and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Third Party Claim, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Article X for any fees or disbursements of other counsel with respect to the defense of such Third Party Claim, in each case subsequently incurred by the indemnified party in connection with the defense of such Third Party Claim.  If notice is given to an indemnifying party of the commencement of any Third Party Claim and the indemnifying party not entitled to assume the defense of such Action, no compromise or settlement of any such Third Party Claim may be effected by the indemnified party without the indemnifying party's consent (which may not be unreasonably withheld, conditioned or delayed).  If the indemnifying party assumes the defense of a Third Party Claim, (i) no compromise or settlement of any such Third Party Claim may be effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Law or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (ii) the indemnifying party will have no Liability with respect to any compromise or settlement of such Third Party Claim effected without its consent (which may not be unreasonably withheld, conditioned or delayed).  If notice is given to an indemnifying party of the commencement of any Third Party Claim and the indemnifying party does not, within ten (10) days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Third Party Claim, the indemnified party may defend, and may consent to the entry of a judgment, or enter into a compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the indemnified party need not consult with, or obtain any consent from, the indemnifying party in connection therewith), and the indemnifying party will be bound thereby.  If notice is given to an indemnifying party of the commencement of any Third Party Claim and the indemnifying party is not entitled to assume the defense of such Third Party Claim, the indemnified party may (i) defend and (ii) with the consent of the indemnifying party (such consent not to be unreasonably withheld, conditioned or delayed) consent to the entry of a judgment, or enter into a compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate.

(c)    Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Third Party Claim may adversely affect it or its Affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying

party, assume the exclusive right to defend, compromise, or settle such Third Party Claim, but the indemnifying party will not be bound by any determination of a Third Party Claim so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld, conditioned or delayed).

(d)     Notwithstanding the provisions of Sections 13.3 and 13.4, the Sellers hereby consent to the non-exclusive jurisdiction of any court in which a Third Party Claim is brought against any Purchaser Indemnitee for purposes of any claim that a Purchaser Indemnitee may have under this Agreement with respect to such Third Party Claim or the matters alleged therein, and agree that process may be served on the Sellers (by means of service of the Sellers' Representatives) with respect to such Third Party Claim anywhere in the world, and the provisions of Sections 13.3 and 13.4 are incorporated herein by reference (mutatis mutandis) for such purposes.

**10.6.    Procedure for Indemnification – Other Claims.**    Claims for indemnification pursuant to Section 10.2 that do not involve a third party shall be made by delivery of written notice, describing the Loss in reasonable detail, and indicating the amount (estimated, if necessary) of the Loss that has been or may be suffered by the claiming party.   Any such notice to be delivered to the Sellers shall be delivered to the Sellers' Representatives, and the Sellers' Representatives shall act on behalf of the Sellers.  The Sellers' Representatives shall be given 30 days to respond to such notice prior to the commencement of any proceeding under Section 13.3 by any party.

## ARTICLE XI.

## TERMINATION

**11.1.    Grounds for Termination.**    This Agreement may be terminated (and the Fiesta Merger and Eateries Mergers may be abandoned) at any time prior to the Closing:

(a)     by written agreement of Holdings, the Sellers' Representatives and the Purchaser;

(b)     by either the Sellers' Representatives or the Purchaser if the Closing shall not have been consummated on or before December 31, 2006 (the "**Cut-Off Date**"); provided, however, that such termination right shall not be available to the Purchaser if any Purchaser Entity's failure to fulfill or breach of its representations, warranties, covenants or other obligations under this Agreement has been the primary cause of the Closing not occurring on or before such date and shall not be available to the Sellers' Representatives if any Seller's, Eateries', Fiesta's or Holdings' failure to fulfill or breach of its representations, warranties, covenants or other obligations under this Agreement has been the primary cause of the Closing not occurring on or before such date;

(c)     by the Purchaser, if satisfaction of any of the conditions set forth in Sections 9.1 or 9.2 becomes impossible (other than through any Purchaser Entity's breach of or failure to comply with its representations, warranties, covenants or other obligations under this Agreement) and the Purchaser has not waived such condition on or prior to the Closing Date; or

(d)  by the Sellers' Representatives, if satisfaction of any of the conditions set forth in Sections 9.1 and 9.3 becomes impossible (other than through the failure of Holdings, Fiesta, Eateries or any Seller to comply with its obligations under this Agreement) and the Sellers' Representatives have not waived such condition on or prior to the Closing Date.

The party desiring to terminate this Agreement pursuant to any of the foregoing paragraphs shall give notice of such termination to the other parties.

**11.2.  Effect of Termination.**  Each party's right of termination under Section 11.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies.  If this Agreement is terminated pursuant to Section 11.1, all further obligations of the parties under this Agreement will terminate, except that the rights and obligations in Section 7.2, ARTICLE X, ARTICLE XII and ARTICLE XIII (other than Section 13.13) will survive; provided, however, that if this Agreement is terminated by a party because of the material breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply in any material respect with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE XII.

### SELLERS' REPRESENTATIVES

**12.1.  Appointment of the Sellers' Representatives.**

(a)  Each Seller hereby irrevocably constitutes and appoints James M. Burke and Bradley L. Grow (the "**Sellers' Representatives**"), as such Seller's attorneys-in-fact and agents in connection with the transactions contemplated by this Agreement.  This power is irrevocable and coupled with an interest, and shall not be affected by the death, incapacity, illness or other inability to act of any Seller.

(b)  Each Seller hereby irrevocably authorizes Sellers' Representatives, each with full power and authority on behalf of such Seller:

(i)  to execute and deliver, and to accept delivery of, such documents as may be deemed by either of the Sellers' Representatives, in its sole discretion, to be appropriate to consummate the Contemplated Transactions;

(ii)  to certify as to the accuracy of the representations and warranties of Holdings, Eateries, Fiesta and of such Seller under, or pursuant to the terms of, this Agreement and to deliver such documents, instruments, certificates or agreements contemplated by this Agreement on behalf of such Seller;

(iii)  to (1) dispute or refrain from disputing any claim made by the Purchaser or any other Purchaser Indemnitee under this Agreement or any other Contract entered into in connection with the Contemplated Transactions; (2) negotiate and compromise any dispute that may arise under, and to exercise or refrain from exercising

any remedies available under, this Agreement or any other Contract entered into in connection with the Contemplated Transactions and (3) execute any settlement agreement, release or other document with respect to such dispute or remedy;

(iv)    to waive any closing condition contained in Article IX of this Agreement and to give or agree to any and all consents, waiver, amendments or modifications deemed by either Sellers' Representative, in its sole discretion, to be necessary or appropriate under this Agreement, and, in each case, to execute and deliver any documents that may be necessary or appropriate in connection therewith;

(v)    to enforce any claim against any Purchaser Entity arising under this Agreement;

(vi)    to engage attorneys, accountants and agents at the expense of the Sellers;

(vii)    to exercise all rights of, and take all actions that may be taken by, the Sellers or any of them under this Agreement or any other Contract entered into in connection with the Contemplated Transactions; and

(viii)    to give such instructions and to take such action or refrain from taking such action as either of the Sellers' Representatives deems, in its sole discretion, necessary or appropriate to carry out the provisions of, and to consummate the Contemplated Transactions.

(c)    Each Seller hereby agrees and acknowledges that:

(i)    the parties to this Agreement shall be entitled to rely on any and all actions taken by either of the Sellers' Representatives under this Agreement notwithstanding any dispute or disagreement among the Sellers without any Liability to, or obligation to inquire of, any Seller, notwithstanding any actual or constructive knowledge on the part of any party hereto of any such dispute or disagreement;

(ii)    notice to the Sellers' Representatives, delivered in the manner provided herein, shall be deemed to be notice to each Seller for the purposes of this Agreement;

(iii)    the authority of the Sellers' Representatives, as described in this Agreement, shall be effective until the rights and obligations of the Sellers' Representatives under this Agreement shall terminate by virtue of the termination of any and all rights and obligations of such Seller to the Purchaser under this Agreement;

(iv)    if both of the Sellers' Representatives resign or otherwise cease to function in their capacity as such for any reason whatsoever, and no successor acceptable to the Purchaser is appointed by a majority-in-interest of the Sellers within thirty 30 days, then the Purchaser shall have the right to appoint a replacement Sellers' Representative to serve as described in this Agreement (who shall be a Seller) and, under such

circumstances, the Purchaser and Holdings shall be entitled to rely on and all actions taken by such replacement Sellers' Representative; and

(v)     the Sellers' Representatives shall not be liable to any Seller for Losses with respect to any action taken or any omission by the Sellers' Representatives pursuant to this Article XII, except to the extent such Losses are caused by the Sellers' Representatives' gross negligence or willful misconduct.

(d)     Each Seller agrees that, notwithstanding the foregoing, at the request of the Purchaser, such Seller shall take all actions necessary or appropriate to consummate the Contemplated Transactions.

12.2.   <u>Limitation on Actions</u>.  Any claim, Action, suit or other proceeding, whether at law or in equity, to enforce any right, benefit or remedy granted to the Sellers under this Agreement shall be asserted, brought, prosecuted, or maintained only by the Sellers' Representatives on behalf of the Sellers.  Any claim, Action, suit or other proceedings, either at law or in equity, to enforce any right, benefit or remedy granted to the Purchaser or any Purchaser Indemnitee under this Agreement, including, without limitation, any right of indemnification provided in this Agreement, may be asserted, brought, prosecuted or maintained by the Purchaser or such Purchaser Indemnitee against any Seller by service of process on the Sellers' Representatives and without the necessity of serving process on, or otherwise joining or naming any other Seller as a defendant in such claim, Action, suit or other proceeding.  With respect to any matter contemplated by this Section, a Seller shall be bound by any determination in favor of or against the Sellers' Representatives or the terms of any settlement or release to which the Sellers' Representatives shall become a party.

12.3.   <u>Indemnification</u>.  Each Seller shall indemnify Sellers' Representatives against any Losses that Sellers' Representatives may suffer or incur in connection with any action taken or any omission by Sellers' Representatives (in his capacity as such) except to the extent such Losses were caused by Sellers' Representatives' gross negligence or willful misconduct.

**ARTICLE XIII.**

**MISCELLANEOUS**

13.1.   <u>Notices</u>.  All notices, consents, waivers, requests and other communications hereunder shall be in writing and shall be delivered by courier or other means of personal service (including by means of a nationally recognized courier service or a professional messenger service), or sent by facsimile or mailed by registered or certified mail, postage prepaid, return receipt requested, in all cases, addressed as follows:

if to the Purchaser:     Hestia Holdings, LLC
                         c/o Halpern Denny & Company
                         500 Boylston Street
                         Boston, MA 01880
                         Attention: David P. Malm and William Nimmo
                         Fax: (617) 536-8535

with copies
to each of:                 Cordova, Smart & Williams, LLC
                            845 Third Avenue, 21st Floor
                            New York, NY 10022
                            Attention: Carl Cordova
                            Fax: (212) 920-3710

                            and

                            Christopher Rile, Esquire
                            Ropes & Gray LLP
                            45 Rockefeller Plaza
                            New York, NY 10111
                            Fax: (212) 841-5725

if to any Seller,
to it c/o the Sellers'
Representatives, and
if to the Sellers'
Representatives to:         Bradley L. Grow
                            2020 Mistletoe Lane
                            Edmond, OK 73034

                            and

                            James M. Burke
                            408 Country Club Terrace
                            Edmond, OK 73003

with a copy to:             D. Keith McFall, Esquire
                            Phillips McFall McCaffrey McVay & Murrah, P.C.
                            One Leadership Square, 12th Floor
                            211 North Robinson
                            Oklahoma City, Oklahoma  73102
                            Fax: (405) 235-4133

All notices, consents, waivers, requests and other communications shall be deemed given on the
date of actual receipt or delivery as evidenced by written receipt, acknowledgment, confirmation
of transmission or other evidence of actual receipt or delivery to the address or transmission to
the facsimile number, as applicable.  In case of service by facsimile, a copy of such notice shall
be personally delivered or sent by nationally recognized courier service or registered or certified
mail, in the manner set forth above, within three (3) Business days thereafter.  Either party hereto
may from time to time by notice in writing served as set forth above designate a different address
or a different or additional Person or Persons to which all such notices or communications
thereafter are to be given.

**13.2.    Entire Agreement.** This Agreement (including without limitation the schedules and exhibits hereto) and the agreements, documents and instruments to be executed and delivered pursuant hereto or thereto are intended to embody the final, complete and exclusive agreement among the parties with respect to the subject matter hereof and thereof; are intended to supersede all prior letters of intent, agreements, understandings and representations (whether written or oral) with respect thereto; and may not be contradicted by evidence of any such prior agreement, understanding or representation, whether written or oral.

**13.3.    Governing Law and Venue.** This Agreement and all matters arising out of or relating hereto, including but not limited to its validity, construction, enforcement and interpretation, shall be governed by the laws of the State of Delaware, without regard to the laws as to choice or conflict of laws; provided, that any matters relating to the internal affairs of a corporation or limited liability company organized under the laws of a jurisdiction other than Delaware shall be governed by the laws of such other jurisdiction. Each party to this Agreement, by its execution hereof, (i) hereby irrevocably submits to the exclusive jurisdiction and venue of the state and federal courts located in the Borough of Manhattan for the purpose of any Action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or related to this Agreement, or the breach, termination or validity of this Agreement, or the Contemplated Transactions, (ii) to the extent not prohibited by applicable Law, hereby waives and agrees not to assert by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject to the personal jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution by reason of a lack of personal jurisdiction, that any such Action brought in one of the above-named courts is improper by reason of a lack of personal jurisdiction or venue, or that this Agreement or the subject matter hereof may not be enforced in or by such court by reason of a lack of personal jurisdiction or improper venue, and (iii) hereby agrees not to commence any Action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or related to this Agreement, or the breach, termination or validity of this Agreement, or the Contemplated Transactions other than before one of the above-named courts, nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such Action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than one of the above-named courts. Notwithstanding the previous sentence, a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts. Each party hereby consents to and accepts service of process in any such proceeding in any manner permitted by New York law or if served pursuant to Section 13.1 hereof.

**13.4.    Waiver of Jury Trial.** Each party acknowledges and agrees that any controversy which may arise under this Agreement or in connection with the Contemplated Transactions is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any Action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation directly or indirectly arising out of or relating to this Agreement, or the breach, termination or validity of this Agreement, or the Contemplated Transactions.    Each party certifies and acknowledges that (a) no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of any such Action, seek to enforce the foregoing waiver, (b) each such party understands and has considered

the implications of this waiver, (c) each such party makes this waiver voluntarily, and (d) each such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 13.4.

13.5.   **Binding Effect.**   This Agreement and the rights, covenants, conditions and obligations of the respective parties hereto shall be binding upon the parties hereto and their respective successors and permitted assigns.   Neither this Agreement, nor any rights or obligations of any party hereunder, may be assigned by a party without the prior written consent of (a) the Sellers' Representatives, in the case of any assignment by any Purchaser Entity or (b) the Purchaser, in the case of any assignment by any Seller, Fiesta, Eateries or Holdings, provided, however, that the Purchaser Entities shall have the right to assign their respective rights and obligations under this Agreement, in whole or in part, to any Affiliate of the Purchaser or to any provider of financing to the Purchaser or its Affiliates or to exercise any of the rights of any Purchaser Entity, or to perform any of the obligations thereof, provided that each Purchaser Entity shall remain obligated to cause such assignee to properly perform hereunder or to itself perform all of the obligations of such assignee hereunder.

13.6.   **Counterparts.**   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

13.7.   **Section Headings.**   The section headings of this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.

13.8.   **Interpretation.**

(a)   When reference is made in this Agreement to any Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.   The table of contents contained in this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.   Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed (unless actually followed by such words) to be followed by the words "without limitation."   The phrases "the date of this Agreement," "the date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the first paragraph of this Agreement.   The words "hereof", "herein", "hereby" and other words of similar import refer to this Agreement as a whole unless otherwise indicated. Whenever the singular is used herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate.

(b)   Neither the listing nor description of any item, matter or document in any schedule hereto nor the furnishing or availability for review of any document will be construed to modify, qualify or disclose an exception to any representation or warranty of any party made herein or in connection herewith, except to the extent that such representation or warranty specifically refers to such schedule and such modification, qualification or exception is clearly described in such schedule.

(c)    The parties intend that each representation, warranty, covenant and indemnity contained herein will have independent significance. If any party has breached or violated, or if there is an inaccuracy in, any representation, warranty or covenant contained herein in any respect, or any such indemnity is applicable, the fact that there exists another representation, warranty, covenant or indemnity relating to the same or similar subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, in respect of which there is not an inaccuracy, or which is not applicable will not detract from or mitigate the fact that the party has breached or violated, or there is an inaccuracy in, the first representation, warranty or covenant or that the first indemnity is applicable.

13.9.    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

13.10.    No Third Party Rights.

(a)    Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than the parties to it and any Purchaser Indemnitees not party hereto and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the Liability of any third Persons to any party to this Agreement, nor shall any provision give any such third Persons any right of subrogation or action over against any party to this Agreement.

(b)    No provision in this Agreement shall create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of Holdings or any Subsidiary in respect of continued employment (or resumed employment) with Holdings or any Subsidiary and no provision shall create any such rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or Benefit Arrangement or any plan or arrangement that may be established by Purchaser or any of its Affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any Employee Plan or Benefit Arrangement.

13.11.    Expenses. Except as otherwise relates to the treatment of Holdings' Expenses, or as otherwise provided in Article XII, each of the parties hereto shall bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this Agreement and the consummation and performance of the Contemplated Transactions.

13.12.    Amendments; No Waivers.

(a)    Subject to applicable Law, any provision of this Agreement (including the schedules hereto) may be amended if, and only if, such amendment is in writing and signed by the Purchaser, Holdings and the Sellers' Representatives (on behalf of all the Sellers). Any provision of this Agreement may be waived if the waiver is in writing and signed by the party to be bound, which in the case of Sellers may be taken by Sellers' Representatives.

(b)      No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other of further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

**13.13.**  <u>Further Assurances</u>.  From time to time after the Closing, at the request of the Purchaser and without further consideration, the Sellers and Holdings will execute and deliver such other documents, and take such other action, as the Purchaser may reasonably request in order to consummate more effectively the transactions contemplated hereby and to vest in the Purchaser and its applicable subsidiaries, successors and assignees good, valid and marketable title to the Equity Interests of the Acquired Companies and, in the Acquired Companies, good and valid title to the Assets, and to otherwise give effect to the Contemplated Transactions.

**13.14.**  <u>No Prejudice</u>.  This Agreement has been jointly prepared by the parties hereto and the terms hereof shall not be construed in favor of or against any party on account of its participation in such preparation.

**13.15.**  <u>Specific Performance</u>.  The Purchaser, Holdings, Eateries, Fiesta and each of the Sellers acknowledge that the other or others would be irreparably harmed if any of the provisions of this Agreement were not performed by such Person in accordance with their specific terms or were otherwise breached.  Accordingly, each of the parties hereto agrees that the other parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement by the other party or parties and to enforce specifically this Agreement and the terms and provisions hereof, in addition to any other remedy to which any such party may be entitled, at law or in equity.

**13.16.**  <u>Non-Management Sellers</u>.  Notwithstanding anything to the contrary contained in this Agreement, (a) each of the Sellers (other than Holdings and the Management Sellers) is executing this Agreement solely for the purposes set forth in Article II, Article III, Article VI, Article VII, Article VIII, Article X, Article XII and Article XIII (and the related definitions set forth in Article I) and (b) except for fraud and except with respect to breaches of the Article III representations and warranties of such Seller and breaches of the covenants of such Seller hereunder, the aggregate liability of each such Seller (other than Holdings and the Management Sellers, whose liability hereunder is joint and several) is limited to the amount of outstanding indebtedness under such Seller's Seller Notes.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –<br>SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have duly executed this Agreement and Plan of Reorganization and Merger as of the date first above written.

**PURCHASER:**

**HESTIA HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
Name: RICHARD CERVERA
Title: PRESIDENT


**EATERIES MERGER SUB:**

**EATERIES MERGER SUB, INC.,**
an Oklahoma corporation

By: _____
Name: RICHARD CERVERA
Title: PRESIDENT


**FIESTA MERGER SUB:**

**FIESTA MERGER SUB, LLC,**
a Delaware limited liability company

By: _____
Name: RICHARD CERVERA
Title: PRESIDENT

**HOLDINGS:**

**EATERIES HOLDINGS, LLC,**
an Oklahoma limited liability company

By: _____
   Name:  James M. Burke
   Title: Manager

By: _____
   Name:  Bradley L. Grow
   Title: Manager

**EATERIES:**

**EATERIES, INC.,**
an Oklahoma limited liability company

By: _____
   Name:
   Title:

**FIESTA:**

**FIESTA, LLC,**
an Oklahoma limited liability company

By: _____
   Name:
   Title:

*-SIGNATURE PAGE TO AGREEMENT AND PLAN OF REORGANIZATION AND MERGER-*

**MANAGEMENT SELLERS:**

_____
Bradley L. Grow


**THE GROW FAMILY, LLC**

By: _____
Name: _Bradley L. Grow_____
Title: _Manager_____

**THE BRADLEY L. GROW REVOCABLE TRUST**

By: _____
Name: _Bradley L. Grow_____
Title: _Trustee_____

**MANAGEMENT SELLERS (Con't):**

_____
Vincent F. Orza

**VINCENT F. ORZA & PATRICIA L. ORZA**

By: _____
Vincent F. Orza

By: _____
Patricia L. Orza

**PATRICA LANDI ORZA TRUST**

By: _____
Name: _____
Title: _____

**ALEXANDRA MARIE ORZA TRUST**

By: _____
Name: _____
Title: _____

**PATRICA L. ORZA TRUST**

By: _____
Name: _____
Title: _____

**VINCENT F. ORZA, JR. TRUST**

By: _____
Name: _____
Title: _____

**MANAGEMENT SELLERS (Con't):**

_____
James M. Burke


**THE BURKE FAMILY, LLC**

By _____
Name: _____
Title: _____

**OTHER SELLERS:**

_____
Preston Stockton

_____
J.B. Edwards

_____
Doug Davis

_____
D. Keith McFall

Phillips, McFall, McCaffrey, McVay &
Murrah, P.C. 401(k) Profit Sharing Plan

By: _____
J. Mark Lovelace, Trustee

_____
William Totty

*-SIGNATURE PAGE TO AGREEMENT AND PLAN OF REORGANIZATION AND MERGER-*

**SELLERS' REPRESENTATIVES**

_____
James M. Rorke

_____
Bradley L. Grow